# FREEDOM COURT REPORTING

Page 37

1  before like we're doing today?
2     A.  Yes.
3     Q.  For what reasons?
4     A.  For that -- for that
5  lawsuit.
6     Q.  What organizations do you
7  belong to?
8     A.  None.
9     Q.  Any church that you attend
10 on a regular basis?
11    A.  No.
12    Q.  Do you hold a nurse's
13 license?
14    A.  Yes.
15    Q.  How long have you held your
16 nurse's license?
17    A.  Since 2000.
18    Q.  Let me show you what we'll
19 mark as Defendant's Exhibit 1.  Is
20 this you in this picture that says
21 Nina?
22       (Whereupon, Defendant's
23       Exhibit Number 1 was

Page 38

1        Marked for identification.)
2        (Handing document to
3        Witness.)
4     A.  Yes.
5     Q.  You have a profile on
6  MySpace?
7     A.  Yes.
8     Q.  It says the profile is set
9  to private; why is that?
10    A.  Because I don't want to
11 hear from anybody I don't know.  The
12 whole reason I set up the MySpace
13 account was to view what my children
14 were doing and who they were talking
15 to.
16    Q.  Tell me how that works.
17    A.  If somebody is -- for you
18 to be able to view my MySpace, I
19 would have to accept you as a friend.
20 You would have to send a friend
21 request, and I would have to accept
22 it.
23    Q.  So, if your children were

Page 39

1  to put you on their list, and you
2  could see everybody they're talking
3  to --
4     A.  Uh-huh.
5     Q.  -- in MySpace; is that
6  correct?
7     A.  Yes.  And you can see all
8  their blogs and all the comments.
9     Q.  Do you ever engage in any
10 chat room activity?
11    A.  Chat room, no.
12    Q.  Do you ever engage in any
13 blogging?
14    A.  Yes.
15    Q.  What type?
16    A.  I blogged about my
17 husband's illness.  We went through a
18 thing with his cardiac, my family
19 being supportive about me going back
20 to school.
21    Q.  How long have you had the
22 MySpace account?
23    A.  Approximately about a year.

Page 40

1     Q.  Has Dr. Gaillard ever
2  been --
3     A.  No.
4     Q.  -- listed as a friend?
5     A.  No.
6     Q.  Who do you have listed on
7  your friends' list?
8     A.  My children, some people I
9  work with.  They're all people that I
10 know.  There's nobody.
11    Q.  Is there anyone on your
12 friends' list who now, or has ever
13 worked on the premises of Decatur
14 General Hospital?
15    A.  Yes.
16    Q.  Who would that be?
17    A.  Tracy Garner, Mela -- I
18 think her last name now is Hartwig,
19 Shovana Rohan, Stacey Herren, Debra
20 Phillips.  I think that's it.
21    Q.  Have you ever discussed
22 anything about your employment at
23 Decatur General Hospital on this

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 41

1  MySpace technology?
2      A.  No, I don't -- I don't
3  think so, no.  I don't understand
4  what you're saying, but I don't see
5  why I would.
6      Q.  I'm not saying you did or
7  didn't.  I'm just asking, for
8  example, you and Ms. Rohan, did you
9  ever talk about the job?
10     A.  Like see you Friday or
11 something like that.
12     Q.  Or my boss is a so and so?
13     A.  No.
14     Q.  Or I don't like working
15 here, or I love working here?
16     A.  No.
17     Q.  Debra Phillips is a charge
18 nurse?
19     A.  Yes.
20     Q.  Which means she has some
21 supervisory authority above you?
22     A.  Yes.
23     Q.  Or at least above some?

Page 42

1      A.  I just thought of two more
2  people that we need to add to that
3  list.
4      Q.  Who is that?
5      A.  Cindy Bice -- actually,
6  three more.  Cathy Beck and Jennifer
7  Durham.
8      Q.  These folks who are
9  associated with Decatur General, why
10 do you have this MySpace connection
11 to them?
12     A.  We're just friends, and
13 they sent a MySpace request.
14     Q.  And they all have MySpace
15 accounts?
16     A.  Yes.
17     Q.  You've never discussed any
18 claims against Decatur General,
19 Apollo, or Dr. Gaillard, on this
20 space?
21     A.  No.
22     Q.  What's that in the
23 background of this photograph?

