**FREEDOM COURT REPORTING**

Page 77

1  it was appropriate for them to do an
2  inservice on this topic?
3     A. Yes.
4     Q. Do you know of any others,
5  other than those listed here, who
6  also went through such training on or
7  about this time?
8     A. No. I would assume it
9  would contain the entire staff. But,
10 no, I don't know.
11    Q. You have no idea one way or
12 the other if the doctors who were on
13 the premises also went through it?
14    A. No.
15       (Whereupon, Defendant's
16       Exhibit Number 15 was
17       Marked for identification.)
18    Q. I'll show you what's marked
19 as Number 15, and this is your
20 resignation letter that we've already
21 referenced. But when you left
22 Decatur General Hospital, you had no
23 complaints whatsoever about your

Page 78

1  employment there?
2     A. That's correct.
3     Q. Did you know Dr. Gaillard
4  at all at the time that you resigned
5  from Decatur General?
6     A. No.
7     Q. Do you know if he was
8  already working in the emergency room
9  at this time?
10    A. When I left?
11    Q. Yes.
12    A. No, he wasn't.
13    Q. He was working there in
14 August of '05?
15    A. Yes.
16    Q. Were you ever harassed in
17 any way at any other employer?
18    A. Yes.
19    Q. Where?
20    A. When I worked at Valleyview
21 I had somebody to touch me. We went
22 in the -- we discussed it in the
23 administrator's office, and that was

Page 79

1  the end of it.
2     Q. It happened on one
3  occasion?
4     A. Yes, and that was it.
5     Q. Meaning it was the end of
6  it. What happened?
7     A. Yes, we sat down and
8  discussed it, and it never happened
9  again.
10    Q. Did the person continue to
11 work there?
12    A. Yes. He was later
13 terminated for some other reason.
14    Q. Who was the person that
15 touched you?
16    A. I don't remember his name.
17    Q. What was the nature of the
18 offense of touching?
19    A. He just touched my hair.
20    Q. Did he say anything, as
21 well?
22    A. Yes. Exactly what he said,
23 I don't remember. We were standing

Page 80

1  over a resident at a nursing home --
2  it's a nursing home facility.
3     Q. So that incident you
4  complained to the director or
5  whoever, and they discussed it with
6  each of you, he didn't repeat it, and
7  you were happy with that?
8     A. Right.
9     Q. I want to focus on the
10 period of August of '05 through March
11 of '06. Prior to August of '05, did
12 you have any complaints at all about
13 Dr. Gaillard?
14    A. No, because I didn't know
15 him.
16    Q. In your chain of command,
17 beginning in August of '05, or maybe
18 before that, and continuing on
19 through March of '06 would be Debra
20 Phillips and Pat Hudson?
21    A. Yes.
22    Q. Now, you say Karla Gray in
23 the chain of command. From the

20 (Pages 77 to 80)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 81

1  standpoint of the emergency room, Ms.
2  Gray is not in the chain of command,
3  is she? She's human resources?
4     A.  No, but it is right here in
5  this policy, though.
6     Q.  The human resources?
7     A.  Yes.
8     Q.  Is there anybody else you
9  would describe in your chain of
10 command in terms of working with the
11 emergency room?
12    A.  Unless I went to Phyllis
13 West, which she's not actually in the
14 emergency room, but she is the
15 director of nurses for the hospital.
16    Q.  Did you ever complain to
17 Ms. West about any of the conduct of
18 Dr. Gaillard?
19    A.  No.
20    Q.  What authority did Debra
21 Phillips have over you?
22    A.  She's my charge nurse.
23    Q.  And what does that mean in

Page 82

1  terms of her ability to schedule you,
2  affect your pay?
3     A.  She actually schedules our
4  assignments for where we work in the
5  emergency department.
6     Q.  What's your understanding
7  of any other authority she might
8  have?
9     A.  Other than can send us
10 home, she can't terminate our
11 employment. She can do written
12 disciplinary.
13    Q.  Anything else you
14 understand to be her authority as it
15 relates to you and others in a
16 similar position?
17    A.  No.
18    Q.  And Pat Hudson, what's your
19 understanding of her authority or
20 control over you and others in a
21 similar position?
22    A.  She has the ability to
23 terminate our employment. She does

