# FREEDOM COURT REPORTING

Page 117

```
 1     Q.  And you agree that you have
 2  some -- some obligation, if you will,
 3  to speak up if things happen?
 4     A.  Yes.
 5     Q.  And in the course of the
 6  next couple of months, did Ms. Hudson
 7  ever speak to you about how things
 8  are going?
 9     A.  Yes, probably a couple of
10  weeks after this.
11     Q.  And you did not report any
12  problem, did you?
13     A.  No.
14     Q.  And then early in 2006 she
15  asked you again about how things were
16  going, and you didn't report any
17  problems, did you?
18     A.  If she asked me again I
19  must not have, because I reported it
20  in February.
21     Q.  In February, I understand.
22     A.  Yes.
23     Q.  But between this early
```

Page 118

```
 1  October meeting or meetings, and you
 2  reported it in February, you made no
 3  complaints to anyone about Dr.
 4  Gaillard?
 5     A.  At one time point in time
 6  the behavior did improve.
 7     Q.  Okay.  I know.  I
 8  understand.  During that period of
 9  time, though, you made no complaints?
10     A.  Right.
11     Q.  And at least one occasion,
12  maybe more, Pat Hudson followed up
13  with you and said, "How are things
14  going, is there any problem," and you
15  didn't report anything, right?
16     A.  Right.
17     Q.  So during that period --
18  and we don't have it tied down to
19  precise days, but during that period
20  of time would you agree there was no
21  action the hospital needed to be
22  taking?
23     A.  Yes.
```

Page 119

```
 1     Q.  We're in agreement on that?
 2     A.  (Witness nods head.)
 3     Q.  Is that yes?
 4     A.  Yes.
 5     Q.  Now, in your description
 6  back on October 2nd, you have a
 7  couple of phrases, "Later in the same
 8  shift, later in the same shift," so
 9  this conduct you're describing here
10  in item 7 on this first page of
11  Defendant's Exhibit 3, that all
12  occurred in the course of one shift?
13     A.  Yes.
14     Q.  Did you have any witnesses
15  to any of that?
16     A.  Yes.
17     Q.  Who were the witnesses in
18  this --
19     A.  They're on there.  Michelle
20  Clark and Candace Thomas.
21     Q.  Did they ever comment to
22  you about what they'd observed, or
23  say anything about it to you?
```

Page 120

```
 1     A.  Yes.
 2     Q.  What did they say to you?
 3     A.  "He really has a thing for
 4  you, doesn't he?"
 5     Q.  On how many occasions had
 6  he touched you?
 7     A.  Twice.
 8     Q.  Okay.  Let me back up.
 9  Debra Phillips, you've told me about
10  your complaints to her and when they
11  were.
12     A.  Uh-huh.
13     Q.  Pat Hudson, Karla Gray, and
14  Dr. Pool came to you.  Dr. Pool came
15  to you, this is back still in '05?
16     A.  Yes.
17     Q.  Relative to your meeting
18  with Pat Hudson and Karla Gray, when
19  was that he came to you?
20     A.  I don't -- I don't
21  remember.
22     Q.  Can you remember just
23  before or after?
```

# FREEDOM COURT REPORTING

Page 121

1  A. I don't remember if it's
2  after Debra and before Ms. Hudson, or
3  after Ms. Hudson.
4  Q. But it was before Karla
5  Gray?
6  A. Yes.
7  Q. What do you recall him
8  saying? Was anybody else present
9  when you spoke with him?
10  A. No.
11  Q. What do you recall him
12  saying to you?
13  A. He pulled me out in the
14  hallway, into a side hallway.
15  Q. What do you recall was said
16  in that conversation?
17  A. He told me to just unload
18  on him, just let him have it.
19  Q. What did you understand
20  that to mean?
21  A. To yell at him, or
22  whatever, and I told him I couldn't
23  do that; then I would lose my job.

