**FREEDOM COURT REPORTING**

Page 157

```
 1    A.  I have no idea.
 2    Q.  I mean, do you have any
 3  reason to say that he treated you as
 4  he did because you're a woman?
 5    A.  I don't know.  I didn't see
 6  him do anything toward a man.
 7    Q.  Okay.
 8    A.  So I don't know.
 9    Q.  With respect to the two
10  incidences of touching, did you
11  describe those touching incidences to
12  Karla Gray, or to Debra Phillips, or
13  to Pat Hudson?
14    A.  I know I did one.  I'm not
15  sure if I did both or not, but I know
16  I did one.
17    Q.  All right.  Who did you
18  describe one of them to?
19    A.  To human resources.
20    Q.  Karla Gray?
21    A.  Yes.
22    Q.  And is that in October or
23  is that in February?
```

Page 158

```
 1    A.  February.
 2    Q.  But after you told human
 3  resources in February of '06 about
 4  the touching --
 5    A.  Right.
 6    Q.  -- or just one of the two
 7  touchings?
 8    A.  Right.
 9    Q.  Did he ever touch you -- he
10  being Dr. Gaillard, ever touch you
11  again in an offensive manner?
12    A.  No.
13    Q.  Do you recall any specific
14  response from Ms. Gray about this
15  subject of him touching you in an
16  offensive manner?
17    A.  At that conversation or at
18  a later conversation?
19    Q.  Well, at that conversation
20  when you told her about it?
21    A.  No, I don't recall her
22  response.
23    Q.  One way or the other?
```

Page 159

```
 1    A.  No.
 2    Q.  Do you recall her saying
 3  anything about it at a later time?
 4    A.  Yes, when -- in reference
 5  to him still being employed there,
 6  there was a comment made about other
 7  than him touching you that one time,
 8  he's really not done anything.
 9    Q.  Who said that?
10    A.  Ms. Gray.
11    Q.  When did she say that?
12    A.  It was on -- during a
13  telephone conversation after the
14  February issue.  Somewhere prior to
15  his termination.
16    Q.  Okay.  Do you know if Dr.
17  Gaillard ever worked for ApolloMD at
18  any time before he came to the
19  premises at Decatur General?
20    A.  I don't know.
21    Q.  Now, and you said
22  originally when you had complaints
23  about Dr. Gaillard, you didn't go to
```

Page 160

```
 1  Dr. Pool, he came to you?
 2    A.  Right.
 3    Q.  And then after you went to
 4  human resources in February of '06
 5  and had that meeting -- I think it's
 6  referenced on the February 23rd, you
 7  did later have some other
 8  conversations with Karla Gray?
 9    A.  Yes.
10    Q.  As well as with Pat Hudson
11  and Debra Phillips about Dr.
12  Gaillard?
13    A.  I know I did with Ms. Gray.
14  I don't -- yes, I did actually have
15  another conversation with Ms. Hudson
16  about him.
17    Q.  When was that with Ms.
18  Hudson?
19    A.  One night that I had
20  actually worked, and I was working in
21  that back area.  He was supposed to
22  have been up on the front hall, and
23  before I left to go home he came back
```

Page 161

1  there and leaned across the desk and
2  said, "There's the invisible Ms.
3  Bennett." So the next night when I
4  came to work to clock in Ms. Hudson
5  was there.
6      Q. And you told her about it?
7      A. She already knew about it,
8  because actually Lee Gray was the
9  charge nurse that night, and he knew
10 about it, and so he had already
11 called her.
12     Q. And what did Ms. Hudson
13 say?
14     A. She knew that I was very
15 upset. She offered to let -- to have
16 Phyllis West come and talk to me,
17 which I told her there was no need in
18 doing that, that wasn't going to do
19 anything.
20     Q. How do you know it
21 wouldn't?
22     A. I still had to work. He
23 was still working there. I still had

Page 162

1  to work that night.
2      Q. Had you told anybody at
3  that point that you wanted Dr.
4  Gaillard gone from the premises?
5      A. No.
6      Q. Is that what you wanted
7  done at that point in time, though?
8      A. Yes.
9      Q. You later told Ms. Gray
10 that, didn't you?
11     A. Yes.
12     Q. Did you later tell anybody
13 else that?
14     A. No.
15     Q. How long after you said you
16 wanted him gone from the premises was
17 it before he was gone?
18     A. The next day.
19     Q. All right. With respect
20 to -- let me ask you about Lee Gray.
21 How did he and Dr. Gaillard get
22 along?
23     A. I don't know.

