Case 5:06-cv-04777-CLS   Document 69-8   Filed 10/05/07   Page 1 of 10

FILED
2007 Oct-05 PM 03:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

FREEDOM COURT REPORTING

Page 197

1 interrogatory answers, we've got all
2 the conduct which you can recall of
3 Dr. Gaillard on which you base all
4 four of your claims?
5     A. Yes.
6     Q. And you've told me of the
7 basis of why you think Decatur
8 General would be responsible for the
9 conduct of Dr. Gaillard?
10    A. Yes.
11    Q. You can't think of any
12 other basis than what you've told me?
13    A. Right.
14    Q. Now, when they had you go
15 on administrative leave with pay, did
16 you consider that punitive to you?
17    A. No.
18    Q. They were trying to work
19 out something until they could get
20 the problem resolved; is that right?
21    A. Yes.
22    Q. Did Mr. Puryear?
23    A. Puryear.

Page 198

1     Q. I'm bad with names.
2     A. That's okay. It's spelled
3 really funny. You say it just like
4 career, but it's Puryear.
5     Q. Did he ever date anybody
6 else at Decatur General?
7     A. No.
8     Q. Does he know Dr. Gaillard?
9     A. He's seen him.
10    Q. And what were those
11 circumstances?
12    A. He brought me some lunch to
13 work, and when we walked down the
14 hallway he was walking behind me, and
15 Dr. Gaillard just turned and watched
16 me walk by. And, so, when we got
17 outside he asked me, "Was that him
18 that was starring," and I said,
19 "Yes."
20    Q. Have you ever considered
21 having Dr. Gaillard arrested -- not
22 now, it was a long time ago, but back
23 then for touching you, for this

Page 199

1 offensive behavior.
2     A. No, I hadn't thought of it.
3     Q. Did you ever swear out a
4 complaint with the police?
5     A. No.
6     Q. Do you contend that Decatur
7 General benefited by any of Dr.
8 Gaillard's actions?
9     A. Well, they benefited
10 because he was at work.
11    Q. Benefited by him being at
12 work and performing the duties of an
13 emergency room doctor?
14    A. Yes.
15    Q. The scope of his duties was
16 to be a doctor, right?
17    A. Right.
18    Q. Is it your understanding
19 that touching you offensively was
20 within the scope of his duties?
21    A. No.
22    Q. That his comments which you
23 found to be invasive of your privacy,

Page 200

1 did you consider those to be in the
2 scope of his duties?
3     A. No.
4     Q. Do you contend that beyond
5 Dr. Gaillard being at work certainly,
6 and performing the work of a doctor,
7 that Decatur General benefited by his
8 conduct that you're complaining
9 about?
10    A. No.
11    Q. Have you looked through the
12 documents that Decatur General and
13 others have produced in this
14 litigation? Have you ever seen
15 those?
16    A. No.
17        (Whereupon, Defendant's
18        Exhibit Number 19 was
19        Marked for identification.)
20        (Handing document to
21        Witness.)
22    Q. What's marked as
23 Defendant's Exhibit 19, Bates

FREEDOM COURT REPORTING

Page 201

1  numbered D19, and these are some
2  notes dated October 6. And is it
3  fair to say you've never seen that
4  document before?
5      A. Never seen it.
6      Q. Okay. And you recall, of
7  course, we've already talked about
8  October 6th, is when you met with
9  Karla Gray?
10     A. Yes.
11     Q. It says at 9:00 o'clock,
12 according to this. Does that sound
13 about right to you?
14     A. Yes.
15     Q. Who all was in that
16 meeting?
17     A. Just me and Karla Gray.
18     Q. And stated in this document
19 in paragraph two, midway down, "This
20 is the first time Ms. Bennett has
21 reported the events. Ms. Bennett
22 acknowledged that she has not
23 reported this matter to anyone in the

Page 202

1  past, including her director, Pat
2  Hudson." And I think you've already
3  testified that would be true, at
4  least a few days before you talked to
5  Ms. Hudson, right?
6      A. Yes.
7      Q. Here at the bottom of the
8  page it says that, "Ms. Gray offered
9  to allow Ms. Bennett to be off on
10 paid administrative leave," but you
11 declined at that time. That's where
12 my question came from earlier.
13     A. I don't recall that,
14 especially not in October.
15     Q. But you didn't take off any
16 time at that point in time?
17     A. No.
18     Q. Look, if you would, at the
19 other events described in here --
20 these comments. These are things
21 that you've already testified to in
22 your interrogatory answers, or
23 earlier today?

