## FREEDOM COURT REPORTING

Page 237

1  psychiatrist?
2      A.  No.
3      Q.  When is the last time you
4  saw one?
5      A.  I don't know.  It's been a
6  long time.
7      Q.  Been at least a year?
8      A.  Yeah, it's been over a
9  year.
10     Q.  Then the last time you saw
11 a psychiatrist was before you met Dr.
12 Gaillard?
13     A.  Yes.
14     Q.  And you have medical
15 benefits at Decatur General?
16     A.  Yes.
17     Q.  Did you ever go see a
18 psychiatrist, psychologist, or
19 counselor at any time after you met
20 Dr. Gaillard?
21     A.  No.
22     Q.  Speak to a minister or
23 speak to somebody who is trained to

Page 238

1  counsel others?
2      A.  No.
3      Q.  Have you sought any kind of
4  medication at all since meeting Dr.
5  Gaillard, that might be anything
6  identified as an antidepressant or a
7  mood-altering drug?
8      A.  No.
9      Q.  So, you've been able to
10 cope through this without any medical
11 care or without any medications?
12     A.  Yes.
13     Q.  But you have been to a
14 psychiatrist before?
15     A.  Yes.
16     Q.  And that's where you were
17 diagnosed with ADHD?
18     A.  Yes.
19     Q.  Were you diagnosed with
20 anything else?
21     A.  No.
22     Q.  Do you consider yourself in
23 good mental health today?

Page 239

1      A.  Yes.
2      Q.  Has there been a time that
3  you did not consider yourself in good
4  mental health?
5      A.  No.
6      Q.  Are you in good physical
7  health today?
8      A.  Yes.
9      Q.  You said you lost appetite
10 for awhile?
11     A.  Yes.
12     Q.  When was that?
13     A.  At some point in time while
14 all this was going on.
15     Q.  How long?
16     A.  I don't know.
17     Q.  Lose weight?
18     A.  A little.
19     Q.  How much?
20     A.  Maybe five pounds.
21     Q.  Is that a lot in the scheme
22 of things?
23     A.  No.

Page 240

1      Q.  Did the loss of five pounds
2  worry you?
3      A.  No.
4      Q.  How else did it affect you
5  physically?  You said sleep, and it
6  still sometimes affects you.  How
7  about even over-the-counter
8  medications for sleep?  Do you ever
9  take those?
10     A.  No.  With ADHD you can take
11 something and it doesn't mean that
12 it's going to work that way.  It can
13 have the opposite effect.
14     Q.  ADHD, you take what for
15 that?
16     A.  Concerta.
17     Q.  What's that?  It's a
18 stimulant?
19     A.  Yes.
20     Q.  And you have to maintain a
21 level to regulate it out, correct?
22     A.  Yes.
23     Q.  Do you have to get the

60  (Pages 237 to 240)

# FREEDOM COURT REPORTING

Page 241

1 level checked periodically?
2    A.  No, no, it's not a
3 medication that you have a level
4 checked, no.
5    Q.  But sometimes it can over
6 stimulate some people?
7    A.  It doesn't stimulate me at
8 all, because it has the opposite
9 effect.  It slows me down.
10    Q.  Okay.  Do you take it once
11 a day?
12    A.  Yes, I don't take it all
13 the time.
14    Q.  That's right.  You didn't
15 take it today.
16    A.  No.
17    Q.  How else has this effected
18 you physically?  You described two
19 things to me -- the sleep, the
20 eating?
21    A.  Crying at times.
22    Q.  All right.  And when is the
23 last time --

Page 242

1    A.  Go ahead.
2    Q.  -- crying and what else?
3    A.  It was very degrading.
4 It's still very degrading.  I mean, I
5 went to school to be a nurse, not to
6 be talked to that way.  And, no, I'm
7 not on an equal level with a
8 physician, but I am a colleague.  I
9 am a professional.  And I should be
10 talked to in that manner.
11    Q.  And the degrading I'll come
12 to.  I wanted to stick with things
13 with physical manifestations if I
14 may, just so we can kind of keep
15 focused on that?
16    A.  Okay.
17    Q.  When is the last time you
18 attribute crying to this matter?
19    A.  When I had to type all this
20 up.
21    Q.  This being the
22 interrogatory answers?
23    A.  Yes.

