**FREEDOM COURT REPORTING**

Page 277

1  four divorces or three divorces?
2    A. No.
3    Q. Have you ever felt anyone
4  else in your life ever has touched
5  you inappropriately? By that I mean,
6  you said that Dr. Gaillard touched
7  your hip one time, or touched your
8  hair, or the back of your neck, that
9  you talked about. And I'm trying to
10 understand. And I'm saying has
11 anyone else ever done anything like
12 that to you?
13   A. Yes.
14   Q. Are you saying people you
15 work with, or random people in the
16 public?
17   A. There was another incident
18 with someone that I work with that I
19 explained earlier.
20   Q. Anything other than that?
21   A. Yes.
22   Q. What else?
23   A. Well, when I was 15 I was

Page 278

1  raped.
2    Q. I'm very sorry about that.
3  I really am. I don't want to have to
4  talk about it, and I'm not going to
5  talk about it. That had to be a
6  terrible experience. Anyone else
7  other than that?
8    A. No.
9    Q. What was -- there was a
10 mention made, I think in your EEOC
11 complaint, and it says in here about
12 Dr. Gaillard throwing charts?
13   A. Yes.
14   Q. Was he upset about
15 something in the charts?
16   A. No. He was upset that Dr.
17 Pool and Dr. Sullivan had talked to
18 him, so that when he came back to
19 work he was very upset. He would
20 sling chairs, he would throw charts,
21 he would take equipment and just push
22 it down the hall just like with
23 chairs, he would shove them down the

Page 279

1  hall because he was mad.
2    Q. Okay. But that didn't
3  affect you, did it?
4    A. Yeah, when a chart flew by,
5  yeah, or a chair flew by, yeah.
6    Q. But it's not your testimony
7  he hit you with a chair?
8    A. No.
9    Q. Or that he hit you with a
10 chart?
11   A. No.
12   Q. At work does anyone ever
13 come up and hug you and say, "Are you
14 having a good day? How you doing
15 today?" I mean, do you have intimate
16 contact like that with anyone at
17 work?
18   A. Yes.
19   Q. Who all do you have contact
20 with like that, friends?
21   A. Yeah, female workers, yeah.
22   Q. Y'all hug and say, "How are
23 you doing," or if you're upset they

Page 280

1  might hug you?
2    A. Yeah.
3    Q. So it's not that you have a
4  problem with that, per se?
5    A. No.
6    Q. Did anyone ever hug you
7  about any of these things you've
8  talked about with Dr. Gaillard?
9    A. I'm sorry, I don't --
10   Q. Well, you've told us about
11 the things that you were upset with
12 that he did, and I'm just trying to
13 understand did any nurses or anyone
14 at the hospital ever give you a hug
15 and say, you know, "We're going to
16 get through this," and try to make
17 you feel better?
18   A. Yes.
19   Q. Who all did that, just
20 co-workers?
21   A. Yes.
22   Q. Did Dr. Gaillard get
23 divorced?

70 (Pages 277 to 280)

**367 VALLEY AVENUE**
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 281

1    A. I have no idea.
2    Q. Did you ever talk to him
3  about his divorce or anything else
4  related to it?
5    A. No.
6    Q. Did you want him to get
7  divorced?
8    A. No.
9    Q. Did he ever ask you out,
10 specifically?
11   A. No.
12   Q. Saying, you know, "Ms.
13 Bennett, would you go out to dinner
14 with me?" Anything like that?
15   A. No.
16   Q. If he had of, would you
17 have gone?
18   A. No.
19   Q. Have you ever gone out to
20 eat or gone on a date with a
21 physician who was employed at a
22 hospital where you were working?
23   A. No.

Page 282

1    Q. Have you ever --
2    A. I'm sorry.
3    Q. Go ahead.
4    A. I went out to eat with a
5  physician, but it was not a date, and
6  that was Dr. Jones. And I'm not of
7  the right gender for him.
8    Q. What does that mean? Oh,
9  he's a different type person?
10   A. Yes.
11   Q. Speaking of that, on your
12 MySpace page, you know it asks you
13 about orientation. You remember
14 that, don't you? When you sign up
15 for it it asks you a number of
16 questions?
17   A. Yes.
18   Q. What did you put?
19   A. Straight.
20   Q. Straight. And does it ask
21 you for the reason you're signing
22 onto MySpace, what did you put for
23 that?

