FILED
2007 Oct-05 PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# CONDENSED TRANSCRIPTS

# OF DEPOSITIONS TAKEN

# ON SEPTEMBER 5th, 2007

## DEPOSITIONS OF:

## KARLA M. GRAY
## NINA BENNETT, VOLUME II

*************************

**NINA BENNETT, PLAINTIFF**

**VS**

**DECATUR GENERAL HOSPITAL, APOLLOMD PHYSICIAN SERVICES AL, LLC, d/b/a EMERGENCY MEDICAL MANAGEMENT, and DR. HENRY GAILLARD, DEFENDANTS**

**Reported by: Tina E. Kent, CSR**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

NINA BENNETT,
Plaintiff,

vs. Civil Action Case No.: CV-06-S-4777-NE

DECATUR GENERAL HOSPITAL, APOLLOMD PHYSICIAN SERVICES OF AL, LLC, d/b/a EMERGENCY MEDICAL MANAGEMENT and DR. HENRY GAILLARD,
Defendants.

************************************

DEPOSITION OF NINA BENNETT
VOLUME II

************************************

**Was taken before Tina E. Kent, Certified Shorthand Reporter and Notary Public for the State of Alabama at Large, on Wednesday, September 5th, 2007, at 2:21 p.m., at the offices of North Alabama Reporting Service, 432 East Moulton Street, Decatur, Alabama.**



STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that said deposition may be taken by me on this date.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.



APPEARANCES

FOR THE PLAINTIFF, NINA BENNETT:

Buddie R. "Buzz" Brown, Jr., Attorney At Law
215 Second Avenue, Southeast
Decatur, Alabama 35601
(256) 355-9517

FOR THE DEFENDANT, DECATUR GENERAL HOSPITAL:

Sally Broatch Waudby, Attorney at Law
LEHR, MIDDLEBROOKS & VREELAND, P.C.
2021 Third Avenue North
Post Office Box 11945
Birmingham, Alabama 35203
(205) 326-3002

FOR THE DEFENDANTS, APOLLOMD PHYSICIAN SERVICES OF AL, LLC, d/b/a EMERGENCY MEDICAL MANAGEMENT:

J.D. Mendheim, Attorney at Law
Richard E. Crum, Attorney at Law
SHEALY, CRUM & PIKE, P.C.
2346 West Main Street, Suite 1
Post Office Box 6346
Dothan, Alabama 36302-6346
(334) 677-3000



APPEARANCES CONTINUED:

FOR THE DEFENDANT, DR. HENRY GAILLARD:

Cheryl Baswell-Guthrie, Attorney at Law
BASWELL-GUTHRIE, P.C.
3300 Westmill Drive, Southwest
Huntsville, Alabama 35805
(256) 288-0130

ALSO PRESENT:
Karla Gray

TABLE OF CONTENTS

EXAMINATION INDEX

NINA BENNETT
FURTHER BY MS. BASWELL-GUTHRIE 376
BY MS. WAUDBY . . . . . . . . . 477
FURTHER BY MR. CRUM . . . . . . 483
FURTHER BY MS. BASWELL-GUTHRIE 515
BY MR. BROWN . . . . . . . . . . 518

EXHIBIT INDEX

Defendants'
22 Diagram Drawing of the General Treatment Area in Critical Care / 1-Page Exhibit 439
23 Diagram Drawing of the CC 3 Area / 1-Page Exhibit 439

OBJECTION INDEX

BY MS. BASWELL-GUTHRIE . . . . 519
BY MS. BASWELL-GUTHRIE . . . . 519
BY MS. BASWELL-GUTHRIE . . . . 519
BY MS. BASWELL-GUTHRIE . . . . 519
BY MS. BASWELL-GUTHRIE . . . . 520
BY MS. BASWELL-GUTHRIE . . . . 520

REPORTER'S CERTIFICATE PAGE . . . . . . . . 521



I, TINA ELLER KENT, a Certified Shorthand Reporter of the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Alabama Rules of Civil Procedure and the foregoing stipulations of counsel, there came before me this witness in the above cause, for oral examination, whereupon the following proceedings were had:

NINA BENNETT
being previously duly sworn, was
examined and testified as follows:

FURTHER EXAMINATION
BY MS. BASWELL-GUTHRIE:

