Case 5:06-cv-04777-CLS    Document 69-16    Filed 10/05/07    Page 1 of 10    FILED
2007 Oct-05 PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

Nina Bennett, Volume II

407

1  Q. Did you ever have conversations with him
2  on your cell phone?
3  A. No.
4  Q. Did you ever have telephone conversations
5  with him from your home phone?
6  A. No.
7  Q. Did you ever send any handwritten notes to
8  Dr. Gaillard in 2005 or 2006?
9  A. No.
10 Q. Did you ever send him any cards?
11 A. No.
12 Q. Did y'all ever watch a movie together?
13 A. No.
14 Q. Do you consider yourself one who gets
15 jealous easily?
16 A. No.
17 Q. Why do you say that?
18 A. I just don't think that I am.
19 Q. Have you ever gotten upset when one of
20 your prior boyfriends or fiancès were with or were
21 dating another woman that you became aware of?
22 A. Yes.
23 Q. What did you do?

408

1  A. Confronted them about it, but I don't
2  think that's getting jealous very easily, I mean,
3  that would be grounds to be upset.
4  Q. When you say that "you confronted them,"
5  in what way? Face-to-face --
6  A. Yes.
7  Q. -- over the phone?
8  A. Face-to-face.
9  Q. Face-to-face? Okay. I'm going back to
10 your Answers To Interrogatories, and after the
11 bathroom alleged incident, it appears that the next
12 incident that you're contending occurred has to do
13 with four large chocolate bars; is that correct?
14 A. Yes.
15 Q. Was this on February 2nd, or was this
16 sometime after February 2nd, 2006?
17 A. It was after February 2nd.
18 Q. Approximately a week or two weeks after --
19 A. It was somewhere near Valentine's Day.
20 Q. You state in your interrogatories, and I'm
21 going to quote it, "Dr. Gaillard began talking
22 about the patient answering appropriately, then he
23 put a plastic bag in front of me stating, I have

409

1  been trying to give this to you." Who is the
2  patient?
3  A. I don't recall.
4  Q. Was that a patient that you had seen
5  before at the hospital?
6  A. I don't know. I had walked up to him with
7  a chart regarding a patient to tell him. I don't
8  remember if all of the labs were back or to see if
9  he wanted to give the patient some more medicine.
10 He turned around and started answering me about the
11 patient with my question, and then handed me a
12 plastic bag and said, "I've been trying to give you
13 this all night." Because every time I walked by
14 him, he was standing there going "psst, psst."
15 Q. Did the chocolate bars have any writing on
16 them?
17 A. They were Hershey's bars.
18 Q. So did the chocolate bars have any words
19 or pictures on them, other than the word "Hershey"?
20 A. I'm sorry?
21 Q. Did the candy have any marks on it, other
22 than maybe who the manufacturer of the candy was?
23 A. No. They were those really large

410

1  chocolate bars that some of the Hershey -- they
2  were Hershey's and some of them had the white
3  wrappers on them and then some of them were --
4  there was one that was purple -- had a purple
5  wrapper on it. It wasn't a Hershey's, but I don't
6  recall what it was.
7  Q. Did he give you a card?
8  A. No.
9  Q. Did he give you a Valentine's card around
10 that time period?
11 A. No.
12 Q. Did he give you any candy that said,
13 "kisses, kisses" or "hugs, hugs" or "I love you"?
14 A. No.
15 Q. Or anything to that nature?
16 A. No.
17 Q. When he handed you the four chocolate
18 bars, was there anyone around you at that time?
19 A. Yes. Denise McBay was sitting at the
20 desk.
21 Q. When he gave you the candy, did you tell
22 him thank you?
23 A. No.

411

1  Q. Why not?
2  A. Because I didn't view it as a compliment.
3  Q. Why not?
4  A. Because I'm there to do my job, which is
5  what he should be there to do. I don't need
6  chocolate, I don't need anything else, I didn't
7  want that kind of relationship with him. But when
8  you say something back to him, you start a banter,
9  because that's what he views it as, and you just
10 get this bantering going back and forth, and I
11 didn't want to do that, either.
12 Q. Has anyone ever in the entire time that
13 you ever have worked during your lifetime ever
14 given you candies during your employment?
15 A. I don't know. Pieces of candy, yes;
16 brought me four big bars of chocolate, no.
17 Q. When he gave you the candies, why did you
18 not take it as just a kind gesture of, you know,
19 being nice and saying thank you for your hard work?
20 A. Well, if that were the case, then I guess
21 I assumed that he would have gave them to everybody
22 else. And based on the fact of everything else
23 that had went on, I didn't view it that way.