Page 43

1      A.  That is actually where I
2  was at a doctor's office with my
3  daughter, because she had to have a
4  breast biopsy done, and she had a
5  little paper gown on, and we had took
6  a bunch of pictures of her sitting
7  there, 'cause she hated it.  And she
8  said, "Why don't you take some
9  pictures of you, mom?  And I said,
10 "Well, go ahead then."
11     Q.  I'm going to mark as
12 exhibit some responses to our
13 interrogatories, and we'll refer to
14 these from time to time in the course
15 of the deposition.  And certainly I
16 want you to feel free to refer to
17 them, because in some instances
18 you've described some of the conduct
19 that you attribute to Dr. Gaillard.
20 I'm going to drive you crazy
21 mispronouncing it.
22         MR. BROWN:  Why don't you
23 just call him the Doctor?

Page 44

1          MR. MIDDLEBROOKS:  Well, we
2  might mention some other doctor, so I
3  want to be careful about that.
4      Q.  (BY MR. MIDDLEBROOKS:)  And
5  I want you to have the benefit of
6  those so we can get your full
7  testimony about the conduct in this
8  complaint.  So we'll go ahead and get
9  these marked.  Then I'll call them
10 off for the record.
11         (Whereupon, Defendant's
12         Exhibit Numbers 2 through 6
13         Were marked for
14         Identification.)
15         MR. MIDDLEBROOKS:  Buzz,
16 I've got a copy of all this for you,
17 if you're interested in looking at
18 them as we go.
19         MR. BROWN:  Yeah.  I
20 mistakenly gave you the MySpace copy.
21 It was a copy and not the original.
22         MR. MIDDLEBROOKS:  Yeah, do
23 you want that back?

FREEDOM COURT REPORTING

Page 45

1  MR. BROWN: Sure. May as
2  well. Yeah, thank you.
3      MR. MIDDLEBROOKS: For the
4  record, I've marked Exhibits 2
5  through 6. Two, which shows our
6  actual defendant Decatur General's
7  interrogatories to the plaintiff, and
8  attached to it are certain portions
9  of responses that are unsigned by the
10 plaintiff. But then we go to
11 Defendant's Exhibit Number 3, and
12 it's entitled Answers to Decatur
13 General Hospital's Interrogatories to
14 Plaintiff. It doesn't restate the
15 interrogatories, but it provides
16 answers.
17     Q. (BY MR. MIDDLEBROOKS:) And
18 Mrs. Bennett, would you confirm for
19 me on the last page of Exhibit 3
20 that's your signature, and that
21 you're certifying them as being true
22 and correct?
23     A. Yes.

Page 46

1      Q. And then we go to
2  Defendant's Number 4. It's entitled
3  Supplemental Answers to Discovery,
4  and it's got references to
5  interrogatories 1 through 23,
6  although it skips over a few numbers
7  in sequence, in request for
8  production 1 through 22, again
9  skipping over certain numbers in this
10 sequence, but is that your signature
11 on what would be the third page in
12 which you represent that these are
13 truthful answers?
14     A. Yes.
15     Q. And then Defendant's
16 Exhibit 5, Supplemental Answer to
17 Discovery Number 10, is that your
18 signature on which you again are
19 testifying that's the truthful
20 response in this supplemental answer?
21     A. Yes.
22     Q. And, then, we come to
23 answers for defendant Henry

Page 47

1  Gaillard's first set of
2  interrogatories to plaintiff, and if
3  you go to page 6, is that your
4  signature that you certify that these
5  are true and correct answers?
6      A. Yes.
7      Q. Before signing off on these
8  answers, did you read through the
9  answers?
10     A. I actually typed these
11 answers.
12     Q. All right. So, you read
13 through the answers because you typed
14 the answers as well; is that correct?
15     A. Yes.
16     Q. And before you signed off
17 on the answers, you were comfortable
18 that they were truthful and accurate?
19     A. Yes.
20     Q. And complete to the best of
21 your knowledge?
22     A. Yes.
23     Q. Sitting here today, is