Page 83

1  make our schedules.
2     Q.  And makes your schedules in
3  what way?
4     A.  Makes our assignments on
5  when we work, our physical working
6  schedules.
7     Q.  Could change you from
8  working Friday night, Saturday night,
9  and Sunday night to?
10    A.  She can actually schedule
11 you to work any time Monday through
12 Thursday, not just on the weekends.
13    Q.  What authority did Dr. Pool
14 have over you, if any?
15    A.  He doesn't have any.
16    Q.  How about Dr. Sullivan?
17    A.  I'm not sure. Since he
18 works for the hospital, I'm not sure
19 what authority he has over us.
20    Q.  And Dr. Gaillard, what
21 authority did he have over you and
22 others in your position?
23    A.  Well, at the time I didn't

Page 84

1  realize that they actually did work
2  for Apollo and didn't have authority
3  over us. It was in the course of
4  this that I learned that they don't
5  have any, that they're not actually
6  my supervisor.
7     Q.  When did you come to the
8  conclusion that he wasn't your
9  supervisor?
10    A.  In the course of all this
11 when Ms. Gray told me.
12    Q.  During the period of time
13 he was still there?
14    A.  Yes.
15    Q.  And what did Ms. Gray tell
16 you in that regard?
17    A.  That he actually was an
18 Apollo employee, he was not my
19 supervisor.
20    Q.  What do you remember at
21 what point in time you learned that?
22    A.  That would have been
23 somewhere between February and March.

Page 85

1  Q. Prior?
2  A. I would say closer to
3  March.
4  Q. Did that change anything
5  for you in terms of working set up?
6  A. No.
7  Q. Had Dr. Gaillard ever done
8  anything that suggested he had the
9  authority to schedule your hours, or
10 affect your pay, or discipline you?
11 A. No.
12 Q. Were you ever under the
13 impression that he had the power to
14 affect your schedule, or discipline
15 you, or change --
16 A. Affecting my work
17 environment, yes.
18 Q. In terms of just being
19 there with you -- in terms of
20 interacting, is that what you mean?
21 A. No, actually, when you're
22 working in an environment like that,
23 the doctors actually have the ability

Page 86

1  to make your job easier or a lot
2  harder.
3  Q. Right. And we'll talk
4  about that. But in terms of the
5  belief that he could affect your pay?
6  A. No. Did I ever have the
7  belief that he could get me in
8  trouble, yes, because I've seen
9  charge nurses do that. When the
10 doctors complain, they go and get
11 onto the nurses.
12 Q. The doctor complains to the
13 charge nurse, and the charge nurse
14 gets onto the nurse?
15 A. Yeah.
16 Q. It's still the charge nurse
17 getting onto the nurse, though,
18 right?
19 A. Yeah, but it's still the
20 physician that got you in trouble.
21 Q. But, again, in terms of
22 pay?
23 A. No.

Page 87

1  Q. He couldn't affect your
2  pay?
3  A. No.
4  Q. Couldn't affect your
5  schedule?
6  A. No.
7  Q. Couldn't discipline you?
8  A. No.
9  Q. And the same with Dr. Pool,
10 could he affect your pay?
11 A. No.
12 Q. Discipline you?
13 A. No.
14 Q. Affect your schedule?
15 A. No.
16 Q. What's your understanding
17 of what authority Dr. Pool had over
18 Dr. Gaillard?
19 A. It's my understanding that
20 was his immediate supervisor.
21 Q. Who did Dr. Pool report to,
22 to your understanding?
23 A. I think he reports to Dr.