Page 122

1  And he said, "No, you won't."
2  Q. Anything else said in that
3  conversation?
4  A. That he'd check into it.
5  Q. Did he ever get back to you
6  about it?
7  A. No.
8  Q. Are you pleased or
9  displeased with how he handled that?
10  A. I'm displeased.
11  Q. When did you next, if at
12  all, complain to Debra Phillips about
13  him -- Dr. Gaillard?
14  A. I don't -- I don't
15  remember.
16  Q. So, some time in February
17  of '06?
18  A. Yes.
19  Q. And Pat Hudson, when did
20  you next speak to her about Dr.
21  Gaillard, also February of '06?
22  A. Yes.
23  Q. And you complained to Karla

Page 123

1  Gray about him February of '06?
2  A. Yes, I think so.
3  Q. We'll come back to look at
4  some things that may show some dates.
5  And Dr. Pool, when did you next have
6  any conversation with him about Dr.
7  Gaillard?
8  A. I didn't.
9  Q. Never again?
10  A. No.
11  Q. So you've told me all the
12  conversations you've had with Dr.
13  Pool about Dr. Gaillard?
14  A. Yeah.
15  Q. Have you ever had any
16  conversations with Dr. Sullivan about
17  him?
18  A. No.
19  Q. It was after these October
20  meetings when the hospital had this
21  inservice on sexual harassment; is
22  that correct?
23  A. I'm sorry?

Page 124

1  Q. The inservice followed
2  these meetings you had with Karla
3  Gray and Pat Hudson about this issue,
4  didn't it?
5  A. Yes, because they were in
6  November.
7  Q. Now, you go on to state in
8  this interrogatory 7 response -- I'm
9  looking at the second page of
10  Defendant's Exhibit Number 3, that
11  over the next several weeks that Dr.
12  Gaillard was very hostile, not just
13  toward you, but everybody; is that
14  correct?
15  A. Yes.
16  Q. Okay. So, he wasn't
17  singling you out in that regard, he
18  was just being a so and so to
19  everybody around you?
20  A. Yes.
21  Q. And, then, late January or
22  sometime in February of '06 is when
23  his comments started occurring again?

31 (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 125

1  A. Yes.
2  Q. You say that he touched you
3  on two occasions. When were those
4  occasions?
5  A. I know one was in February.
6  I don't -- I don't remember exactly
7  when the second one was.
8  Q. Okay. Well, describe the
9  nature of him touching you?
10  A. At one time I was at a
11  patient's bedside. We -- sometimes
12  when we're slammed, overcrowded,
13  don't have enough beds for
14  patients -- we have patients in the
15  hallway on beds. There was a patient
16  on a hallway bed. I pulled the
17  stretcher away from the wall to get
18  in between the stretcher and the bed
19  to try to start an IV on a patient.
20  At that time he walked up beside me
21  to start talking to a patient, and
22  put his hand on my hip, on my left
23  hip at that time. At that time I

Page 126

1  pushed his hand off with my hip with
2  my left elbow and proceeded to walk
3  away.
4       There was another instance
5  when we were standing at a patient's
6  bedside to do a lumbar puncture, and
7  I was holding the patient in
8  position, which required me to have
9  one hand behind their head and
10  another one holding their knees. And
11  he walked behind me to get some
12  gloves, and at that time he moved my
13  hair out of the way, and took his
14  hand and run it up the back of my
15  neck.
16  Q. On the time he touched your
17  left hip, did anybody observe that;
18  do you know?
19  A. I don't know.
20  Q. Did you say anything to him
21  about that?
22  A. "Don't touch me."
23  Q. And what did he say in

Page 127

1  response?
2  A. I walked away. I didn't
3  listen for a response.
4  Q. To your understanding, you
5  were loud enough he could hear you?
6  A. Yes.
7  Q. And the time he moved your
8  hair, what did you say, if anything?
9  A. "Do not touch me."
10  Q. Did he respond?
11  A. I don't remember what he
12  said.
13  Q. Did he ever touch you in an
14  offensive manner on any other
15  occasions?
16  A. No.
17  Q. Did you ever tell him not
18  to talk to you in certain ways?
19  A. Yes.
20  Q. And what would he respond?
21  A. He would just continue.
22  That was almost like a pass card. He
23  viewed that as -- as an engagement.