Page 163

1      Q. Did he ever complain about
2  him -- Gray ever complain about Dr.
3  Gaillard?
4      A. No, I don't work with him
5  that much.
6      Q. You never heard him
7  complain?
8      A. No.
9      Q. All right. So, Ms. Hudson,
10 you talked to her back in October of
11 '05 with the complaint, February of
12 '06. Then a second time you spoke to
13 Ms. Hudson, you just described that.
14 Any other times you complained or
15 spoke to Ms. Hudson about problems
16 with Dr. Gaillard?
17     A. Not that I recall.
18     Q. And Debra Phillips, did you
19 ever speak with Ms. Phillips again
20 about complaints of Dr. Gaillard?
21     A. No.
22     Q. Now, you would work with
23 Ms. Hudson and Ms. Phillips about

Page 164

1  your schedule and some of those
2  things, but not necessarily -- that
3  may be related -- but, again, you've
4  told me about all the times you've
5  complained to Debra Phillips and Ms.
6  Hudson about Dr. Gaillard?
7      A. Yes.
8      Q. And with Ms. Gray, you met
9  with her February 23rd. Do you recall
10 how many more times you spoke with
11 Ms. Gray before you had the
12 conversation with her in which you
13 expressed you wanted Dr. Gaillard
14 gone?
15     A. Either two or three more
16 conversations, because in that
17 timeframe we discussed the
18 administrative leave.
19     Q. Okay. And we've talked
20 about the issue. That was all worked
21 out to your satisfaction on
22 administrative leave?
23     A. Yes.

41 (Pages 161 to 164)

## FREEDOM COURT REPORTING

Page 165

1   Q. And so, again, pay is not
2  an issue in this litigation; is that
3  fair?
4   A. Yes.
5    MR. MIDDLEBROOKS: You
6  don't have any dispute over that?
7    MR. BROWN: (Attorney
8  shakes head.)
9    MR. MIDDLEBROOKS: I didn't
10  think we the did.
11   Q. (BY MR. MIDDLEBROOKS:) All
12  right. So, tell me about those two
13  three conversations you had with Ms.
14  Gray in terms of what was said.
15   A. Well, we discussed the
16  administrative leave, worked that
17  out. Then at one conversation she
18  asked me would I not be -- in other
19  words, you will not be satisfied
20  until he's gone, and I told her yes.
21  At one point in time she had
22  explained to me and he was a contract
23  employee and could not be terminated.

Page 166

1   Q. Did she ever explain to you
2  that we were getting him off the
3  schedule, but it would take a couple
4  of weeks?
5   A. Yes.
6   Q. And that was in the course
7  of one of these conversations?
8   A. Yes.
9   Q. And you told her that's not
10  good enough, I want him gone?
11   A. Yes.
12   Q. And he was gone. You got a
13  call the next day telling you he was
14  gone?
15   A. Yes.
16   Q. Did that please you?
17   A. Yes.
18   Q. But it didn't satisfy you?
19   A. No.
20   Q. Why not?
21   A. Too long in coming.
22   Q. And you contend you were
23  damaged by that delay?

Page 167

1   A. Yes.
2   Q. And we'll talk about how
3  that's affected you as we get later
4  in the deposition. Can you recall
5  anything else further about your
6  conversations with Ms. Gray related
7  to Dr. Gaillard? And feel free to
8  look at your interrogatory answers,
9  and I may have some other documents
10  that show you that might help us
11  flush it out.
12   A. I discussed with her how it
13  was hard for me to work, because I
14  couldn't relax. I was constantly
15  looking over my shoulder. I told her
16  I stayed tense at work, afraid he was
17  going to walk up behind me, never
18  knowing where he was.
19   Q. Now, you do acknowledge
20  they did make efforts to handle your
21  schedule in such a way as to either
22  remove or minimize contact with Dr.
23  Gaillard if you both were going to be