Page 203

1      A. Actually I wasn't -- when
2  we go down to paragraph -- actually I
3  wasn't in the break area. I was
4  sitting at the desk in critical care.
5      Q. And this is referring to
6  which event?
7      A. Where the paragraph starts
8  out, "Later when Ms. Bennett was in
9  the break area."
10     Q. Right. But these are all
11 events that you did describe to Ms.
12 Gray?
13     A. Yes. And at this time is
14 when I also gave a list of other
15 employees that I had heard that he
16 had been inappropriate with.
17     Q. How did you get the list?
18 How did you get the names?
19     A. Just people talk.
20     Q. Did you talk to each person
21 on the list?
22     A. Everybody talks. Everybody
23 stands around and tells things, you

Page 204

1  know. Like somebody will be standing
2  there and they'll just say, you know,
3  "I worked with him the other night,
4  you know, and he said to me blah,
5  blah, blah, blah, blah." That's how
6  I got the list.
7      Q. But other than at some
8  point Ms. Tipton, and later Ms.
9  Graham, to your knowledge none of
10 them ever complained?
11     A. Not that I'm aware of. I
12 don't know.
13     Q. All right. Looking at
14 Defendant's Exhibit 19, there's
15 nothing about your testimony that you
16 would change in any way, is there?
17     A. No.
18        (Whereupon, Defendant's
19        Exhibit Number 20 was
20        Marked for identification.)
21        (Handing document to
22        Witness.)
23     Q. Look if you would at

FREEDOM COURT REPORTING

Page 205

1  Defendant's 20. Again, these are
2  some notes that were made in the
3  course of the dealings with you, and
4  we produced these notes, but if
5  you've not seen them, certainly you
6  can look at them. And what I'm
7  trying to accomplish here is to get
8  as complete a record as possible
9  about what you remember. So, I'll go
10 ahead and show you these. It says
11 here on February 23rd, it says, "I
12 met with Ms. Hudson and Ms. Bennett."
13 That's when you met with Ms. Gray and
14 Ms. Hudson; is that correct?
15    A. Uh-huh, yes.
16    Q. It says here, "Although on
17 two previous occasions, November '05
18 and January 19th, '06 Ms. Hudson
19 asked Ms. Bennett if there were any
20 problems between Dr. Gaillard and Ms.
21 Bennett, she did not report any
22 continuation of harassment at those
23 times." And I think you've already

Page 206

1  testified that's a true statement,
2  isn't it?
3     A. Yes.
4     Q. And then bottom of that
5  paragraph, February 16th, "Ms.
6  Bennett met with Ms. Hudson and
7  informed her that Dr. Gaillard was
8  sexually harassing her." That's a
9  true statement?
10    A. Yes.
11    Q. And if you'll look back at
12 about the last act of harassment, I
13 think there it says February 17th,
14 2006, but essentially what you're
15 talking about, either February 17th
16 or February 16th, right in there was
17 the last act?
18    A. Yes.
19    Q. Okay. It says, "I met with
20 Ms. Hudson and Ms. Bennett on
21 February
22 23rd, first mutually agreeable time,
23 to discuss the situation." Do you

Page 207

1  dispute that?
2     A. I'm sorry, excuse me.
3     Q. That February 23rd was the
4  first mutually agreeable time to
5  meet; do you dispute that?
6     A. No.
7     Q. It says, "In January of '06
8  Dr. Gaillard said he's turning over a
9  new leaf." Did you hear him say
10 that, or you were told he said that?
11    A. I was told he said that.
12    Q. Now, these other events
13 that you described in -- beginning
14 with the next month, early January,
15 mid-January, late January, et cetera,
16 on through that page, all the way up
17 to Valentine's Day with the candy,
18 these are all behaviors of Dr.
19 Gaillard that you didn't share with
20 anybody in the chain of command until
21 this meeting with Ms. -- well, with
22 Ms. Bennett -- excuse me, with Ms.
23 Gray, but the prior meeting with Ms.