Page 243

1    Q.  You understand your
2 answering those interrogatories is a
3 result of litigation you chose to
4 bring?
5    A.  Yes, I do.
6    Q.  Before that, when did you
7 cry?
8    A.  Probably a couple of months
9 before that.  I'm not sure exactly.
10    Q.  Do you know what triggered
11 it?
12    A.  Thinking about this, not --
13    Q.  Not what?  Did you complete
14 your answer?
15    A.  Yes.
16    Q.  Before that, when was the
17 last time you had a crying spell due
18 to this?
19    A.  Probably the -- near the
20 end of this situation.
21    Q.  Roughly March '06?
22    A.  Yeah.
23    Q.  Is that yes?

Page 244

1    A.  Yes.
2    Q.  Did you ever have any
3 chronic crying spells during the time
4 it was going on?
5    A.  Yes.
6    Q.  And you say sometimes at
7 work you left crying?
8    A.  Yes.
9    Q.  On one occasion you said --
10 you said Debra Phillips saw you?
11    A.  Yes.
12    Q.  This is when you first
13 complained up the chain of command;
14 is that right?
15    A.  Yes.
16    Q.  Did anybody in the chain of
17 command ever see you crying any other
18 times that you know of?
19    A.  I don't think.
20    Q.  Any other ways that this
21 has shown up physically?
22    A.  No.
23    Q.  Suffer from migraines or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| Page 245 |
|---|

1 anything like that, ever?
2     A.  Well, I have a headache
3 today.
4     Q.  So do I.  Can I get you
5 some Ibuprofen?
6     A.  No, thank you.
7     Q.  I took some at lunch so I
8 could head that off.  Any other way
9 it's shown up physically?
10     A.  No.
11     Q.  All right.  So affecting
12 your sleep, some weight difference,
13 and crying, correct?
14     A.  Yes.
15     Q.  All right.  Let's go back
16 to mental or psychological.  You said
17 it was degrading.  Describe for me
18 how this has manifested itself in you
19 from a psychological or a mental
20 standpoint?
21     A.  Manifested itself how?
22     Q.  How has it shown up?  How
23 has it affected you mentally and

| Page 246 |
|---|

1 psychologically?
2     A.  Making me feel inadequate.
3 Making me feel like I'm less than a
4 person.
5     Q.  Any other ways?
6     A.  To have someone stand over
7 you to be intimidating to you like
8 that is not something that's easy to
9 describe, or to put in words, or to
10 explain how that it affects you.
11     Q.  Is there anything that you
12 could do back in the summer of 2005
13 that you can't do now, mentally or
14 physically?
15     A.  No.  I just don't have the
16 same confidence that I did have, but,
17 no.
18     Q.  Does Decatur General have
19 an EAP program?
20     A.  I think so, yes.
21     Q.  Have you ever looked into
22 that?
23     A.  No.

| Page 247 |
|---|

1     Q.  But you could choose to go
2 to a counselor or psychologist if you
3 wanted to, or psychiatrist?
4     A.  Yes.
5     Q.  It's within your financial
6 means?
7     A.  Yes.
8     Q.  Is it just your assumption
9 that would not be any help to you?
10     A.  No, I just prefer not to
11 keep talking about it over and over.
12     Q.  So, do you think it would
13 be a help to you, or it wouldn't be a
14 help to you, or you just don't know?
15     A.  I really don't know.
16     Q.  What could Decatur General
17 do with you right now to make things
18 right?  Obviously, we can't go back
19 and do things over, so?
20     A.  I don't know.
21     Q.  Okay.
22     A.  I mean, this -- that lost a
23 lot of trust.

| Page 248 |
|---|

1     Q.  Well, that's what I'm
2 asking you.  What could be done that
3 might make you feel better about it
4 all?
5     A.  I don't know.
6     Q.  In terms of the scale of
7 things, in terms of stresses in
8 life -- and again, it may be hard to
9 categorize -- and again, I apologize
10 for being intrusive, but you have
11 been married a number of times.
12 That's a lot of marriages, isn't it?
13     A.  Yes.
14     Q.  And you've had
15 relationships with at least a couple
16 of the men who couldn't be trusted,
17 could they?
18     A.  No.
19     Q.  I mean they fooled around
20 on you, didn't they?
21     A.  Yes.
22     Q.  And it caused you to have
23 to be tested for STDs?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 249