Page 283

1    A. I think it says networking
2  and friends.
3    Q. Was that true, you used it
4  for networking and friends?
5    A. Yes.
6    Q. It also has personal
7  information -- you can put personal
8  information that I have seen. I've
9  got a good friend who has a MySpace
10 page. We've been talking about this
11 a lot lately. But it has a place to
12 put, you know, I'm so and so, I like
13 to do so and so, and that kind of
14 information. Did you fill that part
15 out?
16   A. Yeah.
17   Q. What does it say?
18   A. I don't remember if I put
19 sports on there or not. It has shows
20 that I like to watch and favorite
21 movies. Heroes, whoever your hero
22 is, that kind of thing.
23   Q. Who are your heroes?

Page 284

1    A. My grandmother.
2    Q. Anybody else?
3    A. No. That's the only person
4  I listed.
5    Q. It has an entry -- I don't
6  know if you call a blog or not, but
7  people send you notes, or e-mails, or
8  messages, right?
9    A. Right.
10   Q. And you said Dr. Gaillard
11 has never sent you a message?
12   A. No.
13   Q. Have you ever sent him a
14 message?
15   A. No.
16   Q. Does he have a MySpace
17 page?
18   A. I have no idea.
19   Q. You never looked?
20   A. No.
21   Q. Do you have any messages
22 from anyone other than from your
23 children?

**FREEDOM COURT REPORTING**

Page 285

1   A. Yes.
2   Q. And that would be
3   co-workers?
4   A. Yes.
5   Q. But nothing on your MySpace
6   page has ever related to Dr. Gaillard
7   or this lawsuit?
8   A. No.
9   Q. And there's pictures on
10  most of these websites, aren't there?
11  A. Yes.
12  Q. Do you have any pictures on
13  yours, other than this first one
14  we've talked about?
15  A. Yes. There's a picture of
16  me and my husband, a picture of me
17  and my children.
18  Q. Any others?
19  A. It's either just -- it's
20  either of me and my husband or me and
21  my kids.
22  Q. Are you and your husband
23  doing well?

Page 286

1   A. Yeah.
2   Q. I mean strong?
3   A. Yes.
4   Q. Everything going fine?
5   A. Yes, just had an
6   anniversary.
7   Q. Great. But every
8   expectation is that y'all will stay
9   together and be happy and live
10  happily ever after?
11  A. Yes.
12  Q. These things you've talked
13  about with Dr. Gaillard have not
14  affected your relationship with your
15  husband in any way?
16  A. We have dated for nine
17  years before we got married, so.
18  Q. And you talked about --
19  well, let me get that question -- go
20  back to that question. The things
21  with Dr. Gaillard have not affected
22  your relationship with your husband
23  in any way, right?

Page 287

1   A. To a small degree, yes, to
2   some degree.
3   Q. In what way?
4   A. It made me more closed off,
5   more defensive, more recluse, I guess
6   is the word I'm looking for.
7   Q. Have you ever had any --
8   anyone other than Dr. Gaillard -- and
9   I don't know how to ask this --
10  pursued you, tried to get you to go
11  out with them, or to see them
12  socially, and you didn't want to do
13  it?
14  A. I'm sure I probably have.
15  Q. Were you upset by that
16  pursuit, pursuement, pursuing -- were
17  you upset by them doing that?
18  A. No.
19  Q. Were you ever flattered
20  that Dr. Gaillard would like to go
21  out with you, or see you socially?
22  A. No. Did you read what he
23  said to me? What about that was

Page 288

1   flattering?
2       MS. BASWELL-GUTHRIE:
3   Objection. Nonresponsive.
4   Q. (BY MR. CRUM:) I
5   understand your thoughts. But my
6   question is that he apparently, you
7   said, wanted to see you socially, but
8   that was nothing that you ever
9   thought was at least a nice sentiment
10  that he wanted to go out with you, or
11  see you socially?
12  A. No.
13  Q. That he was interested in
14  you -- I mean, for whatever reason?
15  A. No.
16  Q. And you said earlier, I
17  think, that you're happy he got
18  terminated, right?
19  A. Yes.
20  Q. You're happy with that
21  outcome and happy that he's not
22  there?
23  A. Yes.