Q. Good afternoon, Ms. Bennett.
A. Good afternoon.
Q. As you know, I'm Cheryl Baswell-Guthrie, and I represent Dr. Gaillard in this matter, and we're continuing your deposition from, I believe, last week.
A. Uh-huh. Yes.
Q. At the end of the conclusion of your



deposition last week where we agreed to reconvene, we had just finished talking about four alleged incidents that occurred on or about October 2nd, 2005; do you recall?
A. Yes.
Q. And I'm just going to refresh your memory so we can bring us to the point where I'm going to start today.
A. Okay.
Q. I had asked you a question in your earlier deposition if between October the 2nd of 2005 through December of 2006, if any other incidents had taken place concerning inappropriate behavior that you believed was inappropriate by Dr. Gaillard; do you recall that?
A. Yes.
Q. And you had said there was not.
A. Correct.
Q. Is that still your testimony today?
A. Yes.
Q. In reviewing Answers To Interrogatories that were your answers to Decatur General Hospital's interrogatories that were produced



previously as a Defendants' Exhibit in your prior deposition, and from your interrogatories, it would appear, and just tell me if I'm correct or not, that after the October 2nd, 2005, incident, the next incident that you recall was either late January or early February of 2006 concerning what you contend are inappropriate comments by Dr. Gaillard; is that correct?
A. Yes.
Q. You mentioned in your Answers To Interrogatories that in late January 2006 or early February 2006, he mentioned, quote, "I like those blue scrubs the best. It's the way they ride on your hips," closed quote. Where were you at the time this incident was made?
A. In the main hallway in front of the unit secretary's desk.
Q. And because I'm not familiar with Decatur General, I just want to make sure: That is in a different area than what we were talking about earlier in your deposition when we were talking about being behind the glass doors with the door open; is that correct?

A. Yes. Those glass doors are always there. Do you have an extra piece of paper?
Q. Yes. (Complies.)
A. There's a main hallway like this (indicating), then the hallway comes to an end, and it goes to a separate area back here (indicating). This area right here (indicating) is the general treatment area, this is all on the same hallway. Then you have a critical care area, and there's a unit secretary's desk right here (indicating). The doctor's desk is right outside of critical care. So there --
Q. Okay.
A. When we say that there are glass doors, behind glass doors, those (indicating) stay there in both areas.
Q. Okay. So --
A. Then behind those, there is another set of doors so that if you needed to -- in the event that there was a fire or a fire drill, or in critical care, if you had a critical patient, you could actually close the other set, but these never move (indicating).



Q. Okay. And just for a description of the document, you've got GT as general treatment?
A. Yes.
Q. And CC as critical care?
A. Yes.
Q. And you have a darkened line where it says "GT" for general treatment. Those dark lines, we're going to represent as glass doors that remain open?
A. They stay there. They do not move.
Q. They just do not move?
A. They're on a track, yes, they stay there. They're stationary.
Q. And the same, too, we have two dark lines on the critical care, which those are glass doors that are on tracks?
A. Yes.
Q. Okay.
A. Yes.
Q. And so you're stating that behind those glass doors are other doors that would close if there was an emergency?
A. Yes. Yes.



Q. Okay. All right. So with respect to the incident that you contend in your Answers To Interrogatories on January 2006, can you put an asterisk by the area on your diagram where you're contending it took place near the unit secretary?
A. Right here (indicating).
Q. Okay. Now, on this -- I'm just going to call it "end of January 2006 incident." Do you recall the exact date that that happened?
A. No, I don't.
Q. Who did you report that incident to, if anyone?
A. No one until I reported it later.
Q. And who did you report it later to?
A. My charge nurse and to Ms. Hudson, and when I spoke with Ms. Gray, I reported it to her.
Q. So I just want to make sure I heard you. Your charge nurse, Ms. Hudson?
A. My charge nurse was Debra Phillips.
Q. Oh, Debra Phillips. Okay.
A. Yeah. And then Ms. Hudson, who is the director.
Q. And to anyone else did you report it?



A. To Ms. Gray.
Q. What time frame passed from the time that you reported it to Debra Phillips?
A. It would have been after the early February incident.
Q. Okay. And I'm looking at your Answers To Interrogatories, and there's a February 2nd, 2006, incident that looks like it took place in triage two, so you're saying that you reported it after that February 2nd, 2006, incident?
A. Yes. Yes.
Q. Okay. Do you know how many days after the February 2nd, 2006, incident that you reported the end of January 2006 incident?
A. No, I don't.
Q. Was it more than a week approximately?
A. It's going to be approximately the same time that I had met with Ms. Hudson. There's not going to be much of a time frame difference there.
Q. And when you say you met with Ms. Hudson --
A. Yes. It's down there, and the date somewhere, but I don't have that in front of me.