412

1  Q. Well, are you sure that no one else got
2  any chocolate bars that day?
3  A. I would assume so, because I took that bag
4  to the back in specialty care, and I'm trying to
5  remember who was working back there, I don't even
6  remember, and put it on the desk and told them that
7  they could have it.
8  Q. Did you ask all of the other nurses
9  whether or not they got any chocolate bars or other
10 candies from Dr. Gaillard?
11 A. No.
12 Q. Did you ask anyone if they got chocolate
13 bars or candies, other than you, from Dr. Gaillard?
14 A. No.
15 Q. You mentioned that Denise McBay was
16 present at the time that he gave you the chocolate
17 bars.
18 A. Yes.
19 Q. Did you tell Dr. Gaillard to stop giving
20 you candy?
21 A. No.
22 Q. Did you turn to Denise McBay and make any
23 comment about him giving you the candy?

413

1  A. She came to me and said, I wondered how
2  long it was going to take him to give you that.
3  He's been trying to give it to you all night.
4  Q. Did she state why she thought that?
5  A. Because all night -- she said that every
6  time I walked by, that he kept trying to get my
7  attention, which I knew that was true. I had been
8  ignoring him.
9  Q. Did Denise McBay indicate to you whether
10 or not she was aware that Dr. Gaillard had given
11 candies to anyone else?
12 A. No.
13 Q. Are you aware of any incident where
14 Dr. Gaillard gave anyone a Valentine's card to
15 anyone at the hospital in 2006?
16 A. No, I'm not.
17 Q. Are you aware of anyone that Dr. Gaillard
18 was dating who worked at the hospital in 2005 or
19 2006?
20 A. No, I'm not.
21 Q. Were there any other comments made on the
22 day that he gave you or around the incident at the
23 time that he gave you the four large chocolate

414

1  bars, other than quote, "I have been trying to give
2  this to you," closed quotes?
3  A. No.
4  Q. Looks like there may be one more incident
5  that you're contending took place, and I need to
6  ask you when this took place. This was the
7  incident about you're contending that he ran his
8  hand up and down your neck. When did that take
9  place?
10 A. I'm not sure.
11 Q. Well, give me an idea of approximately
12 when. Was it after Valentine's Day?
13 A. No.
14 Q. Was it before the candy?
15 A. Yes.
16 Q. Did it fall in between the incident that
17 took place at the bathroom and the candy incident?
18 A. I'm not sure. I don't think so. I'm not
19 sure.
20 Q. When do you think it took place?
21 A. I don't know.
22 Q. Well, I need you to remember for purposes
23 of trial because chronologically, I've got to

415

1 understand how these events took place. So I need
2 to just get you to sit down here and think for a
3 moment.
4     Which incident took place first: The
5 bathroom incident, the chocolate candy incident, or
6 the running the hand up and down the neck, which
7 one took place first?
8     A.  The hand up the neck.
9     Q.  Hand up the neck took place first?
10    A.  Yes.
11    Q.  Okay. And then what was the second
12 incident that took place?
13    A.  The bathroom.
14    Q.  And then the Valentine candy -- or I won't
15 say Valentine candy, but chocolate candy?
16    A.  Yes.
17    Q.  Did the incident about, quote, "I like
18 those blue scrubs the best. It's the way they ride
19 on your hips," closed quote, did that take place
20 prior to the hand up the neck incident?
21    A.  I think that's going to be around the same
22 time.
23    Q.  But you don't remember exactly when it

416

1 took place; correct?
2     A.  Correct.
3         MS. WAUDBY: Is there going to be
4     a breaking point?
5         MS. BASWELL-GUTHRIE: That will
6     be fine. Yeah. Thank you.
7         (Whereupon, a short recess was
8         taken from 3:22 p.m. until
9         3:33 p.m.)
10 BY MS. BASWELL-GUTHRIE:
11    Q.  Ms. Bennett, I'm just going to clarify
12 because I need to make sure chronologywise I've got
13 the dates where I need to have them; okay?
14    A.  Okay.
15    Q.  And I don't mean to repeat myself, but I
16 just want to make sure that I've got it correct.
17        The bathroom incident when we were talking
18 about it earlier, you were contending that took
19 place on February 2nd, 2006; is that correct?
20    A.  2005.
21    Q.  I mean, 2005.
22    A.  Yes.
23    Q.  No, I mean, 2000 . . .