Page 48

1  there any reason to think that any of
2  those answers are in error?
3      A. No.
4      Q. Sitting here today, are
5  there any of those answers that you
6  would like to supplement in any way?
7      A. Not at this moment, no.
8      MR. BROWN: I'm actually
9  going to supplement one of them.
10 There's a possible witness from
11 Crestwood, but as now I do not have
12 the name of the person.
13     MR. MIDDLEBROOKS: So, you
14 may supplement the answer to those
15 who have knowledge?
16     MR. BROWN: Yes. As a
17 witness, yes. Yes, exactly, as those
18 with knowledge.
19     MR. MIDDLEBROOKS: But
20 names unknown right now?
21     MR. BROWN: That's correct.
22     Q. (BY MR. MIDDLEBROOKS:) Do
23 you know who he's talking about?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1   A. I don't know the name.
2   Q. Let me show you what's
3   marked as Defendant's Exhibit 7,
4   which is an application for
5   employment for Decatur General. Do
6   you recognize that as your
7   application for employment with
8   Decatur General?
9       (Whereupon, Defendant's
10      Exhibit Number 7 was
11      Marked for identification.)
12      (Handing document to
13      Witness.)
14  A. Yes.
15  Q. Is this the first time
16  you've ever applied for employment
17  with Decatur General?
18  A. Yes.
19  Q. And I note there you were
20  seeking to work as a registered nurse
21  in emergency room from 7:00 p.m. to
22  7:00 a.m.?
23  A. Yes.

Page 50

1   Q. Why is it you desired those
2   types of hours?
3   A. Actually, I think at that
4   time that was the opening that they
5   had.
6   Q. When did you actually begin
7   work at Decatur General's Hospital?
8   A. It was in August. It -- I
9   don't remember if it was 2003 or
10  2004.
11  Q. Well, this application --
12  A. I'm going to assume 2003.
13  Q. Well, we wouldn't want you
14  to assume, but that's your best
15  estimate?
16  A. Yes.
17  Q. Well, this will probably
18  answer the question, actually.
19      (Whereupon, Defendant's
20      Exhibit Number 8 was
21      Marked for identification.)
22      (Handing document to
23      Witness.)

Page 51

1   Q. I'll show you what's marked
2   as Defendant's Exhibit Number 8,
3   entitled Decatur General New Employee
4   Orientation. And it's dated August
5   25, 2003, and it shows date of
6   employment August 11, 2003. Does
7   that date sound about right as to
8   when you began employment?
9   A. Yes.
10  Q. With Decatur General? Do
11  you remember going through
12  orientation?
13  A. Vaguely.
14  Q. Do you remember receiving
15  copies of policies and so forth at
16  that time?
17  A. No, I don't.
18  Q. Do you remember anything
19  you received back at that
20  orientation?
21  A. To be honest, no.
22  Q. Did you ever have any
23  policies or procedures of Decatur

Page 52

1   General Hospital that you took to
2   your home with you?
3   A. Yes, actually. We had a --
4   there's been several times that we've
5   had inservices, and we've been given
6   policies.
7   Q. Can you recall what type of
8   policies you've been given?
9   A. The things like the MI
10  protocols, the stroke protocols. We
11  actually had a sexual harassment
12  inservice, and we were given
13  paperwork from that.
14  Q. Did you take that home, as
15  well?
16  A. Yes.
17  Q. Do you still have that?
18  A. Probably not, because if I
19  do, I have no idea where it would be.
20  Q. Did you look for it in the
21  course of this litigation?
22  A. Yes, and I did not find it.
23  Q. With respect to any

13 (Pages 49 to 52)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1  documents you might relate to this
2  litigation, did you make a diligent
3  search for it?
4      A. Yes, sir, I did.
5      Q. I've got a copy of what I
6  think you have on that occasion and
7  we'll get it in a minute.
8      A. Okay.
9      Q. What position did you begin
10 working in at Decatur General?
11     A. An emergency room nurse.
12     Q. What hours?
13     A. 7:00 P to 7:00 A.
14 Actually, when you first start on
15 orientation you work 7:00 A to
16 7:00 P.
17     Q. Have you had any different
18 positions at Decatur General other
19 than emergency room?
20     A. No.
21     Q. Have you ever worked for
22 PRN there for a time?
23     A. Yes.