Page 88

1  Sullivan and maybe Dr. Arnold. I'm
2  not sure about that.
3  Q. Who is Dr. Arnold?
4  A. I'm thinking that he is the
5  head of Apollo.
6  Q. Have you ever met Dr.
7  Arnold?
8  A. Yes.
9  Q. Where did you meet him?
10 A. At Decatur General.
11 Q. Is he a regularly --
12 A. Not a regular. He works
13 there sometimes.
14 Q. You probably need to let me
15 finish my question before you answer.
16 It would make her job a lot easier to
17 read a little bit clearer if we did
18 that.
19    Let's talk about your
20 complaints about Dr. Gaillard. First
21 off, tell me all of the people that
22 you complained to, and then we're
23 going to come back and we'll talk

FREEDOM COURT REPORTING

Page 89

1  about when it was and what was said,
2  okay?
3     A.  Okay.
4     Q.  All right.  Who did you
5  complain to?
6     A.  Debra Phillips.
7     Q.  All right.
8     A.  Pat Hudson.
9     Q.  Okay.
10    A.  And Karla Gray.
11    Q.  No one else?
12    A.  And in between there Dr.
13 Pool came to me, in between Debra
14 Phillips and -- I don't remember
15 exactly if I'd already talked to Ms.
16 Hudson or not.  But it was before I
17 had talked to Karla Gray.
18    Q.  Did you ever complain to
19 anyone else, whether somebody came to
20 you or you went to them?
21    A.  No.
22    Q.  Why did you not go to Dr.
23 Pool to complain?

Page 90

1     A.  I don't answer to Dr. Pool.
2     Q.  Okay.  You went to Debra
3  Phillips because you answer to her?
4     A.  Yes.
5     Q.  And you answer to Pat
6  Hudson?
7     A.  Right.  And Debra Phillips
8  was there.
9     Q.  Do you have to go to Debra
10 Phillips before you go to Pat Hudson
11 with things?
12    A.  No, I don't actually have
13 to, but she is the immediate
14 supervisor when you're there at
15 night, so that is the reason I went
16 to her.
17    Q.  Phillips is there at night?
18    A.  Yes.
19    Q.  And Hudson is there when?
20    A.  During the day.
21    Q.  Do you consider Debra
22 Phillips a friend?
23    A.  Yes.

Page 91

1     Q.  Pat Hudson, is she a
2  friend?
3     A.  Yes.  I mean, I don't talk
4  to her outside of work or anything.
5     Q.  Phillips you do talk to
6  outside of work?
7     A.  Sometimes.  Not on a
8  regular basis.
9     Q.  You're on a more familiar
10 basis with Phillips than you are with
11 Hudson; would that be fair to say?
12    A.  Right, because I work with
13 her more.
14    Q.  Complain to anyone else?
15    A.  I don't think so, no.
16    Q.  When is the first time you
17 complained to Debra Phillips?
18    A.  I don't remember exactly.
19    Q.  Now, you --
20    A.  I can actually tell you
21 exactly when it came to a head, but
22 the first time I said something to
23 her, I actually don't remember the

Page 92

1  first time.
2     Q.  Well, I want you to feel
3  free to look at your interrogatory
4  answers, because we're trying to get
5  as clear an understanding of your
6  claims here today -- so, you know,
7  certainly do that if we need to do
8  that, okay?
9     A.  Okay.
10    Q.  I'm trying to -- where I
11 want to go with this is you've told
12 me who you complained to?
13    A.  Right.
14    Q.  I want to try to get as
15 best a picture I can as to when you
16 complained to them in each instance,
17 and then we'll talk about, also, what
18 you said to them in those instances,
19 and what was said back to you, as we
20 go through this sequence.
21    A.  Okay.
22    Q.  So, not trick questions.
23 You're the one with that information,

23 (Pages 89 to 92)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  so I need to get it from you, fair
2  enough?
3     A.  Okay.
4     Q.  All right.  So, if you need
5  to look back, do so, but tell me when
6  do you recall first complaining to
7  Debra Phillips?
8     A.  I don't remember the exact
9  first time that I said something to
10 her.  I know about all of this right
11 here when it all came to a head, but
12 the first time I said something -- I
13 don't remember the exact date on the
14 first time I said something.
15    Q.  Well, I've seen certainly
16 indications that it was in early
17 October, perhaps, is when you first
18 came forward to complain about the
19 fellow.  Go, if you would, to
20 Defendant's Exhibit Number 3.
21    A.  I see that on there, but I
22 don't -- what I'm saying is, I don't
23 think that that was the actual first