Page 128

1  Q. As an engagement, what do
2  you mean?
3  A. He would just engage that
4  much more. That was the response he
5  wanted.
6  Q. He was treating it more
7  like banter as opposed to --
8  A. He wanted a banter, yes.
9  Q. Told to stop? Okay. Going
10  on in your answer you describe some
11  other behavior that you're
12  complaining about. You say here that
13  he tried to follow you into the
14  bathroom?
15  A. Yes.
16  Q. Describe that situation.
17  A. I was standing in -- we
18  have two triage areas; triage one and
19  triage two. I was standing in triage
20  two talking to somebody, and he
21  walked up and was just standing
22  there. So I looked up at Katrina --
23  that's who I was talking to, and I

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1  said, "Come here, I want to show you
2  something." So she and I both turn
3  and walk away in the opposite
4  direction from him; walk around
5  behind registration around to where
6  there's a private bathroom. I walk
7  inside that bathroom and she walks
8  inside the doorway, and I said, "I
9  just came over here to get away
10 from him." By the time that she
11 could turn around, there he stood.
12     Q. Is it a ladies room?
13     A. No.
14     Q. Is it either sex?
15     A. Yes, but it's not an area
16 that doctors normally go to. They
17 have their own bathrooms.
18     Q. Is it meant for nurses
19 only, that bathroom?
20     A. I would assume nurses and
21 registration, because the door that
22 goes in there to go to that bathroom,
23 when you walk down the hallway two

Page 130

1  doors down, there's a door that's a
2  doctor's lounge, and they have their
3  own bathroom.
4      Q. Were you going in there to
5  show her something?
6      A. No. I went to get away
7  from him.
8      Q. And what was he doing on
9  that occasion that bothered you?
10     A. Just standing there.
11     Q. What do you mean, standing
12 there?
13     A. He walked up just to stand
14 there to stare.
15         MR. CRUM: What day is
16 this?
17         MR. MIDDLEBROOKS: Well,
18 we're looking at interrogatory 7,
19 midway down, and it's the vicinity of
20 February 2nd. I don't know if
21 that's --
22     Q. (BY MR. MIDDLEBROOKS:) Is
23 that the day we're talking about?

Page 131

1      A. Yes.
2      Q. February 2nd?
3          MS. BASWELL-GUTHRIE: Of
4  '06, right?
5          MR. MIDDLEBROOKS: Of '06.
6      Q. (BY MR. MIDDLEBROOKS:) And
7  that would be a weekend -- be a
8  Friday night, Saturday night, or
9  Sunday night; is that correct?
10     A. I'm sorry?
11     Q. That would be a weekend?
12     A. Yeah -- no, it was a
13 Thursday. I was not at work.
14     Q. Oh, why were you up there,
15 just to pick up your check?
16     A. Uh-huh.
17     Q. Is that yes?
18     A. Yes.
19     Q. All right. So we're into
20 February and, again, up until this
21 point, you had not gone back to Pat
22 Hudson, or Debra Phillips, or Karla
23 Gray, correct?

Page 132

1      A. Correct.
2      Q. And to your knowledge, then
3  Debra Phillips, Pat Hudson, and Karla
4  Gray did not know this conduct was
5  still going on; is that correct?
6      A. Correct.
7      Q. Do you have any basis to
8  say that Dr. Pool or Dr. Sullivan
9  knew that this conduct was still
10 going on?
11     A. No.
12     Q. Do you know of anybody
13 going to Phillips, Hudson, or Gray on
14 your behalf and saying, "This stuff
15 is still going on between Dr.
16 Gaillard and Nina Bennett?"
17     A. Not that I know of. I know
18 there was some other employees that
19 went on their own behalf, but, no.
20     Q. All right. Then you get
21 onto the next page, again still
22 interrogatory number 7, you say
23 February 16th you spoke with Pat

33 (Pages 129 to 132)

Page 133

1  Hudson regarding the behavior. Do
2  you see that?
3      A. Yeah.
4      Q. What prompted you to speak
5  to her on that occasion?
6      A. A combination of
7  everything.
8      Q. And that would be these
9  things that are shown in
10 interrogatory 7?
11     A. Yes.
12     Q. Anything additional?
13     A. No.
14     Q. All right. So, from the
15 first week of October until February
16 16th, you had made no complaints to
17 anybody in the chain of command; is
18 that true?
19     A. True.
20     Q. And to the extent there was
21 any inquiry of you about how things
22 were going, you didn't report any
23 problems; is that correct?