Page 168

1  there?
2   A. Yes.
3   Q. You're saying it just
4  wasn't successful to your
5  satisfaction, however?
6   A. No. Because we've moved me
7  to another area, and he's still
8  coming to that area. Now you're
9  telling me that I'm going to have to
10  wait a few more weeks. That was not
11  acceptable.
12   Q. Were you ever offered any
13  paid time off where you chose not to
14  take it, because you were concerned
15  about it putting a burden on others
16  in the emergency room?
17   A. I don't recall.
18   Q. Well, do you ever recall
19  being offered paid time off where you
20  didn't take it for any reason?
21   A. I don't recall.
22   Q. You've told me of all the
23  meetings or conversations you've had

42 (Pages 165 to 168)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 169

1  with Debra Phillips, Pat Hudson, or
2  Karla Gray, in which you expressed
3  complaints about Dr. Gaillard?
4      A.  Yes.
5      Q.  And have you told me all
6  the bases on which you would contend
7  that Phillips, Hudson, and Gray would
8  have any knowledge about Gaillard's
9  behavior in the workplace that you
10 found to be offensive?
11     A.  Yes.
12     Q.  And to the best of your
13 knowledge, you named two people early
14 in the deposition who went to Dr.
15 Pool about Dr. Gaillard, and then Ms.
16 Tipton going to -- said she went to
17 human resources about Dr. Gaillard,
18 but up until your February 23rd
19 meeting in '06, you're not aware of
20 anybody else complaining about Dr.
21 Gaillard, are you?
22     A.  No, I'm not aware of it.
23     Q.  And you say you did learn

Page 170

1  about Laura Graham complaining about
2  Dr. Gaillard.  What do you know about
3  her complaint?
4      A.  I know there was an
5  incident.  I'm not really sure what
6  happened, where he laid on her or
7  something.  I'm not sure.
8      Q.  Did you see it?
9      A.  No.
10     Q.  How do you know about it?
11     A.  She told me.
12     Q.  And is that what you
13 remember her telling you?
14     A.  Yes, because I don't
15 remember the details.
16     Q.  Did she say when that
17 happened?
18     A.  No.
19     Q.  And you described it he'd
20 laid on her?
21     A.  That was the gist of what
22 she told me.  What exactly
23 transpired, I don't -- I don't

Page 171

1  remember.
2      Q.  And you don't remember when
3  that was?
4      A.  It was sometime after the
5  February meeting.
6      Q.  Somewhere in the last few
7  weeks that Dr. Gaillard was on the
8  premises?
9      A.  Uh-huh.  Somewhere between
10 the February and March issue
11 timeframe.
12     Q.  Do you know who she
13 complained to?
14     A.  I think she went to human
15 resources.
16     Q.  But you don't know?
17     A.  I think that's correct.  I
18 also -- I want to say that she also
19 spoke with Ms. Hudson, but I can't
20 say that for sure.
21     Q.  Have you and Ms. Graham had
22 conversations about your respective
23 experiences with Dr. Gaillard?

Page 172

1      A.  Yes, because we went and
2  filed a complaint with the EEOC.
3      Q.  You went together?
4      A.  Yes.
5      Q.  Rode down together?
6      A.  Yes.
7      Q.  Anybody suggest you go?
8      A.  No.
9      Q.  Did you have counsel at
10 that time already?
11     A.  No.
12     Q.  Had you spoken to counsel
13 at that time already?
14     A.  No.
15     Q.  Do you know if she had?
16     A.  No, I don't think so.
17     Q.  Well, tell me how it came
18 about that you two decided to go
19 down -- because you're talking about
20 coming down to Birmingham; right?
21     A.  Right.
22     Q.  And go to the EEOC
23 together?

43 (Pages 169 to 172)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1  A. Right.
2  Q. Describe for me how that
3  unfolded. I mean, you weren't both
4  headed to the parking lot at the same
5  time and got in the car by accident.
6  I mean, how did you get from being in
7  Decatur to being in Birmingham, got
8  together to drive together?
9  A. We -- in the course of
10 talking about what had happened, I
11 made the comment about that I was
12 going to do something. She said that
13 she wanted to do something else, and
14 I just told her what I was going to
15 do, and she said that she wanted to
16 do that as well, and we rode together
17 to the EEOC.
18 Q. Have you had any
19 conversations with Ms. Graham
20 subsequent to that time about Dr.
21 Gaillard or Decatur General?
22 A. Before she told me about --
23 Q. No, after going to the