Page 208

1  Hudson a few days earlier?
2     A. Actually, the candy
3  incident, that was actually witnessed
4  by a staff member, and she was
5  actually the charge nurse that night.
6     Q. Who was that?
7     A. That was Denise McBay.
8     Q. Is this the incident that
9  led you to come forward and complain
10 again?
11    A. It was just a combination
12 of things. If you see the paragraph
13 above that, too, while we were
14 trying -- those two paragraphs right
15 there go together (indicating). That
16 was the same weekend, because I had
17 to work in general treatment with him
18 without anybody else.
19    Q. Was this one of the last
20 set of things that happened, though,
21 before you came back and
22 complained --
23    A. Yes.

FREEDOM COURT REPORTING

Page 209

1  Q. -- about it to the chain of
2  command?
3  A. Yes.
4  Q. When would we have had to
5  get Dr. Gaillard off the premises to
6  have kept you from suing?
7  A. Well, to be honest, I'm
8  very upset that it actually ever came
9  to me since there were two other
10 complaints prior to me. Then the
11 fact that there was so many others
12 along that time afterwards.
13 Q. You've told me about all
14 these others?
15 A. Yes.
16 Q. And the complaints they
17 made?
18 A. Yes.
19 Q. So, when would we have had
20 to make sure Gaillard was off our
21 premises to have kept you from suing?
22 A. I guess after I went and
23 complained the first time.

Page 210

1  Q. October of '06?
2  A. Yes, because of the fact
3  that, like I said, there were already
4  two other complaints.
5  Q. And from your
6  perspective --
7  A. It's not just me.
8  Q. -- those two complaints
9  were enough that he should have been
10 run off the premises?
11 A. Well, I mean, we have a
12 zero tolerance policy.
13 Q. We're making good progress.
14    (Whereupon, Defendant's
15    Exhibit Number 21 was
16    Marked for identification.)
17    (Handing document to
18    Witness.)
19 Q. Who is Chasity Green?
20 A. That's my sister.
21 Q. I'll show you what's marked
22 as Defendant's Exhibit 21. These are
23 initial disclosures that is something

Page 211

1  that was submitted to us by your
2  counsel. Have you ever seen this
3  before today?
4  A. Yes.
5  Q. When did you see it?
6  A. I don't know.
7  Q. Did you help prepare it?
8  A. Yes.
9  Q. How so?
10 A. Well, those witnesses right
11 there, those names came from me.
12 Q. How did you decide who to
13 submit?
14 A. Well, if you'll notice
15 every one of those witness' names
16 right there, those are all the ones
17 that I know have voiced a complaint.
18 Q. Okay. Well, you reference
19 any -- well, not you, but it's
20 referenced, "Any known witnesses from
21 any of defendant Dr. Gaillard's
22 divorce in the past five years." Do
23 you know who that would be?

Page 212

1  A. No, I don't know.
2  Q. Do you know anything about
3  his divorce?
4  A. No, I don't, but I was
5  asked.
6  Q. Asked for what?
7  A. I was asked for all my
8  divorce papers.
9  Q. Well, what do you expect to
10 do with those witnesses, or do you
11 have an expectation?
12 A. I'm trying to see if
13 there's a pattern here.
14 Q. Have you found any what you
15 would consider to be evidence of a
16 pattern, other than what you've
17 described for me here today in the
18 deposition?
19 A. I haven't seen any
20 documents from this.
21 Q. Well, not just documents,
22 any information?
23 A. I haven't seen any of the

# FREEDOM COURT REPORTING

Page 213

1  response to this.
2  Q. Response to what?
3  A. If there is a response to
4  this, this disclosure, I haven't seen
5  anything, so -- so I'd have to say I
6  don't have anything.
7  Q. Okay. Who all have you
8  discussed your claims against Decatur
9  General, or really any defendants --
10 who all have you discussed it with?
11 A. I'm sorry?
12 Q. The claims against Decatur
13 General, Apollo, and Dr. Gaillard,
14 who all have you discussed those
15 claims with?
16 A. With my family and my
17 attorney.
18 Q. Anyone else?
19 A. Not that I can recall, no.
20 Q. Anyone present when you
21 discussed it with your attorney?
22 A. No.
23 Q. Who all in your family have