1    A.  Yes.
2        Q.  **Does that create a trust**
3    **issue in men for you, right there?**
4        A.  No, because I don't judge
5    all men based on what somebody else
6    does, just like I wouldn't want
7    somebody else to judge me based on
8    what somebody else did.
9        Q.  **So you don't judge**
10   **everybody by what Dr. Gaillard did,**
11   **either?**
12       A.  No.  No. I have a fine
13   working relationship with the rest of
14   the doctors.
15       Q.  **He's individually**
16   **accountable?**
17           MS. BASWELL-GUTHRIE:
18   Objection to form.
19       A.  From a male standpoint,
20   yes.
21       Q.  **(BY MR. MIDDLEBROOKS:)**
22   **What do you mean?**
23       A.  I know where that question

Page 250

1    is going.
2        Q.  **Well, tell me where it's**
3    **going.**
4        A.  That you're trying to say
5    that he's the only one that is
6    accountable for his actions, and
7    that's not so.  That's where that
8    question was going.
9        Q.  **You're way ahead of me.**
10   **I'm going to yield the floor to my**
11   **colleagues so they can ask you some**
12   **questions on behalf of their clients.**
13   **But here at the end, if you've asked**
14   **me to clarify a question, have I done**
15   **so?**
16       A.  Yes.
17       Q.  **And, so, your answers that**
18   **you've given me are answers that**
19   **you're confident that I should rely**
20   **on?**
21       A.  Yes.
22       Q.  **None that you want to**
23   **change or modify?**

Page 251

1    A.  No.
2
3    EXAMINATION BY MR. CRUM:
4        Q.  **Yes, ma'am, my name is**
5    **Richard Crum, and we met earlier**
6    **today, and I don't have many**
7    **questions for you.  Mr. Middlebrooks**
8    **is a lot smarter than I am, and he's**
9    **asked you most everything that needs**
10   **to be asked, I think.  But I do have**
11   **just a few just to try to hit around**
12   **on some things that I noted as you**
13   **went through the testimony this**
14   **morning, okay?**
15       A.  Okay.
16       Q.  **Same kind of ground rules.**
17   **If you don't understand something**
18   **I've said, or if I'm confusing, or**
19   **misleading, or anything else, just**
20   **tell me and I'll rephrase the**
21   **question, okay?**
22       A.  Okay.
23       Q.  **The only thing I really**

Page 252

1    **want to confirm is that -- well, I**
2    **represent ApolloMD, okay?**
3        A.  Okay.
4        Q.  **And you have sued ApolloMD,**
5    **and sued Emergency Management**
6    **something -- Emergency Management --**
7    **Medical Management.  Who is Emergency**
8    **Medical Management, do you know?**
9        A.  Where are you?
10       Q.  **I'm just on the complaint.**
11   **It says you've sued Decatur General**
12   **Hospital, ApolloMD Physician Services**
13   **of Alabama LLC d/b/a Emergency**
14   **Medical Management.**
15       A.  I think that was what was
16   thought to be one of the names of
17   Apollo.
18       Q.  **That's not the case,**
19   **though?**
20       A.  Yes, actually where that
21   original name came from would be the
22   EEOC complaint, but I don't have it
23   in front of me.  They -- I mean, they

63 (Pages 249 to 252)

# FREEDOM COURT REPORTING

Page 253

1  were the ones that said that that
2  actually wasn't Apollo, that it was
3  the Emergency Medical Management,
4  but.
5      Q.  Well, I don't know who
6  Emergency Medical Management is.  But
7  as far as my client, you understand
8  that my client, ApolloMD, was in part
9  responsible for providing physicians
10  in the emergency room at Decatur
11  General?
12      A.  Yes.
13      Q.  You understand that.  And
14  from what I understand of your
15  testimony this morning, your
16  conversations about Dr. Gaillard's
17  conduct were exclusively with
18  hospital employees, except for a
19  conversation you had with Dr. Pool?
20      A.  Yes.
21      Q.  And that was when after the
22  October incident that day, the events
23  occurred, and you had reported them,