Page 289

1  Q. And you feel like that's a
2  positive step, right?
3  A. Yes.
4  Q. Have you ever -- have you
5  heard complaints or statements about
6  anyone ever gotten -- about anyone
7  else ever having been terminated or
8  gotten terminated?
9  A. No.
10 Q. Any other co-workers that
11 you've gone to your employer and
12 said, "I don't like them," or
13 "They're not doing a good job?"
14 Anything like that that's gotten
15 somebody terminated before?
16 A. No.
17 Q. And once Dr. Gaillard was
18 terminated, you didn't try to contact
19 him in any way and talk to him about
20 these things?
21 A. No.
22 Q. Did you ever have any
23 conversation with him after he was

Page 290

1  terminated, about what had happened?
2  A. No.
3  Q. Do you know that Dr.
4  Gaillard has actually filed a lawsuit
5  against you as to this matter?
6  A. Yes.
7  Q. How do you feel about that?
8  A. I don't -- I don't see what
9  his point to it is, but --
10 Q. When he touched your neck,
11 did he touch the back of your neck,
12 actually the skin, or did he touch
13 your hair?
14 A. The skin.
15 Q. I just notice you've got
16 long hair.
17 A. Right. He moved my hair
18 out of the way, and took his hand and
19 put it at the base of my neck and ran
20 it up.
21 Q. Was he trying to rub your
22 neck, or what was he doing?
23 A. I guess that's what he was

Page 291

1  doing.
2  Q. I don't think I asked you
3  this, but you do plan to keep working
4  there at Decatur General?
5  A. Yes.
6  Q. Do you have every intention
7  to stay there?
8  A. Yes.
9  Q. Your husband, is he
10 continuing to work, I think you said,
11 as a security guard?
12 A. Yes.
13 Q. Does he plan to keep doing
14 that?
15 A. Actually, he's about to
16 start back to school, but he will
17 keep his job, too.
18 Q. Okay. What kind of school
19 is he going to go to?
20 A. Engineering. I think he
21 said aerospace engineering.
22 Q. Fantastic. How far does he
23 need to go to complete something like

Page 292

1  that?
2  A. I don't know how long it
3  takes. He'll have to start from the
4  beginning.
5  Q. Does he have to start
6  college from the beginning, is that
7  what you mean?
8  A. Yeah.
9  Q. He's graduated high school
10 already, obviously?
11 A. Yes.
12 Q. Do you have any knowledge
13 of any kind about communications
14 between Decatur General Hospital and
15 ApolloMD, or any of the companies
16 affiliated with them? And by that I
17 mean do you know of any letters, or
18 memos, or any discussions between
19 those entities about this situation?
20 A. Well, I know there had to
21 be at least one, because Dr. Pool and
22 Dr. Sullivan sat down and met with
23 Dr. Gaillard. Other than that, I

73 (Pages 289 to 292)

Page 293

1  don't know.
2     Q. But you don't have any
3  documents, or letters, or anything
4  like that?
5     A. No, sir.
6     Q. You talked a number of
7  times about your being fearful of Dr.
8  Gaillard. Just so I'm clear, he
9  never followed you in any way, right,
10 outside of the office or building?
11 He didn't follow you home?
12    A. No.
13    Q. Didn't call you at home?
14    A. No.
15    Q. Didn't show up at your
16 house?
17    A. No.
18    Q. Have you ever felt
19 intimidated by anyone else other than
20 Dr. Gaillard?
21    A. I'm sure I have at some
22 point in time.
23    Q. Just give me an

Page 294

1  understanding as to who and what
2  you're talking about. And I say that
3  because you said earlier he would
4  stand over you, or had stood over you
5  on one occasion, and you felt
6  intimidated by it. In fact, I think
7  you said, "I felt like less of a
8  person?"
9     A. It was more than one time.
10 I mean, it was a repetitive thing.
11 I've never worked around somebody
12 else that did that to me, no. I've
13 not worked around anybody else that
14 just stood over me like that.
15    Q. When you say stood over
16 you, help me to understand what you
17 mean. You mean stood behind you, or
18 next to you, or --
19    A. Just right up against me.
20 Not physically touching me, but just
21 right up against me.
22    Q. Would not your physicians
23 you work with have to stand near you