Q. February 16th, 2006, you reference in your Answers To Interrogatories, quote, "I spoke with Pat Hudson regarding his behavior," closed quote. Is that the date that you're probably referring to?
A. Yes. Yes.
Q. So it was approximately two or a little bit more than two weeks from the time of the end of the January 2006 incident when you reported that to Debra Phillips; is that correct --
A. Yes.
Q. -- approximately? Did you report to Ms. Hudson on the same day that you reported to Ms. Phillips concerning the January 2006 incident?
A. No. Because that would have had to have been on a weekend, and Ms. Hudson is not there on the weekends.
Q. So the next time that you reported to Ms. Hudson concerning the end of January 2006 incident would have been February the 16th?
A. Yes.
Q. I just wanted to make sure on that.
And then you said that you also reported to Ms. -- is that Karla Gray?



A. Yes.
Q. Okay. And when did you tell Karla Gray about the end of January 2006?
A. After I talked to Ms. Hudson, she said that I needed to speak with Ms. Gray, and the exact date of that, I'm not sure. I don't have any of that in front of me.
Q. Do you recall if it was the same day --
A. No.
Q. -- on February 16th?
A. No, it was not.
Q. Was it approximately about a week later than February 16th or was it less than a week?
A. I'm not -- I'm not sure of the exact dates.
Q. When you reported it to Ms. Gray, was anyone around with you at the time that you told Ms. Gray?
A. Ms. Hudson was there.
Q. Anyone else?
A. No.
Q. When you spoke with Ms. Hudson on February 16th, was anyone else with you?



A. No.
Q. And when you reported to Debra Phillips about the end of January 2006 incident, was anyone with you at that time?
A. No.
Q. So at the end of January 2006, you were standing in the hallway in front of the unit secretary?
A. In front of that desk, yes.
Q. Were there any patients around you at the time this alleged statement was made by Dr. Gaillard?
A. There were patients in critical care.
Q. Do you remember who they were?
A. No.
Q. Did you recognize any of the patients as being regular patients?
A. No.
Q. Outside of you and Dr. Gaillard present at the end of the January 2006 incident, was there anyone else present who heard him say those statements?
A. I don't know if there was someone sitting



at the unit secretary's desk or not.
Q. Well, has anyone said anything to you to indicate that they may have heard it?
A. No.
Q. You state that he made this statement, "I like those blue scrubs the best," in front of a patient who appears to be a child; is that correct?
A. No.
Q. Okay.
A. No. He did not say that in front of a patient that was a child. That is a different incident that we were standing at a patient's bedside, and he was -- I don't even know what all exactly what he was saying because I kept talking to the child so that I couldn't hear him.
Q. Okay. So let me correct that on the record. At the end of January 2006, then, there was no patient around at the time when he made the incident -- the alleged statement that you contend, which is about the blue scrubs; correct?
A. Correct.
Q. Then you go on in your Answers To Interrogatories and in your next statement, and I

apologize, I just kind of read them together, you contend that he made a statement in front of a patient who appeared to be a child; is that correct?
A. Yes.
Q. And he said to the fact, quote, "it's okay. She knows I have a crush on her," closed quote?
A. To the patient's mother.
Q. Do you know who the patient's mother was?
A. No.
Q. Had you ever seen the patient's mother before?
A. No.
Q. Have you ever seen the patient's mother in the hospital since this alleged incident?
A. No.
Q. Do you know what day this occurred?
A. No, I don't know the exact date.
Q. From your chronology in your Answers To Interrogatories, you bring up this incident prior to talking about coming in to pick up your check, which was on February the 2nd, 2006. Is it a fair



assessment that the incident regarding "she knows I have a crush on her" statement or alleged statement was made prior to February 2nd, 2006, but after the prior end of January 2006 incident?
A. I'm not sure that that's actually in chronological order. I'm not sure if that happened before or after that date.
Q. At the time this alleged statement was made in front of the child about having a crush, was there anyone else present nearby that would have heard this statement being made, other than you and Dr. Gaillard, this child, and the child's mother?
A. It was in general treatment, and there's five beds there, and all that separates each bed is a curtain. So who else was there, I don't know. But no, I did not have a tech in that area at that time.
Q. Has anybody said anything to you to indicate that they did hear this conversation?
A. No.
Q. And you do not recall when this day occurred?