417

1         MR. CRUM: '06.
2 BY MS. BASWELL-GUTHRIE:
3     Q.  '06.
4     A.  '06. Yes.
5     Q.  You had me there for a moment. Okay.
6 That's all right.
7         So February 2nd, 2006, was when the
8 bathroom incident took place?
9     A.  Yes.
10    Q.  And it's your position that after the
11 bathroom incident, the next incident took place
12 about the chocolate candy, and we're going to say
13 somewhere around the Valentine period?
14    A.  Yes.
15    Q.  It's your position that prior to February
16 2nd, 2006, was the incident that took place about
17 the hand on the neck.
18    A.  Yes.
19    Q.  Okay. I'm going to ask you to really
20 think hard for me. Did that occur at the end of
21 January or the beginning of February of 2006?
22    A.  I don't know.
23    Q.  You mentioned before we took a break that

418

1 your opinion is that the hand on the neck incident
2 took place after the comment about him talking
3 about your scrubs hanging on your hips; is that
4 correct?
5     A.  That's going to be somewhere around that
6 same time frame, but I'm not sure when that was,
7 but it's going to be somewhere around the same
8 time.
9     Q.  Is it your recollection that the scrubs on
10 the hips incident and the hand on the neck incident
11 occurred within like a week of each other?
12    A.  Yes.
13    Q.  And your position in your Answers To
14 Interrogatories, and I just want to make sure that
15 it hasn't changed, is that the scrubs incident took
16 place at the end of January or early 2006; correct?
17    A.  Yes.
18    Q.  Well, for purposes of today, since you
19 don't know the exact date, we're going to take the
20 position, if you're okay with this from a
21 chronological standpoint, that the scrubs
22 concerning being on your hips and the hand on the
23 neck incident both occurred either the last couple

419

1  of days of January or the first couple of days of
2  February, 2006; is that relatively -- is that a
3  fair statement?
4      A. Yes.
5      Q. We're going to talk about the hands on the
6  neck incident. In your Answers To Interrogatories,
7  it would appear, but correct me if I'm wrong, it
8  would appear that this took place in critical care
9  three?
10     A. Yes.
11     Q. Do you recall who the patient was that
12 Dr. Gaillard and you were seeing at that time?
13     A. No.
14     Q. Had you ever seen the patient before?
15     A. No.
16     Q. Have you seen the patient since this
17 incident?
18     A. I don't think so.
19     Q. Have you spoken to this patient since this
20 incident?
21     A. I don't think so.
22     Q. You don't think so, or you know you
23 haven't?

420

1      A. Well, I didn't go out of my way to speak
2  to the patient, but if I've had them again, I don't
3  recall because I don't recall who it was.
4      Q. Was there anyone else present at the time
5  of the hand on neck incident, other than you,
6  Dr. Gaillard, and the patient who you do not recall
7  who it is?
8      A. No.
9      Q. Was the patient awake?
10     A. Yes, but he had altered mental status.
11 That's why we were doing a lumbar puncture.
12     Q. So he was under sedatives?
13     A. No. That's the way he came in.
14     Q. Is it a he?
15     A. Yes.
16     Q. What age group was he in, roughly, if you
17 had to guess?
18     A. He was older, so . . .
19     Q. Over 50?
20     A. Yeah.
21     Q. Did he have any family members come in
22 that you recall?
23     A. I don't recall.

421

1      Q. Or friends?
2      A. I don't recall. I know no one was in
3  there when we were doing the lumbar puncture, I
4  don't remember seeing any family member with him.
5      Q. And outside of you, Dr. Gaillard, and the
6  patient, there were no other individuals present at
7  that time; correct?
8      A. Correct.
9      Q. Okay. I'm going to ask for you, if you
10 will, just so I understand, critical care unit
11 three, is that like just curtains kind of around
12 it?
13     A. Yes.
14     Q. I'm going to ask you to draw for me in
15 critical care three, and let's assume this is north
16 (indicating), okay, south (indicating) where the
17 bed was, is there a night table? Just kind of draw
18 for me where things were in that room.
19     A. So just in like the area?
20     Q. In CC three.
21     A. Okay. You would have the stretcher, and
22 at this time, we still had a crash cart over there,
23 so the crash cart was right here (indicating).