Page 54

1      Q. When did you do that?
2      A. December -- I think
3  December, '04, 'til approximately
4  June of 2005.
5      Q. In fact, you submitted a
6  resignation back in December of '04?
7      A. Yes.
8      Q. Why did you do that?
9      A. I took another position.
10     Q. Where?
11     A. At Parkview Health Care as
12 a director of nursing.
13     Q. And then you continued to
14 work PRN?
15     A. Yes.
16     Q. At Decatur General in the
17 emergency room?
18     A. Yes.
19     Q. How often would you attend
20 work as a PRN?
21     A. Maybe once or twice a month
22 at best.
23     Q. The other position with

Page 55

1  Parkview was a full-time job?
2      A. Yes.
3         (Whereupon, Defendant's
4         Exhibit Number 9 was
5         Marked for identification.)
6         (Handing document to
7         Witness.)
8      Q. Let me show you what's
9  marked as Defendant's Exhibit 9, and
10 it's entitled Decatur General
11 Hospital Payroll Personnel Change
12 Notice, Bates number in the lower
13 right-hand corner, 94. This
14 indicates -- it shows you working, I
15 guess, going from PRN to full-time
16 equivalent back on August 13th of
17 2005. Did you return to full-time
18 status at Decatur General at that
19 time?
20     A. Yes. Actually, I came -- I
21 had started back before that, but,
22 yes.
23     Q. Why did you come back to

Page 56

1  Decatur General full time?
2      A. Because I didn't want to be
3  in the nursing home. The director of
4  nursing position you're on call 24-7.
5  I'd rather go to work, do my three
6  shifts, and go home.
7      Q. Did you not realize that
8  when you went to Parkview that that
9  would be the case?
10     A. Yes, but at the time that I
11 went to Parkview we weren't offering
12 that weekend incentive either, so
13 that made the pay raise a lot better
14 at Decatur General, plus it's a few
15 blocks from my house.
16     Q. Okay. Explain what you
17 mean by that?
18     A. On the weekend pay scale
19 you get an extra $8.00 an hour for
20 working weekends.
21     Q. That's something that came
22 into being during your period at
23 Parkview?

14 (Pages 53 to 56)

FREEDOM COURT REPORTING

Page 57

1   A. Yes.
2   Q. How did you learn about
3   that?
4   A. Just from people that still
5   work there.
6   Q. And it says on here you
7   want to work 36 hours a week?
8   A. Yes.
9   Q. Tell me how that worked?
10  A. I worked three 12s in a
11  row -- Friday, Saturday, and Sunday,
12  7:00 P to 7:00 A.
13  Q. Okay. And that's something
14  you prefer to do?
15  A. Yes.
16      (Whereupon, Defendant's
17      Exhibit Number 10 was
18      Marked for identification.)
19      (Handing document to
20      Witness.)
21  Q. Let me show you what's
22  marked as Defendant's Exhibit Number
23  10, and this is Bates number D157 in

Page 58

1   the bottom right-hand corner for
2   identification purposes. But looking
3   at Defendant's Exhibit 10, is that
4   your signature on August 3rd, 2005?
5   A. Yes.
6   Q. And Pat Hudson is the
7   department director -- that's
8   department director over the
9   emergency room?
10  A. Yes.
11  Q. And you were already
12  working with her prior to this date;
13  correct?
14  A. Yes.
15  Q. And it says Decatur General
16  Weekend Program. Does this page
17  fairly describe the terms of
18  employment for that program?
19  A. Yes.
20  Q. Is there anything, looking
21  at this, that you would say is
22  omitted, that you would consider to
23  be material?