Page 94

1  time that I actually said something
2  about his behavior.  But we'll go
3  with that date.
4     Q.  Well, I'm looking -- when
5  you say that date, we're looking at
6  Defendant's Exhibit Number 3?
7     A.  Right.
8     Q.  And these are your answers
9  to interrogatories?
10    A.  Yes.
11    Q.  And it doesn't say that --
12 I don't think it says here you
13 complained on that date, so I'm not
14 trying to put words in your mouth,
15 but you're describing behavior that
16 Dr. Gaillard on that date.  So let me
17 back up with a different question.
18       To your best recollection,
19 had any offensive behavior occurred
20 before October 7th, 2005?
21    A.  There were several
22 inappropriate comments that were
23 made.  I can't remember exactly what

Page 95

1  all was said.  There were so many
2  things, it was almost too numerous to
3  count.  The reason this date stuck
4  out so bad is because when I left
5  work this day, I was actually in
6  tears.
7     Q.  Well, you first would have
8  met him when, in August of '05?
9     A.  Yes.
10    Q.  Did things start the very
11 first day?
12    A.  No.
13    Q.  So you worked for a period
14 of time and he was not a problem?
15    A.  Right.
16    Q.  Period of weeks?
17    A.  I would say at least a
18 month.
19    Q.  Okay.  So somewhere in this
20 timeframe, though, certainly by
21 October 2nd, he was engaging in the
22 behavior you described right here?
23    A.  Yes, sir.

Page 96

1     Q.  Now, as you go on down this
2  answer to interrogatory number 7, at
3  the very bottom, you say "I reported
4  this to Debra Phillips, charge nurse.
5  I also spoke with Pat Hudson,
6  director of emergency department,
7  same week."  And, then, it says, "I
8  met with Karla Gray, human resources,
9  on October 6th, 2005, at which time I
10 was told Dr. Tracy Pool and Dr.
11 Sullivan had already spoken with him
12 about his inappropriate behavior."
13 Do you see that?
14    A.  Yes.
15    Q.  These are answers you
16 typed?
17    A.  Yes, sir.
18    Q.  Did you have notes you
19 typed from?
20    A.  No, sir.
21    Q.  This was from your memory?
22    A.  Yes, sir.
23    Q.  All right.

24 (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 97

1    A. The way that I can remember
2  that is that date right there, that's
3  my husband's birthday.
4    Q. October 2nd?
5    A. Yes.
6    Q. Okay. Did you discuss it
7  with him when you got home that day?
8    A. Yes, and he was in Atlanta
9  for his birthday.
10   Q. Why was he in Atlanta for
11 his birthday?
12   A. Ballgame.
13   Q. Would you each day that
14 this would occur, where you were
15 offended by Dr. Gaillard, would you
16 discuss it with your husband?
17   A. Every time, no.
18   Q. Is there anybody that you
19 would routinely tell about this
20 behavior as it would happen -- any
21 friend, or somebody on MySpace, or
22 anything like that?
23   A. I never discussed it on

Page 98

1  MySpace. At this time I didn't even
2  have a MySpace.
3    Q. Okay. With any friend, or
4  anything like that?
5    A. I don't recall.
6    Q. Or did you just keep it to
7  yourself largely?
8    A. Well, there were several
9  other people that did see things,
10 that were aware that this was a
11 problem, so.
12   Q. Well, this -- when you say
13 I reported this to Debra Phillips,
14 would that be the first time you told
15 Debra Phillips what your notation is
16 right here (indicating)?
17   A. No.
18   Q. So, you had already spoken
19 to Debra Phillips before?
20   A. Yes.
21   Q. Do you know if she told
22 anybody about it?
23   A. I don't think she did.

Page 99

1    Q. What did you expect Ms.
2  Phillips to do with it?
3    A. She didn't tell anybody at
4  that time, because I asked her to
5  wait just to see if it would stop.
6  And when I spoke to her at this time,
7  that's when I told her I couldn't
8  take it anymore.
9    Q. Okay. You wanted Ms.
10 Phillips to take some action this
11 time?
12   A. Yes.
13   Q. Prior to that you had
14 shared it with Ms. Phillips, but you
15 did not want her to take action?
16   A. Right.
17   Q. In fact, you told her not
18 to take any action?
19   A. Yes.
20   Q. Up until this point, are
21 you satisfied with Ms. Phillips'
22 conduct?
23   A. Yes.