Page 134

1      A. That's correct.
2      Q. All right. So, Pat Hudson
3  is told these things by you. What
4  does she say in this meeting on the
5  16th of February?
6      A. She scheduled another
7  meeting with -- she was going to
8  schedule another meeting with Karla
9  Gray, for me and her and Karla Gray
10 to all sit down together.
11     Q. And did she do so?
12     A. Yes.
13     Q. Are you satisfied with how
14 Pat Hudson responded to you on this
15 occasion?
16     A. Yes.
17     Q. And a meeting did take
18 place on February 23rd?
19     A. Yes.
20     Q. Do you know why it took
21 from the 16th to the 23rd for there
22 to be a meeting?
23     A. No, I don't.

Page 135

1      Q. Do you have any complaints
2  about that period of time passing
3  before the meeting took place?
4      A. Yes, because I had to just
5  go back into the same environment.
6      Q. Do you recall if you worked
7  with Dr. Gaillard between the 16th
8  and the 23rd of February?
9      A. I don't recall.
10     Q. You don't recollect any
11 reason why it took that long to have
12 a meeting?
13     A. No.
14     Q. Do you know if efforts had
15 been made to contact you during that
16 period to try to set up a meeting?
17     A. I don't recall.
18     Q. Do you recall having your
19 telephone numbers changed during this
20 time period -- your home numbers,
21 personal numbers?
22     A. At some point in time I did
23 have my numbers changed, and I did

Page 136

1  give notice to the hospital.
2      Q. Gave them to who at the
3  hospital?
4      A. I gave them to Ms. Hudson
5  and to Gwen Glenn, who is her
6  personal secretary, because there's
7  an employee book that anyone can look
8  in there and get your telephone
9  number out of.
10     Q. Handwritten in there?
11     A. No. They're actually
12 typed, but if someone changes their
13 phone number, they just mark over it
14 and rewrite the phone number in
15 there.
16     Q. And that's something you
17 used in the emergency room?
18     A. Yes.
19     Q. Do you know if human
20 resources knows about, or has access
21 to that phonebook, if you will?
22     A. I don't know.
23     Q. All right. So this meeting

34 (Pages 133 to 136)

FREEDOM COURT REPORTING

Page 137

1  was set up. Pat Hudson attended, as
2  well?
3     A. Yes.
4     Q. Tell me about that meeting.
5     A. At that time we all -- we
6  sat down and discussed the other
7  issues and things that had went on at
8  this time.
9     Q. Can you describe in more
10 detail what was actually said by you,
11 and what was said by the others in
12 the meeting?
13    A. I told about the comments
14 about liking the way my scrubs ride
15 on my hips. The touching me, the
16 candy, all those things at that
17 time -- the looking forward to
18 getting to know me on a more personal
19 level when him and his wife get a
20 divorce, those comments.
21    Q. He gave you candy on one
22 occasion?
23    A. Yes.

Page 138

1     Q. Had any of the other
2  doctors ever given you anything?
3     A. No.
4     Q. Have you ever given Dr.
5  Gaillard anything?
6     A. No.
7     Q. Had any of the other
8  doctors at Decatur General ever
9  engaged in any behavior you found to
10 be offensive?
11    A. No.
12    Q. Anything else you can
13 recall that was said at the February
14 23rd meeting?
15    A. At that time I was told
16 that when he told me that he wanted
17 to get to know me on a more personal
18 level, that he had already crossed
19 that line -- that it had been
20 discussed with him about crossing the
21 line, and that at that time he had
22 actually crossed the line.
23    Q. Ms. Gray told you this?