Page 174

1  EEOC?
2  A. After.
3  Q. Since going to the EEOC,
4  have you and Ms. Graham had any
5  conversations about Dr. Gaillard or
6  about any complaints against Decatur
7  General?
8  A. Yes.
9  Q. Tell me about those
10 conversations.
11 A. Wanting to know if either
12 one of us had heard anything from the
13 EEOC.
14 Q. Any other conversations?
15 A. That's about -- that's the
16 gist of the conversation. Have you
17 heard anything, did you get anything
18 in the mail?
19 Q. Did you ever discuss with
20 Ms. Graham your lawsuit against
21 Decatur General?
22 A. No.
23 Q. Or that you were going to

Page 175

1  sue them?
2  A. No.
3  Q. Do you have any knowledge
4  whether she's ever sued them?
5  A. I don't have any knowledge
6  that she has.
7  Q. Did she ever express how
8  she felt about the fact once Dr.
9  Gaillard was gone from the premises?
10 Did she say, "He's gone. I'm fine.
11 I'm moving on;" any conversation like
12 that?
13 A. I'm trying to recall. I
14 think she might have made the comment
15 it was about time.
16 Q. That's all you can
17 remember?
18 A. Yes, sir.
19     (Whereupon, Defendant's
20     Exhibit Number 16 was
21     Marked for identification.)
22     (Handing document to
23     Witness.)

Page 176

1  Q. Let me show you what's been
2  marked as Defendant's Exhibit 16,
3  which is the charge of
4  discrimination, Bates number D2 in
5  the bottom right-hand corner. Do you
6  recognize this charge of
7  discrimination?
8  A. Yes.
9  Q. And that's your signature
10 down by March 10th, 2006?
11 A. Yes.
12 Q. Now, how did you come up
13 with the wording for this charge?
14 A. I did not type that. The
15 person at the EEOC did that.
16 Q. I didn't ask you if you
17 typed it. I asked you how did you
18 come up with the wording for it?
19 A. I'm sorry. I don't
20 understand.
21 Q. Who picked these words?
22 A. You tell me them about the
23 action, and they were the ones that

44 (Pages 173 to 176)

Page 177

1   decided what the discrimination was.
2       Q.  Now, you understand you
3   were signing this under penalty of
4   perjury?
5       A.  Yes.
6       Q.  Just the same kind of oath
7   you took today?
8       A.  Yes.
9       Q.  So, you were careful about
10  signing it, true?
11      A.  Yes.
12      Q.  It's not a trick question.
13      A.  Right.
14      Q.  Did you read it before you
15  signed it?
16      A.  Yes.
17      Q.  Was there anything on here
18  that you disagreed with or that you
19  thought was wrong?
20      A.  Well, besides some of the
21  dates not being actually correct, we
22  brought up -- we did ask about the
23  fact that it had race into play.  And

Page 178

1   actually, believe it or not, this was
2   a black man that actually filled this
3   paper out.
4       Q.  Okay.  Well, let me ask you
5   about that, since you raised that
6   issue.  Why did you check the race
7   box?
8       A.  He said that it applied.
9   He checked the race box.
10      Q.  Did you think race was a
11  factor?
12      A.  I didn't know.
13      Q.  Is there any reason
14  whatsoever you think race was a
15  factor in how Dr. Gaillard or Decatur
16  General treated you?
17      A.  I don't -- I don't know.
18      Q.  Had race ever come up?
19      A.  No.
20      Q.  Have you ever -- have you
21  ever dated a black man?
22      A.  Yeah.
23      Q.  Have you been married to a

Page 179

1   black man?
2       A.  Yes, right now.
3       Q.  So, you would have no
4   objection to the fact of Dr. Gaillard
5   just because he's black?
6       A.  No.
7       Q.  But what I'm perplexed
8   about is, that alone is not enough
9   reason to check the race box, is it?
10      A.  No.  But like I said,
11  this -- the EEOC was the one that
12  said that that applied.
13      Q.  Today sitting here, do you
14  think race is a factor?
15      A.  No, I think it would go
16  more toward gender, but I don't see
17  that -- well, sex is on there.
18      Q.  Sex is what you're here
19  about?
20      A.  Yes.
21      Q.  Anything else in here you
22  might -- well, the dates, I'm sorry.
23  What dates -- the August 4th, 2003,