Page 214

1  you discussed it with?
2  A. My husband and my children.
3  Q. Do any of them have any
4  knowledge, firsthand knowledge, or do
5  they just know what you told them?
6  A. They just know what I told
7  them.
8  Q. Any of them have any
9  knowledge about your alleged damages
10 in this matter?
11 A. As far as?
12 Q. Are you anticipating anyone
13 to testify about how you were damaged
14 by any of the defendants?
15 A. I guess they could.
16 Q. What do you think they
17 could testify to?
18 A. About how upset I was,
19 didn't want to go to work, how I
20 wouldn't drive straight home from
21 work, and I live a straight shot from
22 my job, and I drove all around
23 Decatur before I would even go home.

Page 215

1  Q. To the best of your
2  perspective -- and I know you can't
3  be in somebody else's mind, but from
4  your perspective, if they were
5  sitting here today describing your
6  behavior, what would they describe it
7  to be?
8  A. I don't know. Probably a
9  different person than I really am.
10 Very timid, very meek, scared.
11 Q. That's the real you, or
12 that's the now you?
13 A. That's the now, constantly
14 looking over my shoulder.
15 Q. Has Dr. Gaillard ever
16 called you or made any contact with
17 you since March of 2006?
18 A. No. He did tell me one
19 time that he started to call me while
20 he was off, at work.
21 Q. That's while he was still
22 on the premises at Decatur General,
23 right?

Page 216

1  A. Right.
2  Q. Do you even know where he
3  is today?
4  A. No.
5  Q. Have you tried to find out?
6  A. No.
7  Q. Who best perhaps other than
8  yourself, could describe the effect
9  of this conduct on you?
10 A. Probably my husband.
11 Q. Okay. And why do you say
12 that?
13 A. Because he's the person
14 that knows me best. He's the person
15 that I talk to the most.
16 Q. When did you actually get
17 married?
18 A. August the 18th of last
19 year.
20 Q. 2006?
21 A. Uh-huh.
22 Q. Yes?
23 A. Yes, sorry.

54 (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 217

1  Q. So you were not married
2  throughout all this time --
3  A. No.
4  Q. -- that you had dealings
5  with Dr. Gaillard?
6  A. No.
7  Q. Were you engaged?
8  A. No.
9  Q. You were just dating?
10 A. Yes.
11 Q. Exclusively dating one
12 another?
13 A. Yes.
14 Q. Did you confide in him back
15 at that time about everything that
16 went on?
17 A. Yes.
18 Q. Tell me what you've told
19 him.
20 A. I told him about the
21 incidences. I didn't tell him about
22 him actually touching me until after
23 he was gone.

Page 218

1  Q. Why?
2  A. That would not have went
3  over well.
4  Q. Can you describe in more
5  detail what it is you explained to
6  him?
7  A. The comments -- all the
8  comments; the gestures; the standing
9  directly over me; the giving me
10 candy; all the way back to when it
11 started with the comments about being
12 rode hard and put up wet.
13 Q. Did you tell him each time
14 it occurred, or did you sort of after
15 awhile tell him about what had gone
16 on?
17 A. I didn't tell him about
18 every single one, no.
19 Q. I mean, would you tell him
20 as it occurred, or just periodically
21 just open up and talk about what had
22 gone on?
23 A. Normally at the end of the

Page 219

1  weekend.
2  Q. Did he encourage you to
3  handle things one way or the other?
4  A. Yes.
5  Q. What did he encourage you
6  to do?
7  A. To go to my supervisor.
8  Q. At what point in time was
9  that?
10 A. Around the October 2nd
11 incident when I left work and I was
12 crying, and I started telling him
13 everything that was going on.
14 Q. Any other times he gave you
15 any advice?
16 A. Yes.
17 Q. What?
18 A. To -- when I complained
19 again.
20 Q. He told you to go complain?
21 A. Yes, yes.
22 Q. Did he ever tell you any
23 other times you ought to go complain?