Page 254

1  and from there you said Dr. Pool came
2  and said, "Why don't you let him have
3  it," something along those lines?
4      A.  Yes.
5      Q.  And that is the only
6  conversation that you had with anyone
7  with ApolloMD --
8      A.  Yes.
9      Q.  -- about any of this,
10  right?
11      A.  Yes.
12      Q.  And there was no other
13  reporting to ApolloMD, no other
14  claims to ApolloMD, nothing else
15  other than that conversation that you
16  had with Dr. Pool?
17      A.  By me?
18      Q.  Yes, ma'am.  And meaning
19  there's an office in Atlanta, did you
20  ever call ApolloMD's office in
21  Atlanta to speak to anyone there
22  about this?
23      A.  I don't know how.  I didn't

Page 255

1  know they had an office in Atlanta.
2      Q.  Well, that's where they're
3  located, there in Atlanta.  You
4  didn't call them there, though, and
5  try to talk to them about it?
6      A.  No.
7      Q.  What about the offices in
8  Birmingham?  Did you ever call
9  Southern Medical Group or North
10  Alabama Emergency Physicians, anyone
11  in Birmingham to report Dr.
12  Gaillard's conduct or talk to them
13  about it?
14      A.  No, I wasn't familiar with
15  those names, either.
16      Q.  And we've discussed --
17  you've already discussed today
18  through these hours of deposition,
19  everything that you've had to say
20  about ApolloMD, or anybody affiliated
21  with ApolloMD, right?
22      A.  Yes.
23      Q.  Okay.  Thank you.  Other

Page 256

1  than that, I just had some questions
2  about various things.  As we've gone
3  through this, you mentioned that you
4  have ADHD?
5      A.  Yes.
6      Q.  What does that cause you to
7  do?  What problems does that cause
8  for you, if any?
9      A.  Easily distracted.  When
10  you work in an emergency department,
11  so many things are going on you're
12  easily distracted.
13      Q.  And how long, generally,
14  have you had that?
15      A.  I was just diagnosed with
16  it just a few years ago.  So
17  apparently it really wasn't affecting
18  my work very much, other than making
19  me disorganized.
20      Q.  How did you come to know
21  that you had that problem?
22      A.  A friend of mine brought it
23  to my attention.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1    Q.  She just --
2    A.  She has it, and she brought
3  it to my attention one day.  She
4  said, "You know, you really have
5  ADHD."  And she pointed out, you
6  know, "You're disorganized or easily
7  distracted.  You're on the go all the
8  time," and those -- things along that
9  line.
10    Q.  Okay.  And she indicated
11  you were easily distracted?
12    A.  Yes.
13    Q.  Was that in part the reason
14  you saw a psychologist, or was that
15  other reasons that you saw a
16  psychologist?
17    A.  That was the reason.
18    MR. MIDDLEBROOKS:
19  Psychiatrist.
20    Q.  (BY MR. CRUM:)  I'm sorry,
21  psychiatrist.  I wrote down
22  psychologist.  The psychiatrist
23  treated you for that?

Page 258

1    A.  Yes.
2    Q.  And did his or her
3  treatment for that help with that
4  condition?
5    A.  Yes.
6    Q.  Did it resolve it?
7    A.  Yes.
8    Q.  You don't suffer from that
9  anymore?
10    A.  Well, I still take the
11  medicine.  I mean, I'm always going
12  to have it.  I mean, it's not
13  something that's going to go away.
14  I'm always going to have this.
15    Q.  But with the medicine it's
16  fine, you don't have any problems
17  with it?
18    A.  Right.
19    Q.  You mentioned earlier in
20  your breakdown of damages, that you
21  feel that the hospital is 60 percent
22  liable, ApolloMD is 30 percent
23  liable, and Dr. Gaillard is ten

Page 259

1  percent liable.  Wouldn't you agree
2  that he, Dr. Gaillard, is the one you
3  sued for his own conduct?
4    A.  Yes, I agree that he does
5  have the conduct issue, but at the
6  same time, the issue with his
7  conduct -- because, yes, I only spoke
8  to Dr. Pool one time about his
9  conduct.  But there were two other
10  employees that had already spoken
11  with Dr. Pool about that.  So it's
12  not that his conduct -- that no one
13  was aware of it.  It was that no one
14  was taking action.  And had the
15  action have -- if somebody had
16  actually have taken action, I
17  wouldn't be sitting here in this
18  chair today, because I wouldn't have
19  had to endure it.
20    Q.  That may or may not be
21  true.  My question is, however -- I
22  mean, Dr. Gaillard is the one that
23  supposedly did these things to you,