Page 295

1  in caring for patients?
2     A. Yes, if they're doing
3  something with a patient, but not
4  just to be standing there, no.
5     Q. You haven't filed any type
6  of workmen's comp claim over anything
7  related to this, right?
8     A. No.
9     Q. Don't plan to?
10    A. No.
11    Q. Or attempt to, right?
12    A. Right. No.
13    Q. Ever filed a workmen's comp
14 claim before?
15    A. No.
16    Q. Ever considered it?
17    A. No.
18    Q. And if I can understand --
19 and I'm almost done. Just help me to
20 understand. But in trying to boil it
21 all down and summarize it --we've
22 been here for a number of hours, I
23 understand that, and I'm not at all

Page 296

1  trying to put words in your mouth,
2  but from what I understand you
3  complained about Dr. Gaillard, he was
4  told to stop, some months later you
5  complained again, and he was
6  thereafter terminated after some days
7  went by -- but he was ultimately
8  terminated, right? I mean,
9  essentially that's the timeframe?
10    A. Yes. I mean, it was almost
11 a month after the last time I
12 complained to when he was actually
13 terminated.
14    Q. And if that same situation
15 had happened and no one else had ever
16 complained about Dr. Gaillard at
17 all -- like you talked about other
18 people you said have told you they
19 complained about his activities. But
20 if those people never complained, or
21 you never heard about that, would I
22 be correct in understanding that you
23 would then believe that this

Page 297

1  situation had been handled just as
2  you thought it should be handled?
3     A.  If you're asking me that
4  there was no other complaints, there
5  would just be me?
6     Q.  Yes, ma'am, that's right.
7  Because you've talked about what you
8  understand other people may have said
9  or reported, and we've discussed all
10 that.  And as I understood your
11 testimony, you were upset because
12 when you came to talk to the
13 hospital, you felt like you were the
14 third to complain, and so they should
15 have acted differently, right?
16    A.  Yes.
17    Q.  Isn't that basically kind
18 of boiling it all down?
19    A.  Yes.
20    Q.  But, so, if there had never
21 been anybody else to complain, then
22 would your opinion be that the
23 hospital did act appropriately by the

Page 298

1  things that they did -- this is how
2  they should have reacted if there had
3  been no one else to complain?
4     A.  Somewhat, yes.
5     Q.  And Mr. Middlebrooks asked
6  you if you had filed any type of
7  criminal charges against Dr.
8  Gaillard, and you said you had not,
9  right?
10    A.  Right.
11    Q.  And not considered it?
12    A.  No, I had not.
13    Q.  You know that if someone
14 does assault and battery -- if
15 someone touches you inappropriately,
16 you can go and swear out a warrant
17 against them and have them
18 arrested -- you know that, don't you?
19    A.  Yes.
20    Q.  Why didn't you do that?
21    A.  Well, at the time he still
22 worked there.  If I did that, then he
23 just comes right back to work and

Page 299

1  then I still have to work with him.
2     Q.  Don't you think ultimately
3  that the hospital cared more about
4  how you felt and what you thought in
5  relation to Dr. Gaillard, than they
6  did his feelings, because ultimately
7  he was terminated?
8     A.  No, I don't.
9         MR. CRUM:  Well, I think
10 that's all I have right now.  Thank
11 you, ma'am.
12
13 EXAMINATION BY MS. BASWELL-GUTHRIE:
14    Q.  Ms. Bennett, I'm Cheryl
15 Baswell-Guthrie, and I represent Dr.
16 Gaillard.  And I'd like to say my
17 questions are going to be short, but
18 they're probably not going to be.
19 And I'm going to go into some events
20 with a little bit more detail,
21 because I don't think I have a handle
22 on the chronology, and I do apologize
23 for that, okay.