A. Not the exact date, no, I don't.
Q. Was there anything said after this statement by Dr. Gaillard to anyone else to give me an idea of who may have been nearby when this incident was allegedly made?
A. I'm sorry?
Q. Was there anything that Dr. Gaillard said after this alleged incident about having a crush to someone else to suggest or indicate that maybe someone else may have been nearby to have heard the conversation?
A. Not that I'm aware of.
Q. So for purposes of trial, the only people that you're aware of that would have heard this incident or heard this statement being made was you and Dr. Gaillard; is that correct?
A. Other than the patient and the family member, yes.
Q. And you do not recall their name?
A. No.
Q. You do not recall the date that this took place?
A. No.



Q. Do you remember if it was raining outside that day?
A. No, because I wouldn't have been outside.
Q. Do you remember when you went home that day if it was raining outside?
A. No.
Q. Did this incident occur before the candy incident?
A. It's around the same time. It would probably be easy to track down because they do make daily assignments, and on that particular date, I was working in general treatment. I don't work in general treatment a lot.
Q. Okay. Did you work in general treatment more than two days in a row --
A. No.
Q. -- back at that time?
A. No.
Q. Did you work in general treatment more than twice a week back at that time?
A. No.
Q. Okay. Okay. And I'm just going to go back to these two incidents to make sure that I

understand correctly.

The incident that I'm contending is the end of January of 2006 for purposes of today for clarity, you contend Dr. Gaillard stated, "I like those blue scrubs the best. It's the way they ride on your hips." When he allegedly made that statement, did you tell him to stop?

A. I turned around and walked away. The reason that he made that statement is a friend of mine was standing there with me, one of my coworkers, and I had on pink. And she said, I like pink on you, it looks good on you. And I said, really? You think so? And she said, yeah. She turned and walked away, and then that's when he said, I like the blue scrubs the best. It's the way they ride on your hips. And I just walked away.

Q. Okay. So you walked away; correct?

A. Yes.

Q. And you did not tell him to stop; correct?

A. Correct.

Q. Then the next incident is basically "I have a crush on her" that you contend that



Dr. Gaillard made. Did you say anything to Dr. Gaillard immediately following this statement?

A. No. We're at a patient's bedside.

Q. When you left the patient's bedside, did you say anything to him concerning this statement?

A. No. That's an open area.

Q. When you say "open area," you're talking about the hallway there?

A. No. This general treatment is an open area. You have a desk on one end, a medicine PIXIS here (indicating), and then what you have is beds that line that room. And the only thing that divides the beds are curtains. So while you're at this desk (indicating), you're very close to that other bed. So there's nothing that separates whatever you're saying from the patients at all. They can hear everything that you say.

Q. Okay. It looks like in your Answers To Interrogatories, the next supposed incident took place on or about February the 2nd, 2006. I believe this is a time when you picked up your check; do you recall that incident?

A. Yes.



Q. Okay. And you mentioned that you were at triage two. Can you point to me or draw me a little circle, maybe, where a triage two would be on your diagram?

A. Yes. This is not long enough. You'll have to keep in mind that general treatment is a lot farther down than just the --

Q. I understand.

A. -- way it looks like. So between general treatment and critical care, there are two rooms like this, and this is triage one (indicating) and this would be triage two (indicating).

Q. Okay. Describe for me in your own words what happened at triage two.

A. I was standing here (indicating) and another lady that works there named Katrina, we were standing here talking. Dr. Gaillard walks into triage two, and he just stands there. When I turned and seen him standing there, I looked to her, and I said, come here, I want to show you something.

This is a main hallway (indicating) that patients walk up and down, people use this other



door over here to go in and out into the hospital. We came out of triage two, crossed this area (indicating). At the same time, this is the registration area and discharge area where patients go to give their insurance information. So you've got cubicles, three cubicles right here (indicating). We walked across here (indicating), walked back behind those, and this opens up into an open area (indicating), and there's a bathroom right here (indicating), and then there's another door that walks out into this main area, and then there's a door right here (indicating) that goes over into the emergency department area. I know it's kind of confusing.