422

1  There's a table that actually has all of our stock
2  in it on this side (indicating). There's a monitor
3  that's mounted on the wall on this side.
4      Q. Okay. And I'm going to ask for you --
5      A. This is a wall (indicating). The crash
6  cart actually is up against the wall.
7      Q. That's a wall that you're pointing to,
8  which would be --
9      A. Yes.
10     Q. -- on the east side of your paper?
11     A. Yes.
12     Q. Would you put an E right there just so
13 we'll know?
14     A. (Witness complies.)
15     Q. Okay. So that's an actual wall, not a
16 curtain; correct?
17     A. Correct. And then you would have a
18 curtain that would come around here (indicating).
19     Q. Which would be on the south side?
20     A. Yes.
21     Q. Okay.
22     A. And then one that would come here
23 (indicating), so that it completely closes it off.

423

Q. So we've got here for purposes of deposition testimony, we've got a curtain on the west side and the south side of CC 3, and a wall on the east side.

A. And on the north side.

Q. And a wall on the north side. Okay. Will you kind of just draw a wall like right behind here (indicating)?

A. My drawing skills are terrible. (Witness complies.)

Q. Okay. And I apologize. Will you mark for me what ran along the east wall, what that was again, you told me.

A. Crash cart.

Q. Crash cart. What's a crash cart? I apologize, I don't know.

A. It has all of your medications in it in case a patient were to crash: Atropine, lidocaine, all of those things that you would need to restart somebody's heart or maintain a blood pressure, your defibrillator is on here.

Q. Okay. So that's got like your needles?

A. No.

424

Q. No? Where are your needles?

A. Are over here (indicating).

Q. What are you pointing to for purposes of the deposition?

A. That's our supply cart.

Q. Supply cart. Okay. Will you write that down?

A. (Witness complies.)

Q. Okay.

A. The gloves are on top of this.

Q. So we've got gloves and needles.

A. And needles, syringes, blood tubes, IVs.

Q. Okay. And then to the east side of the supply cart is a monitor that's hanging on the wall; is that correct?

A. Yes. Actually, it's right above it.

Q. Okay. Will you put M on that just for purposes of the deposition so we'll know?

A. (Witness complies.)

Q. Okay. Now, which way was the head of the patient?

A. Head up is here (indicating).

Q. So on the north side?

425

A. Yeah.

Q. And where were you standing?

A. Right here (indicating).

Q. Okay. And I'm going to ask you to put --

A. (Witness complies.)

Q. Okay. That will work. N for Nina. Okay. And then show me where Dr. Gaillard was standing?

A. He started over here (indicating).

Q. So put a G for me for right now. That's where he started.

A. Okay. (Witness complies.) Uh-huh.

Q. Okay. Now, I'm going to ask you to in a -- I've already got kind of a dotted line -- well, I don't . . .

MS. BASWELL-GUTHRIE: Off the record.

(Whereupon, a short recess was taken.)

BY MS. BASWELL-GUTHRIE:

Q. I'm going to ask you to take -- initially where Dr. Gaillard was standing --

A. I need to put something right here (indicating).

426

Q. Okay. Go ahead.

A. This is a -- there was a tray right here (indicating), somewhere near him because for the lumbar puncture.

Q. Is that a mobile tray?

A. Yes. It's what we call a mayo stand because it rolls, it's on wheels.

Q. Okay. Just put mayo stand in there so I'll . . .

A. (Witness complies.)

Q. Okay. And actually, put rolls under that so I'll know that that's what it was.

A. (Witness complies.)

Q. Okay. All right. So you've got G for Dr. Gaillard where he was standing next to the patient on the bed; correct?

A. Correct.

Q. All right. I'm going to ask you to take the red pen and do a dotted line to show me from that point what he did next.

A. He came around onto the side of the bed where I was, because I'm standing here (indicating), I have one hand behind the patient's