Page 59

1   A. No.
2   Q. Is there anything included
3   in Defendant's Exhibit 10 that
4   actually, or in reality, did not
5   apply, or did not occur?
6   A. No.
7   Q. I'm sorry?
8   A. Oh, he was trying to move
9   that up there (indicating). I have
10  to sign that once a year.
11  Q. This weekend program?
12  A. Yes.
13  Q. Noting at item 2, the WEP
14  differentials are $8.00 for RNs and
15  $6.00 for LPNs?
16  A. Yes.
17  Q. Is that what you're
18  referring to as the $8.00?
19  A. Yes.
20  Q. And that's $8.00 an hour?
21  A. Yes.
22  Q. And did you receive that
23  during the period of time that you

Page 60

1   worked at Decatur General following
2   execution of this document?
3   A. Yes.
4   Q. And, then, in item 4 it
5   says, "Shift differentials for LPNs
6   and RNs will apply for hours worked."
7   What was the shift differential?
8   A. $3.00.
9   Q. $3.00 an hour?
10  A. Yes.
11  Q. Did you receive that?
12  A. Yes.
13  Q. Is there anything in this
14  weekend program that you did not
15  actually receive?
16  A. No.
17  Q. I'll show you what's marked
18  as Defendant's Exhibit Number 11.
19  It's Bates number D79 in the bottom
20  right-hand corner. It's Personnel
21  Change Notice, and it refers to you
22  and refers to you working as an RN in
23  the WEP, and that's the weekend

15 (Pages 57 to 60)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 61

1  program; is that correct?
2      A. Yes.
3         (Whereupon, Defendant's
4         Exhibit Number 11 was
5         Marked for identification.)
6      Q. It says, "Pay unit
7  difference for all eligible hours
8  worked in PPE." Do you see that?
9      A. Yes.
10     Q. What's your understanding
11 of what PPE means?
12     A. I don't know what that
13 means.
14     Q. "8-13-05 and 2-11-06 WS did
15 not default." Do you have any idea
16 what this is about?
17     A. No, I don't.
18     Q. But you had been receiving,
19 and did receive, everything that's
20 set
21 forth in the weekend program as shown
22 in Defendant's Exhibit 10?
23     A. There was one time where

Page 62

1  Gwen looked at my schedule and
2  realized that my unit differential I
3  wasn't getting, but I don't know what
4  this is. Never seen this.
5      Q. And that occasion where the
6  unit differential you weren't
7  getting, were you supposed to get it?
8      A. Yes, it's another 50 cents
9  an hour.
10     Q. Did they make it up?
11     A. Yes.
12     Q. So, once that was corrected
13 you got everything that you were
14 supposed to get under the weekend
15 program?
16     A. Yes.
17     Q. When is the first time you
18 worked with Dr. Gaillard?
19     A. I'm not sure. It was after
20 I came back full time.
21     Q. After August of '05?
22     A. Yes.
23     Q. Had you ever met Dr.

Page 63

1  Gaillard before August of '05?
2      A. No.
3      Q. Did you ever hear anything
4  about anything in the history or past
5  about Dr. Gaillard, up to this day?
6      A. Up until then, no.
7      Q. How about now?
8      A. Yes.
9      Q. What have you heard about
10 him as related to his past, if
11 there's anything that stands out in
12 your mind?
13     A. Are we speaking of -- are
14 we talking about Decatur General? Is
15 that what we're talking about?
16     Q. Anywhere. Let's go to
17 Decatur General first?
18     A. I heard of two other
19 incidents prior to mine, of two other
20 employees.
21     Q. Who were the two employees?
22     A. Litia Freeman and Martha
23 Potts.

Page 64

1      Q. And who did you hear this
2  from?
3      A. Those -- those specific
4  people.
5      Q. And what were their
6  positions?
7      A. They were referring to
8  remarks that he had made to them, and
9  that they had discussed it with Dr.
10 Pool.
11     Q. What job did they have
12 there?
13     A. Martha Potts is a
14 registered nurse, and Litia Freeman
15 only works there PRN now. She's a
16 tech.
17     Q. Now, these are things they
18 described to you happened to them
19 before anything ever happened to you,
20 related to --
21     A. Actually, they told me
22 after it had started with me.
23     Q. But it had already happened

16 (Pages 61 to 64)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 65

1  to them?
2  A. Yes.
3  Q. What did Ms. Freeman say
4  had occurred?
5  A. That while she was putting
6  some things in a cabinet, she thought
7  somebody was behind her, and she
8  turned around and Dr. Gaillard was
9  standing behind her, and when she
10 asked him what he was doing, he told
11 her he was admiring the view.
12 Q. And did she describe
13 anything else that Dr. Gaillard did?
14 A. After that, no. She had
15 some remark back for him, but she
16 discussed that with Dr. Pool.
17 Q. And what did she say came
18 out of that conversation with Dr.
19 Pool?
20 A. Nothing, she just said he
21 told her he would take care of it.
22 Q. Did Ms. Freeman indicate
23 she had any more problems with Dr.