Page 100

1    Q. At this point in time you
2  spoke with Ms. Phillips?
3    A. Yes.
4    Q. And, again, this would be
5  on or after October 2nd, correct?
6    A. Yes.
7    Q. And you asked Ms. Phillips
8  to do what?
9    A. I didn't really ask her to
10 do anything. At this point in time,
11 when all this was going on, like it
12 says in here, I left my job in tears
13 that day. When she was asking me
14 what was wrong, I told her I can't
15 take this anymore, and I proceeded to
16 try to tell her, and I started crying
17 and I just left, because it was time
18 to leave work anyway.
19   Q. So, did you ask Ms.
20 Phillips to do anything at that point
21 in time, the day you left crying?
22   A. She said, "Well, we'll have
23 to talk to Ms. Hudson." I said,

25 (Pages 97 to 100)

Page 101

1  "That's fine."
2  Q. And then what happened?
3  A. I did talk to Ms. Hudson.
4  Q. Who made those
5  arrangements?
6  A. I think Debra did. I think
7  Ms. Hudson actually called me.
8  Q. Are you satisfied with Ms.
9  Phillips handling of this at this
10 point?
11 A. Yes.
12 Q. Are you satisfied with Ms.
13 Phillips' handling of this at this
14 point?
15 A. Yes.
16 Q. Or are you satisfied with
17 Ms. Phillips' handling of this
18 throughout?
19 A. Yes.
20 Q. You have no complaints
21 about Ms. Phillips' conduct?
22 A. No.
23 Q. Any time you wanted Ms.

Page 102

1  Phillips to pass on a complaint, to
2  your knowledge she did it?
3  A. Yes.
4  Q. Did you understand her to
5  have any authority to fix anything;
6  if you will?
7  A. To the best of her ability
8  to try to move me around in the ER to
9  not have to work with him as much.
10 Q. And, so, she could do that?
11 A. Yes.
12 Q. Did she do that?
13 A. She tried to, yeah.
14 Q. So Ms. Phillips, when you
15 asked her to pass on a complaint, she
16 did so?
17 A. Yes.
18 Q. And Ms. Phillips, when you
19 asked her assistance to sort of
20 distance yourself from working with
21 Dr. Gaillard, she did that, too?
22 A. As best as she could.
23 Q. Okay.

Page 103

1  A. Sometimes it wasn't
2  possible.
3  Q. But we can put her aside,
4  you've got no complaints about her
5  conduct?
6  A. Right.
7  Q. And to the extent that she
8  did her job with Decatur General,
9  you're fine with that?
10 A. Right.
11 Q. All right. So you spoke
12 with Ms. Hudson, and tell me about
13 that conversation?
14 A. I went in, I sat down and
15 talked with her, and told her exactly
16 what all had been going on.
17 Q. And what did she tell you?
18 A. That I would need to
19 talk -- I needed to talk to Karla
20 Gray, and that she would set that up.
21 Q. And did she do so?
22 A. Yes.
23 Q. Okay. It says here you met

Page 104

1  with Karla Gray on October the 6th;
2  is that correct?
3  A. Yes.
4  Q. How did you recall that
5  date when you prepared this?
6  A. Because it was just right
7  after the other.
8  Q. And I'm not disputing it.
9  I just want to know how you recalled
10 it. And tell me about your
11 conversation with Ms. Gray.
12 A. When I talked with Ms.
13 Gray, she told me that Dr. Pool and
14 Dr. Sullivan had already discussed
15 the issue with Dr. Gaillard before I
16 had actually even talked with her.
17 Q. Did she say what --
18 A. I'm sorry. Go ahead.
19 Q. No, go ahead. I'd rather
20 hear you talk than me talk.
21 A. She said that they had
22 discussed his behavior with him, and
23 that he had been warned that this