Page 139

1     A. Yes.
2     Q. Anything else you can
3  recall Ms. Gray saying?
4     A. Not at this time, no.
5     Q. Are you satisfied with how
6  Ms. Hudson handled her role for the
7  hospital?
8     A. Yes.
9     Q. Up to this point?
10    A. Yes.
11    Q. How about with respect to
12 Ms. Gray, at this point with the
13 hospital?
14    A. Up until that point?
15    Q. Yes.
16    A. Yes.
17    Q. Judging by your answer,
18 then, it's going forward where you
19 have some complaint about Ms. Gray's
20 handling of the matter?
21    A. Yes.
22    Q. How about Ms. Hudson's
23 handling of the matter going forward,

Page 140

1  do you have any complaints of her?
2     A. No.
3     Q. How about Ms. Phillips?
4     A. No.
5     Q. So in terms of contending
6  that there's any inadequate or wrong
7  behavior by Ms. Hudson or Ms.
8  Phillips, we can take that off the
9  table?
10    A. Yes.
11    Q. Your complaints about how
12 Ms. Gray and others above her may
13 have handled the matter?
14    A. Yes.
15    Q. And about how Dr. Pool has
16 handled the matter?
17    A. Yes.
18    Q. Anybody else you can name,
19 though?
20    A. No.
21    Q. You state here, "I was
22 placed on administrative leave. That
23 I would work until specialty care

35 (Pages 137 to 140)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 141

1  closed, and then go home due to the
2  fact that he was the all night
3  physician." Describe for me the
4  nature of the operations in emergency
5  room on the weekends during the
6  shifts that you were assigned. And
7  what I mean by that, you've talked
8  about a couple of different areas
9  physically. How many doctors are
10 there, how are you assigned a doctor,
11 what are the different assignments --
12 just give me an overview of that?
13    A.  Okay. We have three main
14 areas that we're working in at night.
15 You have what we call the main hall,
16 which is the critical care area and
17 general treatment, that one doctor
18 takes care of those.
19        We have a specialty care
20 area. You have two nurses back there
21 with one physician, and sometimes we
22 have general care open where you have
23 one nurse and one physician. But

Page 142

1  normally you have two physicians.
2  One doctor is the all night doctor.
3  At that time the doctor that was up
4  on the main hall would be the all
5  night physician. He would be the one
6  that was there from 6:00 in the
7  afternoon until 6:00 in the morning.
8     Q.  Were you assigned to work
9  with a doctor?
10    A.  You were assigned to a
11 different area and you had to work
12 with whatever doctor was assigned to
13 that area.
14    Q.  How much physical
15 separation are those two areas? That
16 is, standing in one, can you see to
17 the other?
18    A.  No.
19    Q.  Are there walls in between?
20    A.  Not from critical care to
21 specialty care, no. You could see
22 from -- you could look down from
23 critical care down to general

Page 143

1  treatment.
2     Q.  Just down the hallway?
3     A.  Yeah.
4     Q.  But they're all accessible
5  still, even if you can't see, and get
6  around fairly quick?
7     A.  Yes.
8     Q.  Were you ever assigned --
9  strike that.
10       You were never then
11 assigned to work with Dr. Pool or Dr.
12 Gaillard, you were just assigned to
13 an area?
14    A.  Right.
15    Q.  But the doctors themselves
16 were assigned in such a way that they
17 would tend to be in a certain area?
18    A.  Yes.
19    Q.  So in terms of the
20 administrative leave, you would still
21 come to work on a given shift, but if
22 it got town to there being only one
23 doctor, and that one doctor was going

Page 144

1  to be Dr. Gaillard, then you wouldn't
2  have to work?
3     A.  Right.
4     Q.  They put you on paid
5  administrative leave?
6     A.  Right.
7     Q.  Now, were you paid for
8  those hours that you otherwise would
9  have worked?
10    A.  Yes.
11    Q.  Were you paid the same
12 amount that you would have worked --
13 would have earned had you worked?
14    A.  Yes.
15    Q.  Got shift differentials,
16 weekend pay?
17    A.  Yeah, I'm not sure about
18 the unit differential. But, yes, the
19 rest of it, yes. When it was first
20 said I wasn't going to get the
21 weekend pay.
22    Q.  When it was first said you
23 were going to be on administrative

36 (Pages 141 to 144)

Page 145

1  paid leave?
2      A. Yeah. We -- we negotiated
3  the weekend pay rate, because if not,
4  that's too much of a pay cut for me.
5      Q. It was how much an hour
6  would that have been?
7      A. $8.00 an hour.
8      Q. Did they end up paying that
9  $8.00 an hour?
10     A. Yes.
11     Q. So, did you end up making
12 the same money working as not
13 working -- not working as working?
14     A. Yes.
15     Q. So, you didn't lose any
16 money?
17     A. No.
18     Q. So, even though you said
19 initially they weren't going to pay
20 that $8.00 additional amount, after
21 there was some discussion they agreed
22 they would pay it, so you didn't lose
23 any money by how they scheduled you?