Page 180

1   may be a little bit wrong?
2       A.  Yes.
3       Q.  September 30, 2005, may be
4   off by about a day or two?
5       A.  Yes.
6       Q.  And, then, it says you know
7   he's a contract doctor, and you
8   understood that Dr. Gaillard is a
9   contract doctor, correct?  Is that
10  right?
11      A.  Yes, after this all came
12  out, yes.
13      Q.  It says the most recent
14  incident of sexual harassment
15  occurred on February 17th, 2006, that
16  you reported to management.  What
17  specific incident are you speaking of
18  there?  Feel free to look at your
19  interrogatories.
20      A.  I think that date is
21  actually wrong on there.
22      Q.  Can you give me the correct
23  date that should be on here?

FREEDOM COURT REPORTING

Page 181

1  A. I'm not -- I'm not sure --
2  I don't have that -- I don't have
3  that down.
4  Q. Well, from the box midway
5  down the page, dates discrimination
6  took place, you've got the earliest
7  September 30, 2005, latest 2-24,
8  2006. Do you see that, see that box
9  in your charge?
10  A. Yes.
11  Q. Is that yes?
12  A. Uh-huh, yes.
13  Q. I'm just trying to find
14  out. That says latest 2-24, and that
15  says February 17th. I'm trying to
16  find out what that last incident is?
17  A. It's going to be that
18  weekend somewhere around Valentine's
19  Day, and I don't have a 2005 calendar
20  in front of me.
21  Q. So the weekend around
22  Valentine's Day, give or take several
23  days, would be the last time you

Page 182

1  found Dr. Gaillard to be offensive
2  and hostile based on sex?
3  A. Yes.
4  Q. And about what you have in
5  a complaint?
6  A. Yes.
7  Q. Anything else about this
8  charge that you would want to clarify
9  or modify in any way?
10  A. No.
11  Q. Is that the only charge of
12  discrimination you have ever filed
13  against any employer?
14  A. Yes.
15  MR. MIDDLEBROOKS: Let's go
16  off.
17  (Whereupon, a discussion
18  Was held off the record.)
19  (Whereupon, Defendant's
20  Exhibit Number 17 was
21  Marked for identification.)
22  (Handing document to
23  Witness.)

Page 183

1  Q. I'll show you what's marked
2  as Defendant's Exhibit 17, Bates
3  number T222. And do you recognize
4  this document, Dismissal and Notice
5  of Rights, U.S. Equal Employment
6  Opportunity Commission?
7  A. Yes.
8  Q. And you received this back
9  on around August 31st, 2006?
10  A. Yes.
11  Q. And you understood that the
12  EEOC at the end of it's investigation
13  found no wrongdoing on the part of
14  Decatur General?
15  MR. BROWN: Object to the
16  form.
17  Q. (BY MR. MIDDLEBROOKS:)
18  Have you got an answer, ma'am?
19  A. It was my understanding
20  that the letter would either read
21  that there was no finding, and this
22  to me it doesn't really say one way
23  or the other, it just says that they

Page 184

1  weren't able to conclude.
2  Q. Well, it says not able to
3  conclude the information contained
4  establishes a violation to the
5  statutes. They never found a
6  violation of any statute by Decatur
7  General, did they?
8  MR. BROWN: Object to the
9  form.
10  Q. (BY MR. MIDDLEBROOKS:) Do
11  you have an answer?
12  A. I don't know what they --
13  because to me, if they didn't find
14  anything, then I would have thought
15  that box 1 would have been more
16  appropriate.
17  Q. But they didn't check box
18  1. They just checked this box. And
19  did they say they ever found anything
20  against Decatur General? Have you
21  got anything that says they did?
22  A. No, but that really doesn't
23  say it doesn't, either. It just says

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 185

1   they -- they can't tell.
2       Q.  You've never seen anything
3   in which they find anything against
4   Decatur General, have you?
5       A.  No, I haven't seen it.
6       Q.  All right.  So, you tell
7   Ms. Gray that the only thing you
8   think is a suitable outcome is for
9   Dr. Gaillard to be gone.  The next
10  day he's gone.  Have you had any
11  contact with Dr. Gaillard since that
12  date?
13      A.  No.
14      Q.  And as you testified
15  earlier, after that date you have no
16  complaints about Decatur General
17  Hospital?
18      A.  No.
19          (Whereupon, Defendant's
20          Exhibit Number 18 was
21          Marked for identification.)
22          (Handing document to
23          Witness.)