Page 220

1  A. Yes.
2  Q. But you didn't do it?
3  A. No.
4  Q. Any other advice he's given
5  you about how to handle the matter?
6  A. Yes, we've discussed it.
7  Q. Tell me about it.
8  A. We've discussed the whole
9  legal aspect of it.
10 Q. Oh, after the filing?
11 A. Yes.
12 Q. Anybody else you discussed
13 your claims against the defendants
14 with?
15 A. No.
16 Q. I'm going to get into talk
17 to you then about your damages.
18 Which you're contending mental
19 anguish, correct?
20 A. Yes.
21 Q. Emotional distress?
22 A. Yes.
23 Q. And that's the basis of the

55 (Pages 217 to 220)

FREEDOM COURT REPORTING

Page 221

1  damages you've got in this
2  litigation, right?
3       A. Yes.
4       Q. And, then, you may be
5  asking for punitives where you can,
6  but that's the range of damages or
7  type of damages we're speaking of,
8  correct?
9       A. Yes.
10      Q. I want to talk about that,
11 and we'll get into some things which
12 you can describe how it's affected
13 you, but I want to talk broader than
14 that, because things don't happen in
15 isolation. They happen in the
16 sequence of life and so forth.
17      MR. MIDDLEBROOKS: Can we
18 take a break and come back and get
19 started on that, unless the sequence
20 we'd rather do is you want to let
21 them ask their questions related to
22 events and so forth, and I can come
23 back and then start back with

Page 222

1  damages. I don't care.
2       MR. BROWN: Would you
3  rather go ahead and let them ask, or
4  do you just want to take a break?
5       MR. MIDDLEBROOKS: We can
6  take a break either way.
7       MS. BASWELL-GUTHRIE: Let
8  me call the office.
9       MR. MIDDLEBROOKS: We'll
10 shift gears when we get to damages.
11      MR. BROWN: Okay.
12      (Whereupon, a short recess
13      Was taken.)
14      Q. (BY MR. MIDDLEBROOKS:) Ms.
15 Bennett, we've had a break. Any
16 answers you want to modify or
17 supplement in any way?
18      A. Not at this time.
19      Q. Look if you would to
20 Defendant's Exhibit Number 4.
21      A. (Witness complies.) I
22 still have it?
23      Q. Yes.

Page 223

1       A. There it is. Okay.
2       Q. And I hate to touch on
3  something that I think is put to
4  rest, but the last one it's said in a
5  different way -- I've got to ask you
6  about it. In item number three,
7  midway down item three it says,
8  "Karla Gray at human resources
9  threatened to put me on
10 administrative leave during this time
11 period." What do you mean by she
12 threatened to? I guess I was under
13 the impression that's not an issue
14 here, that you were okay with that
15 part of it.
16      A. I guess what that's
17 referring to is the fact that with
18 all this going on around him, he was
19 still allowed to work there. And
20 although I was not the only person
21 that had complained on him, then I
22 was placed on administrative leave.
23      Q. With pay, with pay?

Page 224

1       A. Right, right, right.
2       Q. And when we say full pay,
3  there's no issue about the pay? You
4  didn't lose any rights or the
5  benefits by this administrative
6  leave, did you?
7       A. No.
8       Q. And so, again, the next
9  page where it talks about paragraph
10 four, "Administrative leave with a
11 cut rate of pay." But as we sit here
12 now, there's not an issue about a cut
13 rate of pay; is that correct?
14      A. Yes.
15      Q. And, then, over on what
16 would be the fourth page of
17 Defendant's Exhibit 4 under request
18 for production number 9, "I was never
19 allowed to file any written
20 complaints." Did you ever seek to
21 file a written complaint?
22      A. We don't -- we don't file
23 written complaints. They kept asking

56 (Pages 221 to 224)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 225

1  for a written response, any written
2  paperwork I would have had, and I
3  wouldn't have any because we don't --
4  that's not the way it's done.
5  There's no written form to file.
6      Q.  Well, you're saying at
7  Decatur General there's no form to
8  file a written complaint, and you're
9  not required to file a written
10 complaint, correct?
11     A.  Correct.
12     Q.  Nothing stopped you from
13 writing a letter?
14     A.  No.
15     Q.  No one told you, "Ms.
16 Bennett, don't give us anything in
17 writing," did they?
18     A.  No.
19     Q.  And, then, look if you
20 would to Defendant's Exhibit 5?
21     A.  (Witness complies.)
22     Q.  You say you want a million
23 dollars, right?