Page 260

1  right?
2    A.  Yes.
3    Q.  And whether or not somebody
4  tried to protect you from that, or
5  didn't try to protect you from it,
6  he's the primary defendant, is he
7  not?
8    A.  I see what you're saying.
9  Yes, he did do these things.  But,
10  yes, as his employer, yes, you have a
11  legal responsibility for him, too,
12  because of the fact that this was a
13  continuous thing.  This is, you
14  know -- the federal government made a
15  law against this for a reason.
16    Q.  I understand.  Now Dr.
17  Pool, the conversation you had with
18  him, you indicated he said for you to
19  let him have it?
20    A.  Right.
21    Q.  And you said no, or I
22  can't, or I might lose my job, or
23  somebody might be unhappy with me if

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 261

1  I do that, something along those
2  lines, right?
3      A.  Right.
4      Q.  And he said, "I'll make
5  sure that doesn't happen?"
6      A.  Right.  Now, how is he
7  going to do that?
8      Q.  Well, you still have a job?
9      A.  Right.
10     Q.  Still working there?
11     A.  But I didn't go off on him,
12  either.
13     Q.  Still working there?
14     A.  Yes.
15     Q.  Still making as much as you
16  did?
17     A.  Yes.
18     Q.  Are you making more now, in
19  fact?
20     A.  Probably.  Yes, because I
21  just had an evaluation.
22     Q.  How did the evaluation go,
23  was it positive?

Page 262

1      A.  Yes, I lacked one point
2  getting a maximum raise.
3      Q.  So would I be correct to
4  understand that you've not suffered
5  any retaliation at work for anything
6  related to this event, or these
7  events?
8      A.  Yes.
9      Q.  I asked you earlier about
10  if you had called anybody in Atlanta
11  or Birmingham about Dr. Gaillard.
12  Same question as to writing or
13  written correspondence.  There's no
14  letters, or e-mails, or anything like
15  that to anyone in Atlanta or
16  Birmingham with my client about these
17  events?
18     A.  No.
19     Q.  No tape recordings of
20  anyone with ApolloMD, or any company
21  affiliated with ApolloMD?
22     A.  No.
23     Q.  Have you attempted that and

Page 263

1  failed, or is that something that's
2  never come up?
3      A.  I've not done that.  Which
4  one, the contacting somebody, or?
5      Q.  No, ma'am.  Recording in
6  any way?
7      A.  I have never attempted to
8  record anybody.
9      Q.  Anybody ever recommend to
10  you that you attempt that?
11     A.  No.
12     Q.  One of the things I -- I
13  don't really understand, is you
14  mention in your summary of the things
15  Dr. Gaillard said to you, that at one
16  point he commented that -- I think
17  you said that he said, "You were rode
18  hard and put up wet," something along
19  those lines, right?
20     A.  Yes.
21     Q.  You remember that statement
22  or conversation?
23     A.  Yes.

Page 264

1      Q.  What do you think he meant
2  by that, or do you know?
3      A.  Well, I'm sure he meant
4  exactly what everybody means by that
5  statement.  And when I proceeded to
6  say no and walk away he said, "Oh,
7  just put up wet a lot, huh?"
8      MR. BASWELL-GUTHRIE:
9  Objection.  Nonresponsive.
10     Q.  (BY MR. CRUM:)  I guess
11  what I'm trying to understand is do
12  you, yourself, know what he meant by
13  that?
14     A.  Yes.
15     Q.  Did you ask him, "What do
16  you mean by that?"
17     A.  No.
18     Q.  What do you think it means?
19     A.  I think that that comment
20  is a sexual comment, and that he
21  meant that I had had a lot of sex,
22  and been rode really hard during the
23  process.  And when I said, "No," he

66 (Pages 261 to 264)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 265

1  said, "Oh, just put up wet a lot,
2  huh?" So, then, I guess he meant
3  somebody halfheartedly did whatever.
4      Q. Well, I don't know what he
5  meant, because I wasn't there and I
6  didn't ask him. But my question from
7  there is, in going through your
8  summary it looks like that the first
9  thing we've got in here is Dr.
10  Gaillard asking your age, right?
11     A. Yes.
12     Q. Were you offended by that?
13     A. No.
14     Q. Do you think, and is it
15  your opinion, that Dr. Gaillard
16  wished to go out with you, date
17  you --
18     A. Yes.
19     Q. -- things along those
20  lines; see you socially?
21     A. Yes.
22     Q. Did he ever say that?
23     A. "I look forward to seeing