Page 300

1         I'm going to jump right
2  back in on these dates, because it's
3  important for me to make sure that I
4  understand this correctly if we end
5  up ever going to trial in this case.
6  And I'm going to -- I'm going to
7  re-ask some questions I think you've
8  answered, but I'm just asking for
9  confirmation.  Prior to October 2nd,
10 2005, it is your position that you
11 did not report or tell anyone about
12 any inappropriate behavior by Dr.
13 Gaillard; is that correct?
14    A.  No, actually I had told
15 someone.  I had spoken with Debra
16 Phillips about it and asked her not
17 to say anything at that time, hoping
18 this would just go away.
19    Q.  Okay.  And I apologize
20 again, but --
21    A.  That's okay.
22    Q.  -- I need to reask a few
23 things just to make sure I've got

Page 301

1  these events. What did you tell Ms.
2  Phillips prior to October 2nd, 2005?
3      A.  The comments, and the
4  gestures, and things that were going
5  on with him. Exactly what all that
6  was, I don't remember there were so
7  many.
8      Q.  Well, I'm going to ask you
9  that you remember them, because when
10 we go to trial, you know -- if six
11 months from now you remember them and
12 you don't remember them today, I'm
13 going to have a problem with that.
14 And I think everybody in this room
15 is. If you went to Ms. Phillips
16 prior to October 2nd, 2005, and
17 complained about Dr. Gaillard, I'm
18 going to ask you what did you
19 complain to her about, that you told
20 her not to tell anyone?
21     A.  I don't remember exactly
22 what all I said. I don't remember
23 what he had said.

Page 302

1      Q.  Well, what was it about it
2  that bothered you?
3      A.  There were so many
4  comments, I can't remember exactly.
5      Q.  Well, can you give me some
6  examples because you obviously
7  remember that you went to Ms.
8  Phillips so you're going to remember
9  some conversation you had with her
10 what was your conversation with her?
11     A.  I don't remember.
12     Q.  Well, is it you don't
13 remember because it wasn't important
14 enough to remember prior to October
15 2nd, 2005?
16     A.  No. It's probably that I
17 don't remember because there were so
18 many.
19     Q.  Well, if they were
20 offensive to you, wouldn't you think
21 you would remember?
22     A.  No.
23     Q.  So, you're going to tell

Page 303

1  me --
2      A.  I don't remember exactly
3  what was said. Badgering me is not
4  going to make me remember. I don't
5  remember.
6      Q.  I'm not asking for exactly.
7  I am asking you -- you recall going
8  to Ms. Phillips prior to October 2nd,
9  2005; is that correct?
10     A.  Yes.
11     Q.  Okay. I'm going to ask you
12 in your own recollection, not exact
13 words, what was the conversation with
14 Ms. Phillips concerning Dr. Gaillard?
15     A.  His inappropriate comments.
16     Q.  And I'm going to ask you
17 what were those inappropriate
18 comments referencing to? Maybe not
19 his exact words, but what were they
20 referencing to?
21     A.  I don't remember exactly.
22     Q.  Is that going to be your
23 testimony at trial, that you don't

Page 304

1  remember at trial?
2      A.  I guess so, because I don't
3  remember exactly what all he had
4  said. There are so many. Just like
5  the incident about the way my scrubs
6  fit. That was not the first time I
7  had heard that.
8      Q.  But you remember that
9  incident?
10     A.  Yes, I do remember that.
11     Q.  I'm focusing on this
12 because this is important. This is
13 part of your lawsuit. And no one in
14 this room is taking this lawsuit
15 lightly. If you went to Ms. Phillips
16 prior to October 2nd, 2005, and you
17 had told her there was inappropriate
18 comments by Dr. Gaillard, was it just
19 statements he said, and only
20 statements?
21     A.  Yes.
22     Q.  So prior to October 2nd,
23 2005, the inappropriate behavior that

Page 305

1  you're contending was not having
2  anything to do with physical
3  touching?
4     A.  Right.
5     Q.  Now, with this
6  inappropriate behavior you're
7  contending prior to October 2nd,
8  2005, did he call you names?
9     A.  No.
10    Q.  Did he tell you you're
11 incompetent?
12    A.  No.
13    Q.  Did he tell you you had a
14 sexy figure?
15    A.  No, I don't remember any
16 words like that.
17    Q.  And I'm trying to help you
18 try to remember what he said.  Is
19 there anything coming back at all?
20    A.  He may have made a
21 reference to my body shape or
22 something, but not anything like a
23 sexy figure or anything like that,