Q. That's okay. For purposes of the deposition so I will remember this later, though, if you don't mind --

A. Okay.

Q. -- I'm going -- and for everybody's help -- I'm going to ask you to do like a dotted line where you've already kind of drawn a line going from triage two, just kind of draw, you know, a dotted line going, and just show where you went.

395

A. Okay.
Q. Okay.
A. So this is me and this is --
Q. At triage two?
A. At triage two.
Q. Okay.
A. And I said, come here, I want to show you something. So I walk around her, and she walks behind me, and we come all of the way over here (indicating), and we walked over here to this bathroom.
Q. And I'm going to just stop you right there. If you'll put a B for bathroom.
A. (Witness complies.)
Q. Okay.
A. We walk there to the bathroom, we get inside of the door, and she says, what is it? And I said, it's nothing, I just wanted to get away from him. She said, oh. And she walks back outside of the door, I started to close the door, and then I decided, no. I come -- when I pushed the door back open, he is standing right there at that door and said, can I see? And I said, no, and

396

walked passed him and walked out that door.
Q. Okay. I'm going to ask you to put D for door there.
A. That's a door, too (indicating).
Q. I just want to make sure that I hear you, and I apologize, I've had some hearing issues, and the last few weeks have been kind of bothersome to me.
At the bathroom door, you said that you opened the door? I'm sorry. Say that again.
A. Yes. We went -- we went -- she and I went inside of the door.
Q. Did you close the door behind you?
A. Yes.
Q. Okay.
A. And she said, what is it? And I said, nothing, I was just wanting to get away from him. And she said, oh. And she walks outside of the door. So I had the door handle in my hand, and I started to close the door, and it was about probably three or four inches from closing, and I thought, no. And when I pushed the door open, there he was.

397

Q. What did you say to him?
A. As soon as I pushed the door open, he said, can I see? And I said, no. And I walked passed him and walked out the door and walked back around and left.
Q. Did he say what he was referencing to when he said, "can I see"?
A. No.
Q. When he allegedly made that statement "can I see," was anyone in the bathroom with you when the door was open? Was Katrina still with you, or had she left?
A. I don't know if she was still in this area or if she was right here (indicating). This is -- this is open here (indicating), I know I drew a line there, but that's -- there's not a door there.
Q. Okay. I'm going to ask you then to put Xs along that area that's supposed to be open. Just X through it, and that way we'll know for deposition that you meant that to be open (indicating).
A. (Witness complies.)
Q. So your testimony today is when you were -- you were standing still inside of the

398

bathroom when you opened the door, and Dr. Gaillard was standing there?
A. Yes.
Q. And your position today is that his testimony was, "can I see;" correct?
A. Yes.
Q. And you don't recall if anyone else was there at the time he allegedly made this statement?
A. Katrina was still somewhere in this area. Where exactly she was, I don't know, because she later asked me why he had followed me to the bathroom.
Q. Did she ever indicate to you that she heard him say, quote, "can I see," closed quotes?
A. No, she did not.
Q. You stated earlier that she asked you why he followed you; is that correct?
A. Yes.
Q. Okay. And what was your response?
A. I said, I don't know.
Q. Anything else?
A. No.
Q. And then what was her response, Katrina.

A. She just said, that was weird. And I said, I know.
Q. At that time, did you mention to Katrina about the other incidents that had happened between the end of January 6th, 2006, and February 2nd, 2006?
A. No.
Q. Due to the alleged bathroom incident, did you tell anybody else on that day what had happened at the bathroom?
A. Anybody at work?
Q. Anybody at work.
A. No.
Q. Did you tell anybody who wasn't at work about the bathroom incident?
A. Yes.
Q. When did you tell them about the bathroom incident?
A. That night.
Q. And who was that?
A. My husband.
Q. Outside of your husband, was there anyone else that you told on February 2nd about the



bathroom incident?
A. I think I told LaTia Freeman and Theresa Cottingham.
Q. LaTia Freeman. And who is the other one?
A. Theresa Cottingham.
Q. When do you think you told them about the bathroom incident?
A. I think either that night or the next day, because I had been with them. It was Theresa's birthday.
Q. Did you tell Theresa in person?
A. No.
Q. Did you tell her over the phone?
A. Yes.
Q. Did you tell LaTia over the phone?
A. Yes.
Q. Were they both on the phone at the same time when you told them?
A. No.
Q. What was Theresa's response when you told her about the bathroom incident?
A. What -- she was shocked because she said, what? Like an ecstatic what, you know, like with