427

1  head, another hand behind the patient's thigh to
2  arch their back so that he can do a lumbar
3  puncture. The patient is actually facing toward
4  me.
5      Q. On their side?
6      A. Yes.
7      Q. Okay.
8      A. For a lumbar puncture, the patient either
9  has to sit up and lean over, which this patient
10 could not, or they have to be on their side and you
11 have to -- they have to be bent in a position to
12 where it bows their back out for the lumbar
13 puncture so they can . . .
14     Q. Okay. I understand now. Okay. So let me
15 just clarify for the record. You were holding the
16 patient's head in your left hand?
17     A. I had the neck.
18     Q. The neck with your left hand?
19     A. Uh-huh.
20     Q. And then the right hand, I believe you
21 said was under the thigh; is that correct?
22     A. Yeah. To try to keep them bent so
23 that . . .

428

1      Q. All right. Keep going. I'm sorry to
2  interrupt you.
3      A. He came over here (indicating) to get a
4  pair of gloves. In the process of getting a pair
5  of gloves, I don't know if he had already picked
6  the gloves up and if he was coming back because I
7  didn't turn around to look because I was holding
8  the patient. All of a sudden, I felt my hair when
9  it moved. He picked my hair up, I thought -- I was
10 trying to give him the benefit of a doubt and
11 thought maybe my stethoscope is on it or
12 something. And then the next thing I felt was his
13 hand run up the back of my neck.
14     Q. Okay. And I'm going to back up for just a
15 moment. For purposes of the deposition, you were
16 contending that he went south along the bed and
17 back up on the west side heading north up to the
18 supply cart to get the gloves; is that correct?
19     A. Yes.
20     Q. How long was your hair at the time of that
21 incident?
22     A. Probably about as long as it was -- I had
23 it cut since last week, so about as long as it was

429

1  then but it was in a ponytail.
2      Q. So on the date of the incident, your hair
3  was in a ponytail?
4      A. Yes.
5      Q. It was about the same length as roughly
6  today; is that --
7      A. Probably about another two inches.
8      Q. Longer or shorter?
9      A. Longer.
10     Q. All right. And then on the day of the
11 incident, you had your hair up in a ponytail;
12 correct?
13     A. Correct.
14     Q. Do you normally wear your hair up in a
15 ponytail at work?
16     A. Yes.
17     Q. Do you recall on that incident if you had
18 a stethoscope or anything around your neck?
19     A. Yes.
20     Q. What did you have around your neck?
21     A. My stethoscope.
22     Q. Was there anything else?
23     A. No.

430

1      Q. Did he take his hand and rub up your neck
2  or rub down your neck?
3      A. He took his hand and put it at the base of
4  my neck and rubbed it up the back of my neck.
5      Q. Up to your hairline?
6      A. Yes.
7      Q. When he did that, did you feel your
8  stethoscope move?
9      A. No.
10     Q. Did you feel your ponytail move?
11     A. Yes.
12     Q. How did your ponytail move?
13     A. He moved it.
14     Q. No. How did it move like --
15     A. To the side.
16     Q. Did it swing left and right?
17     A. No. He moved it to the side to put his
18 hand up the back of my neck.
19     Q. So you're saying that Dr. Gaillard
20 actually took your ponytail and moved it to the
21 side?
22     A. Yes.
23     Q. And then took his hand at the base of your

**431**

1  neck and rolled his hand up your neck to your
2  hairline?
3      A.  Yes.
4      Q.  And your position is that you don't recall
5  your stethoscope moving during that process?
6      A.  No.
7      Q.  What were you wearing that day?
8      A.  Scrubs.
9      Q.  Were you wearing a shirt under your --
10     A.  Scrubs.
11     Q.  -- scrubs?
12     A.  Yes.
13     Q.  What kind of shirt?
14     A.  I don't know.  I always wear a shirt under
15 my scrubs.
16     Q.  Is it normally a button-down shirt or a
17 nonbutton shirt?
18     A.  Just like a T-shirt type thing.
19     Q.  So no buttons on the front, typically?
20     A.  No buttons.
21     Q.  Do you know if that's what you were
22 wearing that day?  Do you know if that was what --
23     A.  Under my scrub top?