Page 66

1  Gaillard?
2  A. No.
3  Q. So, to your knowledge it
4  was a one time incident?
5  A. Yes.
6  Q. And to your knowledge, that
7  was the extent of the incident?
8  A. Yes.
9  Q. And what did Ms. Potts tell
10 you?
11 A. That she was standing at a
12 patient's bedside. They were
13 suturing a patient, and he made some
14 remark to her about kissing her
15 because they were standing so close.
16 Q. Did she describe any other
17 events?
18 A. No.
19 Q. And what did she say she
20 did about that?
21 A. She discussed that with Dr.
22 Pool.
23 Q. And what became of that?

Page 67

1  A. I don't know.
2  Q. So to your knowledge, she
3  had that one incident with Dr.
4  Gaillard that --
5  A. Yes.
6  Q. -- caused her to talk to
7  Dr. Pool, and that was it?
8  A. Yes.
9  Q. Do you know on either
10 occasion what Dr. Pool did about
11 those conversations?
12 A. No, I don't.
13 Q. What was your relationship
14 like with Dr. Pool?
15 A. I mean, we were cordial,
16 had a good working relationship.
17 Q. Other than any complaints
18 you have about how he may have
19 handled Dr. Gaillard, do you have any
20 complaints about Dr. Pool?
21 A. No.
22 Q. Do you have any complaints
23 about Dr. Sullivan?

Page 68

1  A. Well, he and Dr. Pool both
2  addressed the issues with Dr.
3  Gaillard at the same time.
4  Q. Other than as it's related
5  to Dr. Gaillard, any complaints about
6  Dr. Sullivan?
7  A. No.
8  Q. Dr. Pool, do you know who
9  his employer is?
10 A. Apollo.
11 Q. Do you know who Dr.
12 Sullivan's is?
13 A. Decatur General.
14 Q. How do you know that?
15 A. Because Dr. -- Dr. Sullivan
16 used to be the physician that was
17 over the ER. He got some type of
18 promotion. I'm not sure now exactly
19 now what his job title is.
20 Q. All right. Ms. Freeman and
21 Ms. Pots described those two events
22 to you. Did anyone else describe to
23 you anything that had happened

17 (Pages 65 to 68)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 69

1  previous -- previously with Dr.
2  Gaillard?
3     A.  No.
4     Q.  What have you heard about
5  Dr. Gaillard's past before Decatur
6  General?
7     A.  I've just -- I've heard
8  that this is a running pattern.
9     Q.  Where have you heard that?
10    A.  Just from different people.
11 I don't -- I don't have a specific
12 person to say there's a specific
13 source at this time to tell you that
14 this is the person that they're
15 getting that from. I don't have
16 that.
17    Q.  Do you even know who the
18 employer was, or where it was?
19    A.  Crestwood.
20    Q.  Do you have any basis for
21 saying that Decatur General knew
22 about anything in Dr. Gaillard's past
23 at Crestwood, or anywhere else?

Page 70

1     A.  Well, why would I think
2  that they don't? They check into my
3  background.
4     Q.  You're an employee of
5  Decatur General, correct?
6     A.  This is correct. But
7  you're allowing them to come into
8  your facility to work and interact
9  with your employees. And once the
10 complaint is made by your employees,
11 it would seem to me that that would
12 be the time to look into someone's
13 background.
14    Q.  Let's talk about what you
15 know, okay? Do you know of any
16 information that Decatur General had
17 about Dr. Gaillard's background?
18    A.  No, I don't.
19    Q.  Do you know of any
20 information that Apollo Medical Group
21 had about Dr. Gaillard's background?
22    A.  No, I don't.
23    Q.  Now, you said you received