Page 105

1 behavior could not continue.
2   Q. Did she say what caused
3 them to talk to the doctor, Dr.
4 Gaillard?
5   A. I assumed it was about this
6 incident.
7   Q. But she didn't say why?
8   A. She said, "Well, they've
9 already discussed it with him."
10   Q. Okay.
11   A. So that's why I assumed it
12 was this.
13   Q. All right. Now, are you
14 satisfied with how Pat Hudson handled
15 this at this point?
16   A. Yes.
17   Q. What did you expect Ms.
18 Hudson to do, other than what she did
19 in this instance?
20   A. That's exactly what I
21 expected her to do.
22   Q. So in her role at Decatur
23 General, you've got no complaint

Page 106

1 about Ms. Hudson?
2   A. Right.
3   Q. What authority did she
4 have, to your understanding, to fix
5 things?
6   A. Well, she can work in
7 between me and the rest of the
8 administrative group, and tell me
9 what other steps that I need to take.
10   Q. In terms of complaining?
11   A. Yes.
12   Q. And she did that, she sent
13 you to Karla Gray?
14   A. Yes.
15   Q. What could she do, if
16 anything, that would be meaningful to
17 you in terms of schedule or anything
18 else?
19   A. Maybe even reschedule me.
20 I don't know. I mean, actually
21 that's what our policy says for me to
22 do, is to go to her, so.
23   Q. Okay. All right. Then you

Page 107

1 met with Ms. Gray on this occasion?
2   A. Yes.
3   Q. Were you satisfied at this
4 point with the hospital's response?
5   A. Actually, no. I was a
6 little upset that they had already
7 discussed this situation with him,
8 and had not even heard what I had to
9 say about it.
10   Q. Now, Debra Phillips had
11 heard some of what you had to say?
12   A. Yes.
13   Q. And Pat Hudson?
14   A. Yes.
15   Q. She heard what you said?
16   A. Yes.
17   Q. Who is it you understand
18 made the decision to go talk to Dr.
19 Gaillard?
20   A. Well, the thing -- my thing
21 is, why was I even going to go to
22 human resources to talk to her if
23 they've already made their decision

Page 108

1 on what they're going to do before I
2 even speak to her?
3   Q. What did you want --
4   A. Before following the steps,
5 the action has already be done.
6   Q. What did you want done at
7 that point?
8   A. Well, I at least wanted
9 them to listen to what I had to say
10 before they came back and delivered a
11 slap on the wrist, or whatever they
12 were going to do.
13   Q. Well, Pat Hudson had
14 listened to what you had to say,
15 right?
16   A. Yes.
17   Q. So they had listened to
18 what you had to say?
19   A. Yes, she had. But my point
20 is, so you're telling me that that
21 went straight on to them?
22   Q. To who?
23   A. To Dr. Sullivan and to Dr.

27 (Pages 105 to 108)

Page 109

1  Pool?
2      Q. I'm not telling you
3  anything.
4      A. Okay.
5      Q. I'm just trying to
6  understand what you're saying in
7  terms of -- you've -- you got to tell
8  Pat Hudson everything?
9      A. Right. I guess what I'm
10 saying to say is, our policy says
11 these are the people for me to go
12 talk to. And before I had spoken to
13 everybody, the decision had already
14 been made for the disciplinary
15 action.
16     Q. Would you have -- would you
17 fault Pat Hudson if she spoke to Dr.
18 Pool after talking to you, saying,
19 "We've got a problem, and I want it
20 dealt with right now"?
21     A. No. But then why deal with
22 that and then tell me later that it's
23 dealt with? Why was I not notified

Page 110

1  beforehand, instead of after the
2  fact? If you're going to go ahead
3  and do that, then there was no point
4  in me going to human resources.
5          MS. BASWELL-GUTHRIE:
6  Objection. Nonresponsive.
7      Q. (BY MR. MIDDLEBROOKS:)
8  You're talking about October 2nd,
9  four days, right?
10     A. Uh-huh.
11     Q. Is that yes?
12     A. Yes.
13     Q. Do you know what day
14 October 6th is, what day of the week?
15     A. Not off the top of my head,
16 no.
17     Q. October 2nd would have been
18 on a weekend, right?
19     A. Yes.
20     Q. So you're there at night?
21     A. Yes.
22     Q. Human resources is not
23 typically there at night, are they?