Page 146

1      A. Right.
2      Q. So in the course of your
3  complaints against Decatur General,
4  in terms of pay issues you're not out
5  any money at all?
6      A. Like I said, the unit
7  differential, unless if that's gone,
8  then that would be it. It's in our
9  check, so it's really strange why I
10 can never figure it up.
11     Q. Let me go at it this way.
12 Is part of your damage claim in this
13 instance a pay issue?
14     A. No.
15     Q. Okay. So, your damages
16 claims are not for pay?
17     A. Right.
18     Q. It's related to what you
19 have contended to be emotional harm?
20     A. Yes.
21     Q. And damages of that nature?
22     A. Yes.
23         MR. MIDDLEBROOKS: We've

Page 147

1  gone at it about close to two hours.
2  Can we take a break -- or, in fact,
3  do you want to break for lunch?
4          MS. BASWELL-GUTHRIE: Let's
5  take lunch. I have some calls that
6  have got to be returned.
7          MR. BROWN: Okay with me.
8          (Whereupon, a recess
9          Was taken for lunch.)
10     Q. (BY MR. MIDDLEBROOKS:) Ms.
11 Bennett, we're back from a lunch
12 break. Upon reflection, are there
13 any answers you want to modify or
14 change in any way?
15     A. Yes, actually, there was.
16 I'm trying to think back to where we
17 were. At one point we were
18 discussing why I wasn't satisfied
19 with the way that that was handled
20 about Dr. Gaillard being addressed
21 prior to -- I had went to human
22 resources, around that whole subject
23 there. I don't know if I conveyed

Page 148

1  this to you or not, but the reason
2  that I was so upset was because of
3  the fact that there had been two
4  other incidences, and I just felt
5  like they had went ahead and done
6  something without fully listening to
7  my side.
8      Q. Two other incidences
9  involving two other people?
10     A. Yes, sir.
11     Q. The two you told me about
12 earlier?
13     A. Yes, sir.
14     Q. Anything else you wish to
15 modify or supplement in your answers?
16     A. Yes. Let's go back to -- I
17 think it was the next to the last
18 question that you were asking me. Do
19 you remember exactly where we were?
20 That's okay, because I remember what
21 it was. When we had discussed the
22 second time that I had went to human
23 resources, and you were asking me

37 (Pages 145 to 148)

Page 149

1  about what all we had discussed, we
2  didn't discuss -- we didn't go over
3  what all we had discussed in the
4  first time that I went. And I wanted
5  to touch on that a little bit,
6  because we didn't talk about that.
7  One of the things that I did talk
8  about when I went over the first time
9  with the first complaint --
10  Q. Back in October?
11  A. Yes, sir. When I went over
12  at that time I did give -- not only
13  had I given Ms. Hudson, but I also
14  gave Ms. Gray a list of employees
15  that had similar problems with Dr.
16  Gaillard with inappropriate comments
17  and gestures, and that type of thing.
18  So that when we're getting over to --
19  when we're looking at February and
20  saying that I didn't say anything up
21  until this time again, in between --
22  even after that time and February,
23  there were other people that went

Page 150

1  over and complained. So, the reason
2  for not speaking up and saying
3  something was because you're looking
4  at these -- this is going on,
5  somebody else is going and saying
6  something, and nothing is happening.
7  That -- I just wanted to be able to
8  say that, because we're looking at it
9  like I'm just not saying anything.
10  But I wanted to make sure that you
11  saw it from my standpoint, as well.
12  Q. Okay. And I think I
13  understand.
14  A. Do you understand?
15  Q. Let me repeat it and make
16  sure I do. You haven't changed your
17  testimony from October to that
18  meeting in February you didn't come
19  forward and complain?
20  A. Right.
21  Q. And when asked in that
22  interview if there were any problems,
23  you didn't report any?