Page 186

1       Q.  I'll show you your
2   complaint in this matter.  I did mark
3   it as Exhibit Number 18.  It will be
4   a matter of record.  You've read your
5   complaint before?
6       A.  Yes.
7       Q.  Look, if you would, under
8   D, Count One, Sexual Harassment?
9       A.  Okay.
10      Q.  And in Paragraph 6 it says,
11  Dr. Henry Gaillard was employed by
12  Decatur General Hospital and still is
13  employed by ApolloMD Physician
14  Services.  Now, you said that you had
15  learned at some point that he was not
16  our employee; is that correct?
17      A.  Yes.
18      Q.  And it states in here in
19  paragraph seven, "Specifically
20  Decatur General Hospital and Apollo
21  Physician Services allowed the
22  hostile environment to remain for
23  about one year before taking any

Page 187

1   action to remedy the situation, et
2   cetera."  Now, a year is a little
3   exaggerated, isn't it?
4       A.  It's not quite a year.
5       Q.  Well, you didn't even know
6   the guy before August of '05, did
7   you?
8       A.  No.
9       Q.  And he was gone in early
10  March of '06, wasn't he?
11      A.  Yes.
12      Q.  But in here it also says
13  that you were put on administrative
14  leave at lower pay.  Now, that's
15  incorrect, right?
16      A.  Like I said before, I don't
17  know about the unit pay.  If that's
18  correct, then I had the same pay.
19      Q.  But, again, we're not
20  quibbling about pay here, though, are
21  we?
22      A.  No.
23      Q.  I just don't want to be

Page 188

1   surprised about anything.  Now, you
2   go on to some counts beyond the Title
3   7 count of sexual harassment.  It
4   says, "Assault and battery under
5   Alabama law."  Do you see that?
6       A.  Yes.
7       Q.  And, again, it was Dr.
8   Gaillard that engaged in the touching
9   you said to be offensive; is that
10  right?
11      A.  Yes.
12      Q.  This claim, is it just
13  against Dr. Gaillard?
14      A.  I'm sorry?
15      Q.  This claim -- I know the
16  Title 7 count is against Decatur
17  General?
18      A.  Right.
19      Q.  The claim of assault and
20  battery, who is the defendant or
21  defendants in that?
22      A.  That would be Dr. Gaillard.
23      Q.  He's the only defendant to

47 (Pages 185 to 188)

Page 189

1  that one; is that correct?
2  A. Yeah.
3  Q. And the invasion of
4  privacy, isn't it correct that that
5  one is also only Dr. Gaillard?
6  A. Yes.
7  Q. But count 4, outrage --
8     THE WITNESS: Can I go to
9  the bathroom?
10    MR. MIDDLEBROOKS: Excuse
11 me?
12    THE WITNESS: Can I go to
13 the restroom?
14    MR. MIDDLEBROOKS: Yes.
15 Off the record.
16    (Whereupon, a discussion
17    Was held off the record.)
18    (Whereupon, a short recess
19    Was taken.)
20 Q. (BY MR. MIDDLEBROOKS:)
21 We'll continue with questioning.
22 Upon reflection is there anything you
23 want to modify or change in any way?

Page 190

1  And, by the way, when I ask you that,
2  I'm not suggesting there's a reason
3  you should modify or change anything.
4  I'm just giving you a chance. Do you
5  have an answer to that question?
6  A. Yes.
7  Q. Okay.
8  A. Going back to who the -- I
9  think the point that's here is the
10 fact that he was still working for
11 Decatur General. He still -- even
12 though he's a contract employee, he
13 still is an employee for Decatur
14 General because he's still on their
15 premises.
16 Q. You're referring to what
17 paragraph?
18 A. When you were talking
19 about -- when you were talking about
20 the assault and battery under Alabama
21 law, and then the invasion of
22 privacy -- because he was still an
23 employee -- he is a contract