Page 226

1      A.  Yes, that's in there.
2      Q.  How did you come up with a
3  million dollars?  It's a nice round
4  number, certainly, but how did you
5  come up with that number?  Are you
6  still reading?
7      A.  Yes.  I don't know.  When
8  you break it down into percentages,
9  easier to calculate I guess.
10     Q.  How did you come up with
11 those numbers, though?
12     A.  Because I based it on a
13 percentage.
14     Q.  Well, then, how did you
15 come up with a total number before
16 you did the percentages?
17     A.  It was just like you said,
18 it was just a nice round number.  It
19 was just a number.
20     Q.  And what were your mental
21 workings to go about figuring out the
22 percentage you did; 60 percent
23 Decatur General, 30 percent Apollo,

Page 227

1  10 percent Dr. Gaillard?
2      A.  Because when I looked at
3  who I felt like was most responsible,
4  that's the way I calculated those
5  numbers.
6      Q.  So another way of saying
7  it, Dr. Gaillard is the least
8  responsible of all the defendants?
9      A.  Well, because I felt like
10 Decatur General had a responsibility
11 to me, even if they felt like he was
12 a contract employee and they couldn't
13 address that issue with him.  They
14 had an obligation to me to provide me
15 with a safe work environment instead
16 of a hostile environment.  So, I
17 guess that's how I felt like they
18 were more responsible.  Yes, he is
19 responsible for his actions, but
20 Decatur General is supposed to be
21 looking out for me.
22     Q.  Did you ever feel that you
23 were threatened by Dr. Gaillard?

Page 228

1      A.  Yes.
2      Q.  With bodily harm?
3      A.  I didn't know what he would
4  do.  He's very intimidating.
5      Q.  Have you described for me
6  the behavior on which you base that
7  statement that he's very
8  intimidating?
9      A.  Yes, just to stand over
10 you -- his presence over you.  This
11 is not a small man.  This is a rather
12 large man.
13     Q.  How big is he?
14     A.  Probably somewhere between
15 6'2", 6'3" maybe.  Probably weighs
16 about -- I don't know, between maybe
17 250 -- I don't -- maybe bigger.  I
18 don't know.  This is a large man.
19     Q.  Okay.  Anything else about
20 him which made you feel intimidated?
21     A.  And he demeaned.
22     Q.  Have you described for me
23 the ways he did that?

57 (Pages 225 to 228)

FREEDOM COURT REPORTING

Page 229

1    A. Yes.
2    Q. And he did that by the
3  comments you just testified to?
4    A. Yes.
5    Q. Any other way?
6    A. The looks.
7    Q. What looks?
8    A. The glaring at you. Just
9  to stand and just stare at you -- to
10  glare at you.
11    Q. Did any of Dr. Gaillard's
12  behavior ever compromise patient
13  care?
14    A. I don't know.
15    Q. You don't know of any?
16    A. I'm sorry?
17    Q. Do you know of anywhere it
18  did?
19    A. I don't know.
20    Q. Did you ever report to
21  anybody that his conduct was
22  jeopardizing patient care?
23    A. I wouldn't report that if I

Page 230

1  didn't know if it was or not.
2    Q. You never reported it?
3    A. No.
4    Q. You agree nothing should be
5  done to compromise his patient care?
6    A. Yes.
7    MR. BROWN: I'm going to
8  object to the form of that one.
9    Q. (BY MR. MIDDLEBROOKS:) All
10  right. So the way you've been
11  damaged in this matter is in some
12  fashion physical and mental?
13    A. Yes.
14    Q. Describe for me the
15  physical impact this has had on you,
16  if any?
17    A. The physical impact? The
18  not being able to sleep, the
19  inability to eat. Before this --
20  prior to this, I was very satisfied
21  with my job.
22    Q. Are you satisfied today?
23    A. Somewhat. Do I feel like