Page 266

1  you -- knowing you on a more personal
2  level when me and my wife get a
3  divorce," were his exact words.
4      Q. Did you ever respond
5  affirmatively or positively that you
6  would like to date him, or go out
7  with him?
8      A. No.
9      Q. Did you ever feel like you
10  wanted to go out with him or date
11  him?
12     A. No.
13     Q. Why is that?
14     A. Not attracted to him.
15     Q. Did you ever tell him that?
16     A. I did tell him that, "This
17  right here is as personal as you're
18  going to know me."
19     Q. I understand that. Yes,
20  ma'am, that's in here. I guess what
21  I'm trying to understand is, was
22  there something you didn't like about
23  him? Did he not look good? I've

Page 267

1  never seen the man. Is he not
2  attractive? Is he not attractive
3  emotionally, or what is it about him
4  you did not like?
5      A. He's not attractive to me,
6  and his behavior is repulsive. If
7  somebody that I work with is going to
8  talk to me this way, why would I go
9  out with them?
10     Q. Have you ever gone out with
11  anybody at work?
12     A. No.
13     Q. Not ever?
14     A. Maybe a long time ago, I
15  don't know, but not lately.
16     Q. And the first thing he said
17  to you, he asked about your age, and
18  you said, "Stop, I'm not talking to
19  you, because you don't know how to
20  act"?
21     A. Because he said -- when I
22  told him my age he said, "Is that
23  all?" This is not the first. This

Page 268

1  is just the first one that I could
2  remember the details of it to put
3  down. But what he did, he asked me
4  my age. And when I told him he came
5  back with, "Is that all?" I knew
6  that meant here we go again. Here's
7  coming something else. So I just
8  told him to, "Stop, I'm not talking
9  to you. You don't know how to act."
10  And then he proceeded to continue,
11  "Oh, just rode hard and put up wet a
12  lot, huh?"
13     Q. Well, you said a moment ago
14  that he wanted -- you feel like that
15  ultimately his --
16     A. Yes, because later on he
17  did make that comment.
18     Q. Let me finish. You said
19  ultimately you felt like he wanted to
20  go out with you, or date you, or see
21  you socially, right?
22     A. Yes, near the end of this,
23  yes, that's what I realized.

67 (Pages 265 to 268)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1    Q. Well, I mean, if he asked
2 you your age and said, "Is that all,"
3 do you think that's the way that a
4 gentleman might make a lady want to
5 go out with him?
6    A. No. But at this point in
7 the process I didn't think that's
8 what he wanted.
9    Q. What did you think he
10 wanted at this point in the process?
11    A. I just thought he was a
12 jerk.
13    Q. Did you tell him he was a
14 jerk?
15    A. No.
16    Q. Have you ever tried to just
17 stay away from him and not talk to
18 him?
19    A. Yes.
20    Q. Did you ever -- did you
21 ever talk to him? Other than the
22 things we've got in here, obviously,
23 I understand you said those things

Page 270

1 and he said those things according to
2 your testimony. But my question is,
3 you worked with him, and during your
4 work with him did you ever have
5 conversations with him that were not
6 offensive that we haven't got written
7 down here?
8    A. Yes.
9    Q. What kind of conversations
10 did you have with him?
11    A. When I first started
12 working with him, not anything
13 personal. It was, you know -- "Well,
14 here's this patient's chart this
15 patient is asking for. They're
16 saying this is going on. What do you
17 think is going on? Do we want to
18 address this problem with this
19 patient?"
20    Q. Did you feel like he
21 listened to your input professionally
22 when you gave it on a patient? Do
23 you feel like he was listening to you