Page 306

1  no.
2     Q.  Okay.  Do you recall what
3  he said about your figure, if he said
4  anything about it?
5     A.  No, I don't.
6     Q.  And those incidences prior
7  to October 2nd, 2005, where did they
8  take place?
9     A.  Somewhere in the emergency
10 department.
11    Q.  Well, do you remember where
12 in the emergency department they took
13 place?
14    A.  No, not exactly, no, I
15 don't.
16    Q.  Do you remember if anyone
17 was in the room at the time those
18 incidents took place prior to October
19 2nd, 2005?
20    A.  No, I don't.
21    Q.  Who would you have gone to
22 outside of Ms. Phillips to tell that
23 person about this particular behavior

Page 307

1  that you're contending is
2  inappropriate by Dr. Gaillard?
3     A.  Well, I can tell you
4  someone I worked with the majority of
5  the time when I worked.  That was --
6     Q.  Who was that?
7     A.  That would have been
8  Candace Thomas.  That's who I worked
9  with the majority of the time that I
10 worked.
11    Q.  Did you talk to Candace
12 Thomas about the incidents prior to
13 October 2nd, 2005?
14    A.  I don't recall talking to
15 her about it before then, no.
16    Q.  How long have you known
17 Candace Thomas?
18    A.  For about four years.
19    Q.  Do you go out to lunch or
20 dinner with her?
21    A.  No.
22    Q.  Do you do anything with her
23 outside of work?

Page 308

1     A.  No.
2     Q.  So prior to October 2nd,
3  2005, your only recollection is that
4  he made statements that you believe
5  are inappropriate, and you recall
6  they were in the ER department; is
7  that correct?
8     A.  Yes.
9     Q.  Do you recall if there were
10 any patients in the room?
11    A.  No.
12    Q.  Do you recall if there were
13 any other nurses in the room?
14    A.  No.
15    Q.  When those types of
16 comments -- whatever those comments
17 are that Dr. Gaillard supposedly made
18 to you, did you tell him to stop?
19    A.  They were not on a
20 consistent basis as they were at this
21 time.  It was something just like
22 every now and then, and that's why I
23 was just trying to wear it off to see

Page 309

1  if he would just stop.
2      Q.  So is your answer to my
3  question no, you did not tell him to
4  stop?
5      A.  Yes.
6      Q.  My understanding from your
7  testimony today -- and just tell me
8  if I'm correct, is that the first
9  incident that you reported was in
10  October, 2005; is that correct?
11      A.  Yes.
12      Q.  And my understanding from
13  your testimony -- and just correct me
14  if I'm wrong, that was told to Ms.
15  Phillips, Ms. Hudson, and Karla Gray;
16  is that correct?
17      A.  Yes.
18      Q.  From the time of the
19  incident -- and we're just going to
20  say on or about October 2nd, 2005,
21  for purposes of today, from the time
22  the incident occurred, approximately
23  how long was it before you talked to

Page 310

1  Ms. Phillips?
2      A.  This incident?
3      Q.  The October 2nd, 2005?
4      A.  That day, that same day.
5      Q.  How about Ms. Hudson?
6      A.  The Monday.
7      Q.  So, that would have been
8  two days later?
9      A.  I left on Sunday. That's
10  when all this happened. And, then, I
11  talked to Ms. Hudson, I think it was
12  the next day.
13      Q.  Okay. It was the next day.
14      A.  Well, actually, it was like
15  a Monday morning when I left, because
16  I worked nights.
17      Q.  And how about Ms. Gray?
18      A.  I think it was that
19  Thursday afterwards.
20      Q.  Back on this -- we're going
21  to call it for purposes of today the
22  October 2nd, 2005, incident -- you
23  stated today and in your

Page 311

1  interrogatories that he asked you
2  your age. At the time he asked your
3  age, who was in the room with you and
4  Dr. Gaillard?
5      A.  Michelle Clark.
6      Q.  Has Michelle Clark provided
7  any type of written statement to you?
8      A.  No.
9      Q.  Or your attorney?
10      A.  No.
11      Q.  And who is Michelle Clark?
12      A.  An RN in the emergency
13  department.
14      Q.  Does she still work there?
15      A.  Yes.
16      Q.  Does she work on your
17  shifts?
18      A.  Yes.
19      Q.  You guys go to lunch or
20  dinner?
21      A.  No.
22      Q.  Ever do anything after
23  working hours?