an exclamation point.
Q. Anything else she said?
A. She said, what was he doing? And I said, I don't know.
Q. Were you crying when you were talking to her?
A. Yes.
Q. Did she ask you why you were so upset about the incident?
A. No.
Q. Did he touch you in any way concerning the bathroom incident, Dr. Gaillard?
A. No.
Q. Can you recall any other statement that he made at the bathroom incident, other than, "can I see"?
A. No.
Q. When you told Theresa on the phone, did you call her?
A. Yes.
Q. Did you call her specifically to tell her about the bathroom incident?
A. Yes.



Q. What else did you talk about on the phone that day when you told her about the bathroom incident?
A. The hockey game, how we got free tickets.
Q. Can you think of anything else?
A. I . . .
Q. Did y'all talk about children?
A. I doubt it. I remember talking about those things because she wanted to talk about something else to change the subject.
Q. Did you initiate the call to LaTia Freeman?
A. Yes.
Q. Did you specifically call LaTia to tell her about the bathroom incident or something else?
A. The incident.
Q. Who did you call first, LaTia or Theresa?
A. I don't know. I think it was Theresa that I called first.
Q. What made you call both of them?
A. Because we were very close friends at that time.
Q. Did you do things with Theresa outside of

working hours?
A. Yes. And me and her and LaTia had all went to the hockey game that night for Theresa's birthday.
Q. The hockey game was on February 2nd?
A. Yes.
Q. So you told LaTia and Theresa about the bathroom incident prior to going to a hockey game?
A. No.
Q. After the hockey game?
A. Yes.
Q. So after you went to the hockey game, you came home and then called them about the bathroom incident?
A. Yes.
Q. Why did you not tell them at the hockey game?
A. Because it occurred after that, that's when I went to pick my check up.
Q. So you were at the hockey game first, then you went to the hospital to pick up your check, which was the bathroom incident that you're contending?



A. Yes.
Q. Okay. I understand. When you called Theresa and LaTia, did you call them from your cell phone?
A. No. My house phone.
Q. What's your home phone number?
A. Now? It's 340-2075.
Q. At that time.
A. Oh, I don't know.
Q. What address were you at?
A. At that time?
Q. Yes.
A. 802 14th Avenue, Southeast.
Q. Was the phone deal under your name?
A. I think it was under my son's name.
Q. What is your son's name?
A. Timothy Scott Bennett.
Q. What was your cell phone during the time of August 2005 through March of 2006?
A. I have no idea.
Q. Who was your provider?
A. Corr Wireless.
Q. Was it under your name or someone else's



name?
A. It would have been under my name.
Q. But you don't remember your cell number?
A. No.
MS. BASWELL-GUTHRIE: Off the record for just a moment.
(Whereupon, an off-the-record discussion was had.)
MS. BASWELL-GUTHRIE: Back on.
BY MS. BASWELL-GUTHRIE:
Q. When you spoke with Theresa and LaTia on February the 2nd, 2006, concerning the bathroom incident, did you tell them about any of the prior incidents that you're contending happened between the end of January 2006 and up to February 2nd, 2006?
A. I'm not sure. I know LaTia had already told me about her incident that she had had, so I'm not sure if we discussed those at that time or not.
Q. What did LaTia tell you about her incident?
A. That she was in specialty care, she was putting something up in a cabinet. She turned



around and Dr. Gaillard was standing behind her, and when she asked him what he was doing, he said he was admiring the view.
Q. Did she tell anybody about what she contends he said?
A. Yes. She talked to Dr. Pool.
Q. Do you know if there was a written document made from that discussion?
A. I don't know.
Q. Back on the February incident on February 2nd, 2006, that you're contending, when you opened the door and you contend Dr. Gaillard was there and he said, "can I see," did you tell him to stop making comments?
A. I said, no, and walked away.
Q. And at this time, I know I've asked, but just to make sure, there was no one else that would have heard this statement, other than possibly Katrina, is that correct, to your knowledge?
A. That's correct.
Q. Did you and Dr. Gaillard ever go out for lunch or dinner?
A. No.