**432**

1      Q.  -- you were wearing that day was a shirt
2  with no buttons?
3      A.  I'm sure it was because I normally wear a
4  T-shirt type shirt under my scrubs.
5      Q.  Do you ever remember wearing a collared
6  shirt --
7      A.  No.
8      Q.  -- to work?
9      A.  No.
10     Q.  Is it your testimony today that you've
11 never worn a collared shirt under your scrubs while
12 being employed at Decatur General?
13     A.  A button-down shirt?
14     Q.  Collared shirt.
15     A.  I have worn a collared shirt to work
16 before, yes, right after I first started there, and
17 it was too hot because it was a long-sleeve shirt.
18     Q.  Outside of that time, do you recall ever
19 wearing another -- do you recall another time where
20 you wore a collared shirt under your scrubs at
21 Decatur General?
22     A.  No.
23     Q.  Is it your position today and for purposes

**433**

1  of testimony that on that day you did not have a
2  collared shirt on?
3      A.  Yes.
4      Q.  And there was no one there to witness this
5  incident, other than you, Dr. Gaillard, and the
6  patient who we do not know; correct?
7      A.  Correct.
8      Q.  When you felt this movement on the back of
9  your neck, did it ever occur to you that it could
10 possibly be him just massaging you to get you to
11 relax?
12     A.  No.
13     Q.  Were you uptight that day?
14     A.  No, not until he touched my neck.
15     Q.  Prior to the incident, were you anxious or
16 nervous that day for any reason?
17     A.  No more so than when I was when I had to
18 work with him, so, no.
19     Q.  Well, the day that you -- and I apologize
20 because I don't work at the hospital so I don't
21 know.  When you come in in the morning, when do you
22 realize who you're working with that day?
23     A.  You mean when I come in at night?

**434**

1      Q.  Yeah.  I'm sorry.
2      A.  When we look at our schedule.  When we
3  come in, we have a daily assignment of where we're
4  working.  And at the top of the assignment sheet,
5  it says what doctors are in what areas.
6      Q.  Do you typically know a week in advance
7  who you're going to be working with?
8      A.  No.  We normally -- we can look at the
9  schedule and see who's working, but you won't know
10 if you're working with that doctor all night
11 because of the area in the back closes at -- we
12 quit putting patients back there at 11:30, so
13 typically 1:30 or so, that area closes.  So you
14 don't necessarily know what doctor you're going to
15 work with all night.
16     Q.  Were you anxious the day before this
17 incident occurred?
18     A.  I don't recall.  I don't recall being
19 anxious.
20     Q.  Did anything in your personal life occur
21 in February 2006 or January 2006 that would have
22 upset you?
23     A.  No, nothing that I recall.

435

1  Q. No deaths in the family?
2  A. No.
3  Q. Nobody getting a divorce?
4  A. No.
5  Q. Any separations, any of your family or
6  distant family --
7  A. No.
8  Q. -- that would have upset you?
9  A. No.
10 Q. Okay. Anything going on with your
11 children in January, February of 2006 that would
12 have you concerned or upset about anything?
13 A. No.
14 Q. Had you seen a doctor in January or
15 February of 2006 for anything?
16 A. I don't recall seeing a doctor in January
17 or February.
18 Q. Were you on Lexapro in January and
19 February of 2006?
20 A. No, I don't think so.
21 Q. Were you on any type of anxiety medicine
22 or antidepressant drugs in January or February of
23 2006?

436

1  A. No, I don't think so.
2  Q. When were you on Lexapro? What time
3  period?
4  A. Around 2001 or 2002.
5  Q. Until when?
6  A. I think -- I don't remember exactly how
7  long I took that. Six months to a year.
8  Q. Okay. How about any other types of
9  relaxants, anxiety medicine, or antidepressant
10 drugs?
11 A. No.
12 Q. Have you ever taken Xanax?
13 A. Yes. About a month after my mother died,
14 I went and saw a doctor and told him I thought I
15 was depressed because my mother had died. And he
16 told me that I should have been over it by now and
17 he tried Pro -- wanted to put me on Prozac and gave
18 me some Xanax and told me to take the Xanax until
19 the Prozac kicked it. And I took one and it made
20 me sleep all day, and I didn't take anymore.
21 Q. And I apologize, because I've lost a
22 parent, too. When did your mom pass away?
23 A. She passed away in -- I graduated LPN