Page 71

1  some training at Decatur General in
2  sexual harassment?
3     A.  Yes.
4     Q.  Did you receive any other
5  kind of training at Decatur General?
6     A.  All job related, yes.
7     Q.  Now, were you aware of
8  Decatur General having a policy that
9  prohibited sexual harassment?
10    A.  Yes.
11    Q.  How did you become aware of
12 that?
13    A.  That's part of our
14 training. And, then, after I made the
15 first complaint, we had another
16 inservice regarding sexual
17 harassment.
18    Q.  Let me show you a couple of
19 policies and see if you recognize
20 those?
21        (Whereupon, Defendant's
22        Exhibit Number 12 was
23        Marked for identification.)

Page 72

1         (Handing document to
2         Witness.)
3         I'll show you what's marked
4  as Defendant's Exhibit 12,
5  Prohibition Against Harassment,
6  two-page policy, shown last revised
7  1-17-03. Have you seen that before?
8     A.  Yes.
9     Q.  And you saw this in the
10 course of your employment at Decatur
11 General?
12    A.  Yes.
13        (Whereupon, Defendant's
14        Exhibit Number 13 was
15        Marked for identification.)
16        (Handing document to
17        Witness.)
18    Q.  And I'll show you what's
19 marked as Defendant's Exhibit Number
20 13, Problem Solving Procedures and
21 Appeal Process. Have you seen that
22 policy before?
23    A.  No.

Page 73

1  Q. Have you ever seen an
2  Administrative Policy Manual?
3  A. Yes.
4  Q. Where have you seen that?
5  A. Sitting on a shelf in the
6  emergency department.
7  Q. Have you ever looked
8  through it?
9  A. No.
10 Q. Now, you understood, then,
11 that as a policy Decatur General
12 prohibited harassment, including
13 sexual harassment?
14 A. Yes.
15 Q. Did you have an
16 understanding about how to complain
17 if you believed you were subjected to
18 such harassment?
19 A. Yes.
20 Q. How did you form that
21 understanding?
22 A. Because it's considered a
23 chain of command type thing. I went

Page 74

1  to my charge nurse. Then I went to
2  the department director. And, then,
3  I went to human resources.
4  Q. All right. So you went to
5  charge nurse?
6  A. Yes.
7  Q. And then director?
8  A. Yes.
9  Q. Then human resources?
10 A. Yes.
11 Q. Charge nurse would be Debra
12 Phillips?
13 A. Yes.
14 Q. Director, Pat Hudson?
15 A. Yes.
16 Q. And human resources would
17 be Karla Gray?
18 A. Yes.
19 Q. Is this your chain of
20 command for all purposes?
21 A. Yes.
22     (Whereupon, Defendant's
23     Exhibit Number 14 was

Page 75

1       Marked for identification.)
2       (Handing document to
3       Witness.)
4  Q. Let me show you what's
5  marked as Defendant's Exhibit 14, and
6  it's a record of training sexual
7  harassment and an inservice, as well.
8  But looking at Defendant's Exhibit
9  14, dated November 14th, 2005, first
10 page is Bates numbered D15, and is
11 followed by some copies of some power
12 point slides. Do you recognize these
13 materials?
14 A. Yes.
15 Q. Okay. Is that your
16 signature where it says Nina Bennett?
17 A. Yes.
18 Q. And you attended a meeting
19 on this date, November 14th, 2005?
20 A. Yes.
21 Q. And at this time did they
22 make a presentation of this power
23 point, sexual harassment, or how was

Page 76

1  that done?
2  A. Yeah. It was the paperwork
3  right here.
4  Q. Hard copies?
5  A. Yes.
6  Q. Who led that meeting?
7  A. Ms. Hudson.
8  Q. Was there any discussion by
9  you in the course of this meeting
10 about this topic?
11 A. No.
12 Q. Did you have any
13 understanding of why they were having
14 this inservice?
15 A. Yes.
16 Q. What was your
17 understanding?
18 A. That apparently we were
19 having a problem with this. Since I
20 was not the only person to complain
21 with the same thing, that's why we
22 were having an inservice.
23 Q. You think it was -- agree

19 (Pages 73 to 76)