Page 111

1      A. No, but I didn't -- when I
2  spoke to Ms. Hudson that was not at
3  night either.
4      Q. You came in to see her?
5      A. Yes.
6      Q. When did you do that?
7      A. I came in during the day.
8      Q. On a weekend or after?
9      A. No, it would have to be
10 during the week.
11     Q. So, you came in and spoke
12 with Ms. Hudson. Did she call you
13 and tell you she wanted to speak to
14 you?
15     A. Yes.
16     Q. So she was proactive?
17     A. Yes.
18     Q. You appreciate that?
19     A. Yes.
20     Q. She invites you in, you go
21 in, and you tell her everything?
22     A. Yes.
23     Q. And, then, she says you're

Page 112

1  to go talk to Karla Gray in human
2  resources?
3      A. Yes.
4      Q. She sets that up?
5      A. Yes.
6      Q. You're agreeable?
7      A. Yes.
8      Q. That's fine with you,
9  right?
10     A. Yes.
11     Q. And then you go to human
12 resources and you're told, "I don't
13 need to hear what you've got to say,"
14 or does Karla Gray listen to you?
15     A. She listened, but she told
16 me they had already discussed it with
17 him and they had already -- Dr. Pool
18 and Dr. Sullivan both had already
19 discussed his behavior with him.
20     Q. So going back do you fault
21 if Pat Hudson was proactive and spoke
22 with Dr. Pool?
23     A. No.

# FREEDOM COURT REPORTING

Page 113

1  Q. The sooner the better,
2  wouldn't it?
3  A. Yes.
4  Q. Did you have things to tell
5  Ms. Gray that you had not told Ms.
6  Hudson?
7  A. No.
8  Q. Did you tell Ms. Hudson all
9  the things that are set forth in
10  Defendant's Exhibit Number 3?
11  A. Yes.
12  Q. Did you tell her anything
13  additional?
14  A. Yes. I also told her about
15  the incidents that I referred to with
16  Litia Freeman and Martha Potts.
17  Q. But those did not involve
18  you?
19  A. No.
20  Q. You just told her about
21  others?
22      Is there anything in this
23  Defendant's Exhibit 3, item 7, that

Page 114

1  you didn't tell Ms. Hudson?
2  A. About that incident?
3  Q. Well, leading up -- you
4  describe on October 2nd up to the
5  point you spoke to Debra Phillips and
6  spoke with Pat Hudson?
7  A. There were other things
8  said, but like I said before, I don't
9  remember exactly everything that was
10  said.
11  Q. But you left Ms. Hudson
12  with a complete picture?
13  A. Yes.
14  Q. All right. And you fault
15  them on the seat list, that they
16  should have waited until human
17  resources spoke to you as well. But
18  at that -- do you want to say
19  something?
20  A. No.
21  Q. At that point in time, did
22  you want them to do anything more
23  than just make sure the behavior

Page 115

1  stopped?
2  A. No, but my other question
3  was with the other two behaviors, was
4  that addressed, because if we had
5  done the same thing with those two
6  behaviors, then it's not going to
7  stop with mine.
8  Q. That is if they had talked
9  with him previously about the other
10  two complaints and he didn't stop,
11  why think he would stop now?
12  A. Right.
13  Q. Did you ask that question?
14  A. No.
15  Q. But if Dr. Gaillard's
16  behavior that you found offensive had
17  stopped right then and there, you
18  would have been fine?
19  A. Yes.
20  Q. It would have been just
21  like back at the prior employer, it
22  had stopped and you could go forward?
23  A. Yes.

Page 116

1  Q. Even could have worked with
2  him?
3  A. Yes.
4  Q. Now, wasn't there some
5  conversation with you about the
6  importance of reporting anything
7  additional that happens in the way of
8  inappropriate behavior?
9  A. What I was told was that if
10  it continues, or he starts again, or
11  if there's any kind of retaliatory
12  behavior, to report that.
13  Q. Who told you that?
14  A. Karla Gray.
15  Q. Anyone else tell you that?
16  A. Ms. Hudson had told me
17  that.
18  Q. And you agree those are
19  both appropriate instructions?
20  A. Yes.
21  Q. And were you agreeable to
22  do that?
23  A. Yes.

29 (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660