Page 151

1  A. Right.
2  Q. But you said during that
3  interim you were aware of others who
4  did go complain about it, and from
5  your perspective nothing changed with
6  Dr. Gaillard?
7  A. Exactly. Yes, sir.
8  Q. Who -- and we're talking
9  about that interim between your
10  meetings in October of '05 until the
11  latter part of February of '06, in
12  the meetings, that we pick back up
13  on. Who is it that went and
14  complained about Dr. Gaillard?
15  A. I know there was another
16  nurse. I know Catherine Tipton went
17  and complained about Dr. Gaillard.
18  Q. Anyone else?
19  A. At that point that was it.
20  Q. And how do you know she
21  did?
22  A. She said she did.
23  Q. Did she say who she

Page 152

1  complained to?
2  A. She said she went to human
3  resources.
4  Q. Did she say who at human
5  resources?
6  A. I did not ask, no.
7  Q. Do you remember the
8  timeframe?
9  A. Somewhere between the
10  October that we're referring to and
11  February.
12  Q. Did she describe the
13  nature -- did she describe
14  specifically the behavior --
15  A. No.
16  Q. -- that she was complaining
17  about?
18  A. No.
19  Q. Did she say how much of it
20  had gone on?
21  A. No, sir.
22  Q. Did she say that after she
23  complained, it never happened again?

Page 153

1   A.  At that -- I actually
2   believe that it did, because I
3   believe that after the February
4   incident where I complained again, I
5   think she actually went back, and I
6   know there was another nurse after
7   that that complained, as well.
8       Q.  Who was that?
9       A.  Laura Graham.
10      Q.  All right.  Then still back
11  during that period of 30 October,
12  late February, between your two
13  meetings where you complained, okay?
14      A.  Yes.
15      Q.  Let's see, she Cathleen?
16      A.  Catherine.
17      Q.  Catherine Tipton?
18      A.  Yes, sir.
19      Q.  Told you she had complained
20  to human resources?
21      A.  Yes, sir.
22      Q.  And you're saying you know
23  after you went back in February, she

Page 154

1   complained again?
2       A.  Yes, sir.
3       Q.  To your understanding.  But
4   here again, during this period of
5   time where she said, "I complained
6   about him," do you know if she had
7   any problems with Dr. Gaillard until
8   after your February meetings?
9       A.  You mean repetitive, or do
10  you mean again after the --
11      Q.  Well, she tells you some
12  point -- for example, say in December
13  she says --
14      A.  Right.
15      Q.  -- I'm going to human
16  resources and complain about Dr.
17  Gaillard.
18      A.  Right.
19      Q.  Do you know if anywhere
20  from the time she told you, up until
21  your February meetings with Ms.
22  Hudson and Ms. Gray, February '06, do
23  you know if she had anymore problems

Page 155

1   with Dr. Gaillard in December, or
2   January, or early February?
3       A.  I don't know.
4       Q.  Okay.
5       A.  I don't know.
6       Q.  Do you know of anyone else
7   who, during that period of time,
8   complained about Dr. Gaillard to
9   anybody?
10      A.  I do not know.
11      Q.  All right.  So Ms. Tipton
12  is the only one?
13      A.  That I'm aware of, yes,
14  sir.
15      Q.  And you're saying because
16  she had gone to human resources and
17  complained, you decided not to step
18  forward at that time?
19      A.  Yes, sir.
20      Q.  Any other reason you didn't
21  step forward at that time?
22      A.  Because it made -- because
23  every time that -- well, let me back

Page 156

1   up.  Not every time.  When he was
2   disciplined before and made -- I made
3   a note to put it in here about how
4   hostile he became, not only toward
5   me, but other staff.
6       Q.  Everybody?
7       A.  Everybody, right.  So not
8   only -- my logic was, if she's went
9   over and she's complained and we've
10  not done anything to him, if I step
11  over and I complain, are we still not
12  going to do anything, and then you're
13  going to make this whole hostile
14  environment not just for me, but for
15  everybody else as well.
16      Q.  Was he hostile toward any
17  men?
18      A.  Not that I'm aware of.  We
19  don't have that many men that work in
20  the ER.
21      Q.  Okay.  Are you contending
22  that his hostility is based upon
23  gender?

39 (Pages 153 to 156)