Page 191

1  employee, but at the same time he
2  still does work for Decatur General,
3  and so at the same time they are
4  still liable for his actions. So,
5  then, I would have to say that that
6  would be both.
7     MR. CRUM: What are we
8  talking about now?
9     THE WITNESS: He was asking
10 me in reference to who actually was
11 responsible.
12    MR. CRUM: Thanks.
13 Q. (BY MR. MIDDLEBROOKS:)
14 Yeah. I'm asking in count 2, who are
15 you suing in count 2?
16 A. Because it's actually --
17 that would be him and Decatur General
18 at the same time, because he's still
19 working for them. He's still allowed
20 to be on the premises.
21 Q. So, in what way do you say
22 Decatur General is responsible for
23 improper or offensive touching of

Page 192

1  you?
2  A. Because after all the
3  complaints they already had, he was
4  still there.
5  Q. Well, who complained about
6  him actually touching?
7  A. Nobody actually complained
8  about him touching, but it was the
9  sexual harassment. All the other
10 complaints about him and he was still
11 there.
12 Q. Do you know of anything
13 that would put Decatur General on
14 notice that he was prone to offensive
15 touching, before you ever complained
16 to them?
17 A. No, I'm not aware of
18 anything that they would have known
19 about that he was going to touch
20 somebody, but they knew that he had
21 already been inappropriate with
22 staff -- made inappropriate comments
23 with staff. So, I mean, we're

Page 193

1  talking about we have a zero
2  tolerance policy.
3     Q.  What is your understanding
4  of what assault and battery is?  I'm
5  not holding you to --
6     A.  Anybody putting their hands
7  on me in an unwanted way.
8     Q.  All right.  So, he did that
9  twice?
10    A.  Yes.
11    Q.  And you complained about
12 that in February of 2006?
13    A.  Yes.
14    Q.  It never happened again?
15    A.  No.
16    Q.  And before you complained
17 about it in February of 2006, you're
18 not aware of any basis that Decatur
19 General would know that he had ever
20 improperly touched anybody before?
21    A.  No.
22    Q.  We're in agreement on that?
23    A.  That they didn't know that

Page 194

1  he had -- right.
2     Q.  Well, any other basis for
3  saying that you think Decatur General
4  would be responsible for the two
5  times Dr. Gaillard improperly touched
6  you?
7     A.  I'm sorry?
8     Q.  Any other basis for your
9  contention that Dr. -- excuse me,
10 Decatur General would have any legal
11 responsibility for the two occasions
12 Dr. Gaillard allegedly touched you in
13 an offensive manner?
14    A.  No.
15    Q.  Did Dr. Gaillard ever
16 threaten you in any way?
17    A.  No.
18    Q.  Did anyone witness, to your
19 knowledge, those two offensive
20 touchings?
21    A.  I don't know.  One was in
22 the hallway, so I don't know.
23    Q.  No one ever reported to you

Page 195

1  they'd seen it?
2     A.  No.
3     Q.  Then the invasion of
4  privacy, who are you suing for that?
5     A.  Well, that would be him,
6  and also at this point he's still an
7  employee of the hospital.  And, yes,
8  they may not have known that he was
9  going to do that, but his behavior
10 had already been inappropriate.
11    Q.  Well, in Count H,
12 paragraphs 16 and 17, you don't name
13 Decatur General at all, do you?
14    A.  No.
15    Q.  Now you did name both us
16 and Apollo in Count 4, don't you?
17    A.  Yes.  I had to find 4, I'm
18 sorry.
19    Q.  Certainly in Count 4 you're
20 claiming we're defendants along with
21 the two others?
22    A.  Yes.
23    Q.  Have you described to me

Page 196

1  all the conduct of Dr. Gaillard which
2  constitutes the assault and battery
3  you're complaining about?
4     A.  Yes.
5     Q.  Have you described to me
6  all the conduct of Dr. Gaillard which
7  you contend was invasive of your
8  privacy?
9     A.  Yes.
10    Q.  And have you described all
11 the conduct of Dr. Gaillard which you
12 contend was outrageous conduct, on
13 which you base Count 4?
14    A.  Are we including what's
15 already in the written?
16    Q.  In your interrogatory
17 answers, yes?
18    A.  With all that included?
19    Q.  Yes.
20    A.  Yes.
21    Q.  So, if I look at your
22 testimony and go back and read it,
23 which I will, and look at your

49 (Pages 193 to 196)