Page 231

1  if this happened again whose side
2  would they take, they would take the
3  same route.
4    Q. That's your belief?
5    A. Well, yeah, but I think I
6  have grounds to believe that.
7    Q. And the grounds to believe,
8  you've described them all to us
9  today?
10    A. Yes.
11    Q. Any other grounds other
12  than what you've told me?
13    A. No. I think several people
14  complaining about the same thing and
15  them still having a job is grounds
16  enough.
17    Q. Now, this loss of sleep,
18  when did it begin?
19    A. I'm not sure.
20    Q. Did it ever end?
21    A. I still have it sometimes.
22    Q. Do you take medication for
23  it?

Page 232

1    A. No.
2    Q. Never?
3    A. No.
4    Q. Have you had other periods
5  of your life where events have caused
6  you loss of sleep?
7    A. Sometimes I do go
8  through -- I might have one night out
9  of a month that I may not can sleep.
10  But none other than that.
11    Q. Your divorces didn't cause
12  you loss of sleep?
13    A. No.
14    Q. Your abusive husband didn't
15  cause you loss of sleep?
16    A. No.
17    Q. None of those events caused
18  you loss of sleep? Having a child
19  out of wedlock didn't cause you loss
20  of sleep?
21    A. No.
22    Q. So in all your life of all
23  the things that have happened, this

58 (Pages 229 to 232)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 233

1   is the event that's caused you loss
2   of sleep?
3     A.  Well, there's probably been
4   some other things that's caused me
5   loss of sleep, like my mother's death
6   and my grandmother's death, major
7   events like that.  But getting out of
8   an abusive relationship, no.
9     Q.  How old when your mother
10  died?
11    A.  She died in 2000.
12    Q.  Were you estranged from
13  her?
14    A.  Somewhat.
15    Q.  Had you reconciled before
16  her death?
17    A.  No.
18    Q.  Did you find that
19  stressful, the relationship you had
20  with your mother, or lack of
21  relationship?
22    A.  No.  Actually, no.
23    Q.  Had you ever had a good

Page 234

1   relationship with your mother all
2   your life?
3     A.  No.
4     Q.  Never knew your father?
5     A.  Yes, I do.
6     Q.  You do?
7     A.  Yes.
8     Q.  Is he still alive?
9     A.  Yes.
10    Q.  What's your relationship
11  with him?
12    A.  It's estranged.
13    Q.  Does that cause you any
14  stress?
15    A.  No.
16    Q.  This behavior of Dr.
17  Gaillard's, is that the most
18  stressful thing you've ever happened
19  in your life?
20    A.  No.
21    Q.  What's the most stressful?
22    A.  The death of my mother and
23  my grandmother.

Page 235

1     Q.  After those two deaths,
2   what would be in your mind the most
3   stressful?
4     A.  Well, this ranks right up
5   there.
6     Q.  With what?
7     A.  With the most stressful
8   events in my life.  I really don't
9   know what you're wanting me to say
10  here.  I don't understand what you're
11  trying to ask me.  Was it stressful,
12  yes, very.
13    Q.  Well, you've never sued
14  anybody except in that car wreck
15  before, right?
16    A.  Right.
17    Q.  And you've sued us along
18  with some other people, and you claim
19  you're damaged, and I'm trying to
20  understand how you're damaged.
21    A.  Right.
22    Q.  And you say you want a
23  million dollars to make you whole.

Page 236

1   That's a lot of money.  So I'm trying
2   to understand what it is in your mind
3   that's occurred to you that justifies
4   your asking for a million dollars?
5   That's my motivation, okay?
6     A.  Okay.
7     Q.  I hate for you to get up on
8   the stand and come up and tell
9   something that I've not heard before,
10  if I've asked you the right
11  questions.  I'm trying to come up
12  with the right questions, and I may
13  not do it all the time.  But I'm
14  trying to get through some of these.
15  And you know more about your past
16  than I do.  So I've just got to ask
17  some probing questions, and not
18  intending to be rude about it, okay?
19    A.  Okay.
20    Q.  With respect to -- well,
21  you've seen a psychiatrist before?
22    A.  Yes.
23    Q.  Are you still seeing a

59 (Pages 233 to 236)