Page 271

1 and working with you well?
2    A. Yes.
3    Q. No questions or problems
4 about that? I mean, you don't feel
5 like he just ignored what you might
6 have to say as a nurse or anything?
7    A. No.
8    Q. We're not here about
9 anything related to that? You're not
10 about his professional --
11    A. No. Not just ignored what
12 your opinion as a nurse was the
13 question.
14    Q. You felt like he respected
15 your opinion as a nurse?
16    A. Yes.
17    Q. What about his abilities as
18 a doctor, do you feel like he was
19 well qualified and did a good job?
20    A. Yes, at times.
21    Q. Besides patients, and care,
22 and medical issues, what -- you said
23 you did have some conversations with

Page 272

1 him early on. What kind of things
2 did y'all talk about?
3    A. I did not stand around and
4 have a social.
5    Q. Never. Never said, "How's
6 the weather?"
7    A. I don't recall ever having
8 a conversation like that with him.
9    Q. Did you ever try to have a
10 conversation like that with him?
11    A. No.
12    Q. I mean, did you ever try to
13 have a conversation about the way
14 you felt he was acting and say,
15 "Look, you know, this is -- I'm not
16 attracted to you, and I just wish you
17 would not continue to act this way?"
18    A. No.
19    Q. What was he -- you said
20 something about -- and I'm just going
21 through this, and I don't want to go
22 through it all again. But it says,
23 "Ms. Bennett should be bought a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 273

1 calendar to change her scrubs," or
2 something along those lines. What is
3 that about? What's he talking about,
4 or do you know, because I don't know
5 is what I'm asking?
6    A. Well, because I had changed
7 my scrubs that night, and he made the
8 comment in front of other nurses in a
9 patient care area that, "Maybe
10 somebody should buy me a calendar, so
11 that way I could keep up with my
12 cycle and wouldn't have to change my
13 scrubs."
14    Q. Well, what does that mean?
15 That doesn't make any sense, does it?
16    A. I had changed them.
17    Q. Right. That's what I mean.
18    A. Apparently he thought I had
19 bled through my clothes, so if
20 somebody bought me a calendar then I
21 could keep up with my cycle and I
22 wouldn't have those problems.
23    Q. Well, did you wear clean

Page 274

1 clothes every day?
2    A. Yes.
3    Q. Have you ever been asked by
4 anyone else to show some cleavage?
5    A. No.
6    Q. Have you ever shown any
7 cleavage?
8    A. No.
9    Q. What was that patient doing
10 that he said, "Why don't you show
11 some cleavage, and he might be a
12 little more helpful?" What was that
13 patient -- what was going on there?
14    A. He was real short of
15 breath, and he kept trying to sit up,
16 and move around, and everything else,
17 and was real agitated. And I kept
18 trying to get him to be still so that
19 we could do what we needed to do to
20 him. And he told me that maybe if
21 I'd go over there and show that
22 patient a little bit of cleavage,
23 maybe he'd be a little bit more

Page 275

1 inclined to do what I asked him to
2 do. And, then, after the patient
3 settled down, he said, "I see that
4 you followed my advice." And he
5 walked up to me in the hallway, and
6 bent down and pulled his shirt down,
7 because I didn't know what he was
8 talking about -- and pulled his shirt
9 down to say that I had bent over the
10 patient and showed him some cleavage.
11    Q. Was that upsetting for you?
12    A. Yes.
13    Q. Sorry if you're getting
14 upset. I'm not trying to do that.
15 If you want to take a break, we can.
16 Has anyone in your life ever said,
17 you know, "Why don't you show me some
18 cleavage," or anyone ever said
19 anything like that you to before?
20    A. No.
21    Q. What was it that calmed the
22 patient down that day?
23    A. To breath. And he gave him

Page 276

1 some medicine.
2    MS. BASWELL-GUTHRIE: I'm
3 sorry. Who was that again?
4    A. Dr. Gaillard.
5    MS. BASWELL-GUTHRIE: No.
6 Who was the patient?
7    A. I don't remember the
8 patient's name.
9    Q. (BY MR. CRUM:) Was that --
10 that was the day, though, you left
11 with tears in your eyes over these
12 things being said?
13    A. Yes.
14    Q. Do you cry easily?
15    A. No. That's why everybody
16 was so upset.
17    Q. Who's everybody?
18    A. Anybody that saw me crying
19 was upset, because I'm not a crying
20 type person.
21    Q. I think Mr. Middlebrooks --
22 as I said, I think he's asked you a
23 lot of this, but did you cry over the

69 (Pages 273 to 276)