Page 312

1      A.  No.
2      Q.  Do you ever talk with her
3  about your personal life?
4      A.  No.
5      Q.  You don't ever talk to her
6  about your children?
7      A.  I don't know. If I do, I
8  don't know what I would say, but
9  maybe I do, I don't know. She's
10  talked to us about her mother passing
11  away.
12      Q.  Well, do you ever talk to
13  her about problems that you may be
14  having with your children or at home?
15      A.  I may have talked about
16  somewhere we've been or something
17  like that, but I don't -- I only have
18  one child at home, and she's not
19  giving me any problems.
20      Q.  Who do you normally confide
21  in when you're upset about something?
22      A.  My husband.
23      Q.  Who else?

FREEDOM COURT REPORTING

Page 313

```
 1     A.  My sister.
 2     Q.  What's your sister's name?
 3     A.  Chasity Green.
 4     Q.  I think you mentioned that
 5  earlier.  I apologize.
 6     A.  That's okay.
 7     Q.  Does she live in Decatur?
 8     A.  Yes.
 9     Q.  What street does she live
10  on?
11     A.  Camille -- Camelia,
12  C-A-M-E-L-I-A.
13     Q.  Did you have any
14  conversations about Dr. Gaillard's
15  behavior with your sister?
16     A.  Yes.
17     Q.  Now, let's go back to the
18  October 2nd, 2005, incident.  When he
19  asked you your age, Michelle Clark
20  was present in the emergency room,
21  correct?
22     A.  Yes.
23     Q.  Was there anyone else
```

Page 314

```
 1  present?
 2     A.  No, I believe that was it.
 3  We were in the general treatment.
 4     Q.  When he asked your age, why
 5  did you say to him, "Stop, I am not
 6  talking to you, because you don't
 7  know how to act?"
 8     A.  Because he made the comment
 9  back, "Is that all?"  That's his
10  setup to get ready to say something
11  else.
12     Q.  And that's assumption on
13  your part, correct?
14     A.  Yes.
15     Q.  And this may sound out
16  of -- kind of not relevant because it
17  kind over rolls me for a minute, but
18  do you ride horses?
19     A.  No.
20     Q.  Have you ever been around
21  horses?
22     A.  No.
23     Q.  Never been around any
```

Page 315

```
 1  farmers, cowboys?
 2     A.  No.
 3     Q.  Okay.  Have you ever heard
 4  the statement, "You've been rode
 5  hard," to indicate that you look
 6  actually older than you really are?
 7     A.  No.
 8     Q.  Have you asked anyone what
 9  the term means, "Put up wet a lot,"
10  in your life?
11     A.  No.
12     Q.  Did Dr. Gaillard tell you
13  what he meant by that statement?
14     A.  No, I didn't ask him.
15     Q.  Would it surprise you that
16  that statement is sometimes referred
17  to as just having a hard, difficult
18  life?
19     A.  Yes.
20     Q.  And being tired.  Would
21  that surprise you?
22     A.  Yes.
23     Q.  When you heard that
```

Page 316

```
 1  statement, why did you not ask Dr.
 2  Gaillard what he meant by it?
 3     A.  Because I thought I already
 4  knew what it meant, so I didn't ask
 5  him what he meant.  I just walked
 6  away.
 7     Q.  Well, correct me if I'm
 8  wrong, you were working with him on
 9  an -- well, let me strike that.
10         Were you working with him
11  on a regular basis in the ER
12  department at that time and around
13  October 2nd, 2005?
14     A.  Yes.
15     Q.  And is it important to you
16  to have good relationships with your
17  colleagues and your bosses in the ER
18  department?
19     A.  Yes.
20     Q.  And you would agree that
21  communication is important between
22  employees and colleagues, correct?
23     A.  Yes, about patients.
```

79 (Pages 313 to 316)