437

1  school in 2000, so she passed away in 2000, and
2  then my grandmother passed away in 2001, so it was
3  back-to-back.
4  Q. Okay. When this alleged incident took
5  place of the rubbing of the hand on your neck, did
6  you turn to Dr. Gaillard and tell him to stop?
7  A. I said, don't touch me.
8  Q. And then what did he say?
9  A. He just looked at me and he started to say
10 something, and I said, I don't want to talk about
11 it. And then he walked on over to the other side
12 and we went on with what we were doing with the
13 patient.
14 Q. Okay. So when he ran his hand allegedly
15 on your neck, you told him to not touch you?
16 A. Yes.
17 Q. And you said he was getting ready to say
18 something?
19 A. He opened up his mouth to say something,
20 and I just said something like, I don't want to
21 talk about it.
22 Q. When you left that room, the CC 3, did he
23 say anything to you after you left CC 3,

438

1  Dr. Gaillard?
2  A. No, I went to the bathroom.
3  Q. And you did not say anything to
4  Dr. Gaillard, either; correct?
5  A. Nothing else about that, no.
6  Q. And you went to the restroom?
7  A. Yes.
8  Q. How far was the restroom from the CC 3
9  unit?
10 A. This is critical care, I came around and
11 went through the door, which is actually closer to
12 up here (indicating), but through that door and
13 over here to this bathroom (indicating).
14 Q. Did anyone see you go in the bathroom?
15 A. I don't know.
16 Q. Did you say anything to anyone when you
17 went -- before you went into the bathroom?
18 A. No.
19 Q. Did you say anything to anyone when you
20 came out of the bathroom about the incident in CC
21 3?
22 A. No.
23 Q. Did you tell anyone that day what

439

1  happened?
2    A. I told my husband about it later, but I
3  don't think I told anybody at work, no.
4    Q. Did you tell anybody the next day what
5  happened in CC 3, outside of your husband?
6    A. I don't think so.
7    Q. I want to go back to the bathroom incident
8  for just a moment. On the diagram that we have,
9  and I'm going to go ahead and mark these.
10           MS. BASWELL-GUTHRIE: Off the
11       record.
12           (Whereupon, an off-the-record
13             discussion was had.)
14           (Whereupon, Defendants' Exhibit
15             22 was marked for
16             identification and attached
17             hereto.)
18           (Whereupon, Defendants' Exhibit
19             23 was marked for
20             identification and attached
21             hereto.)
22  BY MS. BASWELL-GUTHRIE:
23    Q. We're going to go ahead and mark a

440

1  drawing, Ms. Bennett, that you drew as Defendants'
2  Exhibit 22, which is just a general diagram about
3  the general treatment in critical care. And then
4  we're going to mark as Defendants' Exhibit 23 a
5  general diagram about CC 3.
6        I'm going to go back to Defendants'
7  Exhibit 22. On the bathroom incident, you have a
8  dotted line going from triage --
9    A. Two.
10   Q. Two. Thank you. Is that the path that
11  you took to go to the restroom, this dotted line?
12   A. On the incident that we're talking
13  about --
14   Q. On the bathroom incident.
15   A. Yes.
16   Q. The earlier bathroom incident.
17   A. Yes. Yes.
18   Q. Okay. Which was February 2nd, 2006, I
19  believe.
20   A. Yes.
21   Q. Okay. You had mentioned that Dr. Gaillard
22  was right outside of the bathroom when you opened
23  up the door. Do you know what path he took to get

441

1  to the bathroom?
2    A. No.
3    Q. From triage two, where is the closest door
4  to triage two that lets you back in this hallway
5  that runs --
6    A. There's not a door.
7    Q. -- to general treatment?
8    A. This is open.
9    Q. This is open on both sides?
10   A. Yes. Uh-huh.
11   Q. Okay.
12   A. On both of the triage areas. There's not
13  a door on either side.
14   Q. Is there a curtain?
15   A. No.
16   Q. Okay. All right. So it is possible then
17  that Dr. Gaillard could have come out of triage,
18  walked down the hallway that runs, I guess, in
19  front of what you're calling general treatment and
20  critical care down this hallway through this door
21  and into the bathroom that way (indicating);
22  correct?
23   A. Yes.

442

1    Q. Versus going the route that you went,
2  which is the dotted line we'll call it on
3  Defendants' Exhibit 22; is that correct?
4    A. Yes.
5    Q. And it's your position today that you do
6  not know anyone who saw Dr. Gaillard go from triage
7  two to walk over to the bathroom; correct?
8    A. I don't -- I don't know if Katrina saw him
9  walk up or not.
10   Q. Did she ever tell you she did?
11   A. No, and I didn't ask her.
12   Q. Okay. Has anybody else said they saw him
13  go to the bathroom from triage?
14   A. No.
15   Q. Okay. Is that bathroom a unisex bathroom?
16   A. Yes.
17   Q. From triage two, where is the closest
18  ladies' room only?
19   A. You have to go all of the way down the
20  main hallway all of the way through specialty
21  care. At the end of that hallway, take a left, and
22  on the right, there's a nurse's lounge. And
23  actually, that's a unisex bathroom.

443

```
 1    Q. And that's a unisex bathroom, too?
 2    A. Yes. You could use the one I guess the
 3  patients use.
 4    Q. Where is that one?
 5    A. It's always dirty. It's up the hallway.
 6    Q. If you came out of triage two, you would
 7  turn left?
 8    A. Yes.
 9    Q. That would be to the ladies' room only and
10  the men's room only?
11    A. I'm sorry. No.
12    Q. Okay. Is that a unisex, too?
13    A. That's unisex, too. I'm sorry. Out in
14  the waiting room is the ladies' room.
15    Q. Okay.
16    A. I'm sorry.
17    Q. The ladies' room only and the men's room
18  only is out in the waiting room --
19    A. Yes.
20    Q. -- is that right? Okay.
21    A. Now, if you go on this main hallway, if
22  you go two doors down, there's a doctors' lounge,
23  and they have a bathroom inside of there.
```

444

```
 1    Q. Let me just make sure that I understand
 2  that for purposes of your testimony. On Defense
 3  Exhibit 22, if you came out of triage two, you turn
 4  right, head towards your asterisk?
 5    A. Yes.
 6    Q. Keep heading that direction and --
 7    A. And you could come outside of this door
 8  (indicating), because this is the door that lets
 9  out into this main hall (indicating).
10    Q. So you'd go through this, we'll call this
11  D2, if you'll put a D2 there.
12    A. (Witness complies.)
13    Q. You're saying come down the hallway and go
14  through D2?
15    A. Yes.
16    Q. And then turn --
17    A. Left.
18    Q. -- left and keep going down that hallway?
19    A. Yes.
20    Q. Okay.
21    A. There's -- after you pass this door
22  (indicating), then there's a charge nurse door and
23  then there's another door. And that is actually
```

445

```
 1  the doctors' lounge. You actually have to enter a
 2  code to get in there.
 3    Q. Okay. I'm going to ask you to put
 4  doctors' lounge there, if you will.
 5    A. Okay. (Witness complies.)
 6    Q. DL for doctors' lounge. And on this next
 7  line before that, that was the charge nurse?
 8    A. Yes.
 9    Q. Is that what you said? Okay. And that's
10  the charge nurse station?
11    A. That's the office.
12    Q. Office? Okay.
13    A. My drawing is not very good.
14    Q. No. It's fine. I'm just trying to get my
15  bearings here.
16        I believe you stated in your testimony
17  last week that you were not mad at the hospital,
18  but you were disappointed about how the hospital
19  you contend handled the matter; is that correct?
20    A. Yes.
21    Q. Why have you not left and found another
22  job?
23    A. Because it's very convenient to my house.
```

446

```
 1  It's the hours that I need to work. The pay, no
 2  more than I'm having to spend on transportation
 3  because I live four blocks from my job.
 4    Q. Are you concerned that the hospital may
 5  not handle the matter the way you want them to
 6  again in the future?
 7    A. Yes. Actually, I am.
 8    Q. How concerned are you?
 9    A. To be quite honest with you, I assume that
10  if it happened again, it would be handled the same
11  way.
12    Q. But you're not leaving?
13    A. No.
14    Q. Since Dr. Gaillard left, have you looked
15  for another job?
16    A. No.
17    Q. So you've not submitted your résumés
18  anywhere?
19    A. No.
20    Q. Electronically or physically or by mail?
21    A. No.
22    Q. You had mentioned in your testimony last
23  week that once in awhile, you get on the chat room,
```