Case 5:06-cv-04777-CLS   Document 69-17   Filed 10/05/07   Page 1 of 10

Nina Bennett, Volume II

FILED
2007 Oct-05 PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

447

1  I call it a chat room, because I think that's what
2  you clarified it as last week, do you recall that
3  testimony?
4      A.  No, I don't because I don't get on a chat
5  room.
6      Q.  Okay.  Let me rephrase that then.  You had
7  mentioned a list of friends that you communicate on
8  the Internet with.
9      A.  Yes.
10     Q.  How do you communicate with them?
11     A.  On MySpace.
12     Q.  Are there any employees of Decatur General
13 that you communicate electronically through the
14 Internet with?
15     A.  Yes.  That was the list that I gave last
16 week.
17     Q.  Okay.  I'm going to try to read my
18 handwriting, which may be a challenge.
19         I've got a Tracy Garner, is that an
20 employee of Decatur General?
21     A.  Yes.
22     Q.  A Ms. Hardwick.
23     A.  Yes.

448

1      Q.  Is that an employee --
2      A.  Yes.
3      Q.  -- of Decatur General?  Shovana Rohan?
4      A.  Yes.
5      Q.  An employee?
6      A.  Yes.  You did good.
7      Q.  Stacy Herron?
8      A.  Yes.
9      Q.  She's an employee of Decatur General?
10     A.  Yes.
11     Q.  Cathey Beck?
12     A.  Yes.
13     Q.  An employee of Decatur General?
14     A.  Yes.
15     Q.  And a Jennifer Durham?
16     A.  Yes.
17     Q.  Okay.  And I do have one name here I
18 cannot read.  A Cindy something?
19     A.  Bice, B-i-c-e.
20     Q.  Is she an employee of Decatur General?
21     A.  Yes.
22     Q.  Have you ever told Cindy Bice any of the
23 incidents that you're alleging about Dr. Gaillard?

449

1      A.  No.
2      Q.  Have you ever talked to Tracy Garner about
3  any of the incidents that you're alleging about
4  Dr. Gaillard?
5      A.  Yes.
6      Q.  Okay.  What have you told her?
7      A.  I don't recall.  I know she had made some
8  statements back when he was still there about some
9  incidents that he had supposedly done.  And what
10 she said, I don't know, and I don't even think she
11 complained to anybody.
12     Q.  Did she tell you what she saw or heard?
13     A.  It was something to do with her, but
14 exactly what it was, I don't remember.
15     Q.  Okay.  Did you --
16     A.  I don't work with her a lot.
17     Q.  Okay.  Did you tell Ms. Hardwick about any
18 incidents --
19     A.  No.
20     Q.  -- concerning Dr. Gaillard?
21     A.  No.
22     Q.  Did you tell any incidents to Shovana
23 Rohan concerning Dr. Gaillard?

450

1      A.  She was -- she had actually told me an
2  incident of something that he had said to her.
3  None of these things were discussed on the
4  Internet.
5      Q.  What did Shovana tell you about
6  Dr. Gaillard?
7      A.  That she was working with him one day, and
8  she asked him was he having a bad day, and he asked
9  her what, and she asked him again, and he asked
10 her, why did she say that?  And she said, well, I'm
11 just trying to feel you out to see what kind of day
12 you're having.  And she said that he told her that
13 you can feel me up anytime you want to but here's
14 not the time or place.
15     Q.  Did she tell anybody at the hospital that
16 he supposedly said this?
17     A.  I don't know.
18     Q.  Do you know if she told anybody else about
19 that supposed incident?
20     A.  I don't know.
21     Q.  Do you know when this was supposed to have
22 happened?
23     A.  No, ma'am, I don't.

451

1  Q. Did she tell you about that incident after
2  the candy bar incident?
3  A. No.
4  Q. When did she tell you that?
5  A. That was -- that was -- that was before
6  the first time I went to human resources, the first
7  time -- before the first time I had talked to
8  Ms. Hudson and before I had talked to Karla Gray or
9  right about that same time.
10 Q. Okay.
11 A. It was before I talked to them.
12 Q. It was before the first incident that you
13 reported?
14 A. Yes.
15 Q. Have you had any conversations with Stacy
16 Herron concerning incidents of Dr. Gaillard?
17 A. No.
18 Q. How about Cathey Beck?
19 A. No.
20 Q. And Jennifer Durham?
21 A. No.
22 Q. Is there anyone else that you communicate
23 with electronically on the Internet who is an

452

1  employee or works with or for the hospital, other
2  than those individuals that you've just named?
3  A. Yes.
4  Q. Who else?
5  A. Debra Phillips.
6  Q. Okay.
7  A. Bea, and I don't -- I sorry, I think her
8  last name is Bal -- no. Her last name starts with
9  a B, I can't . . .
10 Q. What was her first name? Do you remember
11 her first name?
12 A. Bea, B-e-a.
13 Q. Oh, B-e-a. Okay. Bea.
14 A. Yeah. And I can't tell you exactly what
15 the last name is.
16 Q. Did you ever tell her about any incidents
17 concerning Dr. Gaillard?
18 A. No.
19 Q. Anyone else that you talked to
20 electronically on the Internet?
21 A. Maresio Garcia.
22 Q. Did you ever talk to Maresio?
23 A. No.

453

1  Q. Anyone else that you've spoken with who
2  works for or with the hospital on the Internet?
3  A. No. I don't think so.
4  Q. That's all that you can think of?
5  A. Yes. And I didn't discuss any of this
6  with anybody on the Internet.
7  Q. Okay.
8  A. The most we say about work on the Internet
9  is, I'll see you Friday, something to that nature.
10 Q. Do you ever do e-mails on the computers at
11 Decatur General?
12 A. No, I don't have a password to get on the
13 Internet at Decatur General.
14 Q. When you normally speak with your friends,
15 do you use your cell phone?
16 A. Yes. Or my home phone.
17 Q. What's your current cell phone number?
18 A. 621-0393.
19 Q. And you still don't recall your older cell
20 phone number at the time of 2005, 2006?
21 A. No. I'm sorry, I don't.
22 Q. That was with . . .
23 A. Corr Wireless.

454

1  Q. Corr Wireless. Thank you.
2  A. Yes.
3  Q. You had mentioned in your testimony that
4  there was someone at Crestwood that you thought had
5  information concerning behavior of Dr. Gaillard, do
6  you recall that testimony?
7  A. Yes.
8  Q. Do you know who that person is at
9  Crestwood?
10 A. No, I don't.
11 Q. Who told you about that?
12 A. I've had two people. I can remember who
13 one was, I can't remember the second person.
14 Q. Who was the first person?
15 A. LaTia Freeman.
16 Q. What did LaTia tell you?
17 A. That she knew someone at Crestwood and
18 that he had done the same thing at Crestwood.
19 Q. What did she mean by "the same thing"?
20 A. I guess she meant he had behaved the same
21 way.
22 Q. Did she tell you what that behavior was?
23 A. No.

455

Q. So when LaTia talked about Crestwood -- I just want to make sure for purposes of today and for trial, you do not recall specifically what she was saying had happened at Crestwood?
A. She didn't go into detail. All she said was that he had done the same thing at Crestwood. She did not go into detail.
Q. Did she say who those people involved?
A. No.
Q. Did she say when it would have happened?
A. She said when he was at Crestwood. I don't know when that was.
Q. Did LaTia Freeman used to work at Crestwood?
A. No. She said she had a friend there.
Q. Did she tell you who her friend was?
A. No.
Q. Is her friend still working at Crestwood?
A. I don't know.
Q. When is the last time you talked to LaTia Freeman about this lawsuit?
A. It's been a long time. I don't . . .
Q. When did she tell you -- when did you

456

first learn of a potential incident at Crestwood?
A. She had told me that a long time ago, and I really didn't pay any attention to it. And then someone else, and I'm trying to remember who it was, recently told me the same thing. And I'm trying to remember who told me.
Q. Well, did she tell you after the candy bar incident or before the candy bar incident?
A. After. It was after he was gone.
Q. It was after he was gone?
A. Yes.
Q. Are there any nurses at Decatur General who worked at Crestwood that you're aware of?
A. Not that I'm aware of, no.
Q. How would I get ahold of LaTia Freeman?
A. It's -- hold on. I don't do well with numbers. (The witness is reviewing her cell phone.)
Q. That's okay. I'm there.
A. 565-5765.
Q. Does she live in Decatur?
A. She lives in Athens.
Q. Is she married?

457

A. No.
Q. Is that her cell number?
A. Yes. She doesn't have a home phone.
Q. You had mentioned in your earlier testimony, I think from last week, there's a registered nurse by the name of Martha Potts.
A. Yes.
Q. Is she still at Decatur General?
A. Yes.
Q. What has she told you about Dr. Gaillard, if anything?
A. That she was standing at a bedside with him for a procedure. They were sewing on a patient, and he made some kind of comment about he -- they were -- something about kissing her. I'm not -- I don't remember exactly verbatim what she said -- what he had said to her. I'm sorry. Excuse me.
Q. What year did she tell you that?
A. 2005.
Q. Did she tell you that before the October 2nd, 2005, incident?
A. Yes. Or somewhere around, because when I

458

went -- when I met with Ms. Hudson and Karla Gray, I did tell them about that incident and the one with LaTia Freeman.
Q. You had mentioned in your testimony last week that somebody told you it was, quote, "a running pattern," do you remember saying that last week?
A. Do you recall what we were . . .
Q. You were talking about Dr. Gaillard's conduct, and I just wrote down "a running pattern" to question you on.
A. Do you have anything --
Q. Do you remember why you would have said that last week?
A. Do you have anything before that? I mean, that was a long day.
Q. Yeah, I know. That's okay. I believe we were talking about Dr. Gaillard's conduct, and you were being questioned on it. But let's see if I can get you some more specificity here. (Ms. Baswell-Guthrie is reviewing Nina Bennett's Volume I deposition transcript.)
   I'm going to quote from the earlier

459

1 deposition.
2    A. Okay.
3    Q. On page 9, line 4, it says, "Question:
4 "What have you heard about Dr. Gaillard's past
5 before Decatur General? Answer: I just -- I've
6 heard that this is a running pattern."
7       What did you mean by that?
8    A. That would have been in reference to the
9 Crestwood incident.
10   Q. The Crestwood incident that LaTia --
11   A. Yes.
12   Q. -- had mentioned to you?
13   A. Yes.
14   Q. Anything else --
15   A. No.
16   Q. -- that you would have been referring to?
17   A. No.
18   Q. You had mentioned that you had, I believe,
19 worked at Valley View?
20   A. Yes.
21   Q. And I apologize. Is Valley View a nursing
22 home or a --
23   A. Yes.

460

1    Q. -- hospital? It's a nursing home?
2    A. Yes.
3    Q. When did you work for Valley View?
4 Roughly what years?
5    A. Around 2001, 2002, somewhere around in
6 there, because I know I worked there before I
7 graduated as an RN, so . . .
8    Q. Okay. That's what --
9    A. And then afterwards --
10   Q. Okay. I apologize. Go ahead.
11   A. I was a LPN before I was a RN, so while I
12 was actually in school to be a RN, I started
13 working there, and I worked there after I had
14 graduated, so it's somewhere around 2001, 2002.
15   Q. Okay. And you had mentioned in your
16 earlier testimony, and I just want to clarify it
17 because I wasn't feeling real well that day, and I
18 apologize. I had heard you say that somebody else
19 had bothered you or harassed you while you were on
20 the job. Can you describe to me about that
21 incident again.
22   A. Actually, he had -- I had taken him into a
23 patient's room to show -- he was a maintenance man,

461

1 to show him -- the patient was complaining about
2 her bed, wanted a board under her mattress, and I
3 had taken him in the room. She said something to
4 me, I didn't hear her, so I bent down to hear what
5 she said, and he had touched my hair and made some
6 comment, and we had went to the administrator and
7 talked about that and resolved it.
8       He was later terminated I think for
9 stealing or something from the facility.
10   Q. Do you know what comment he made to you?
11   A. No, I don't remember.
12   Q. Did he touch your hair and then make a
13 comment or about the same time?
14   A. About the same time.
15   Q. You don't remember his name, do you?
16   A. Troy something.
17   Q. What color hair did he have?
18   A. It was kind of dark.
19   Q. Did you ever make a written report?
20   A. I don't know that they do a written
21 report, but we met with the administrator, we went
22 in the administrator's office and talked about it.
23   Q. Who is we?

462

1    A. Me, him, the administrator, and the
2 director of nursing.
3    Q. Did you ask Troy to go with you to talk to
4 the administrator?
5    A. No. I had went and talked to the
6 administrator, and he called a meeting, and we all
7 sat down and talked about it.
8    Q. Before you went to the administrator, did
9 you talk to Troy about it or tell him to not do it
10 again?
11   A. I said, don't touch me. Yes.
12   Q. What did he say?
13   A. He said, okay.
14   Q. My understanding, but I want to make sure
15 I'm remembering correctly. From last week's
16 testimony, you did prepare or assist in preparing,
17 I call it the PowerPoint concerning the in-service
18 meeting that was in November of 2005?
19   A. No, I didn't.
20   Q. Who prepared that?
21   A. I don't know. I attended it, but I don't
22 know who prepared it.
23   Q. Okay. Did you see the documentation that

463

1 was prepared before the in-service meeting?
2    A. No.
3    Q. Had you ever been in a harassment training
4 class or course before November of 2005?
5    A. I don't recall that. I don't know if we
6 went through something like that when we were hired
7 in or not, but I don't remember.
8    Q. Have you ever been through any type of
9 training course or class of any type of harassment,
10 employment harassment with any other prior
11 employers?
12    A. I don't recall doing that, no.
13    Q. There was testimony by you in the prior
14 deposition where you repeatedly stated throughout
15 that day that you believe the hospital had, quote,
16 "a zero tolerance policy," do you remember that?
17    A. Yes.
18    Q. What do you mean by that?
19    A. That's what their policy states, they have
20 zero tolerance. That's what . . .
21    Q. What do you think zero tolerance means in
22 your opinion?
23    A. No tolerance.

464

1    Q. In your opinion, I'm not trying to be
2 argumentative, what does no tolerance mean to you?
3    A. No tolerance to me means that if somebody
4 does do something, then one time you talk to them
5 about it, but then after that, you have no
6 tolerance for it, then that's the end of it.
7    Q. What did you mean by "the end of it"?
8    A. Well, we have a zero tolerance for
9 violence in the workplace, too. So I feel like if
10 I had done -- if I do a violent act, then -- well,
11 actually, I think I would probably be terminated on
12 the spot.
13    Q. So let me make sure. I'm not trying to
14 paraphrase you, I'm just trying to make sure that I
15 understand. In your opinion, zero tolerance policy
16 means that if an employee violates a policy
17 regulation, they should be terminated?
18    A. Yes. If that's what the zero tolerance
19 says, if that's what the policy says, zero
20 tolerance.
21    Q. They should be terminated on the first
22 alleged conduct?
23    A. Not necessarily, no.

465

1    Q. Well, then explain to me what you mean by
2 that.
3    A. That's what I'm saying. If on the first
4 time, if you discuss it with them, and then if they
5 repeat it, then, yes.
6    Q. Then they should be terminated at least by
7 the second alleged conduct?
8    A. Yes.
9    Q. Did you ever ask for a meeting to confront
10 Dr. Gaillard in person concerning his alleged
11 conduct?
12    A. No.
13    Q. If somebody accused you at Decatur General
14 of doing something that was a violation of the
15 policy, would you want the opportunity to talk to
16 that individual about what they said that you did
17 wrong?
18    A. I guess it would depend on what they said
19 that I had done.
20    Q. Okay. Well, let's say that another female
21 accused you of -- or another male accused you of
22 sexual harassment, would you want to confront that
23 person in person and talk with them about why they

466

1 thought that, if your job was on the line?
2    A. I guess so. If this were just me --
3    Q. I'm going to ask you to hold for just a
4 second. I apologize.
5       And I may have asked this before last
6 week, and I apologize if I'm repeating it, but I
7 just want to make sure that I cover it. Your
8 husband's name is what again on the record?
9    A. Derek Puryear.
10    Q. And if I remember correctly, you stated
11 that you had dated him off and on more regular than
12 nonregular from 2001 until when y'all got married;
13 is that correct?
14    A. Actually, it would be from '99.
15    Q. From '99. Okay.
16    A. Yes.
17    Q. I apologize. From 1999 through -- and
18 when did y'all get married?
19    A. August the 18th. What year is this?
20    Q. 2007.
21    A. 2006. We just had our anniversary.
22    Q. So from 1999 through August of 2006, who
23 else did your husband date during that time period?

467
1  A. I'm not sure.
2  Q. Well, I need you to think back.
3  A. I'm sure I probably don't know everybody
4  he dated.
5  Q. Okay. Fair enough. But who do you
6  recall?
7  A. Heather Atchley.
8  Q. Ashley, as in A-s-h --
9  A. Atchley, A-t-c-h-l-e-y.
10  Q. Who else did he date during that time
11  period? And let me say this: Date or had a
12  relationship, a physical relationship with during
13  that time: Either, or.
14  A. Michelle Webb.
15  Q. Who else?
16  A. I can't think of any other names.
17  Q. Did he ever date any other nurses during
18  that time period, whether they were LPNs, RNs, or
19  any other classification?
20  A. Not that I know of, no.
21  Q. Did he ever date anyone who worked with or
22  for Decatur General Hospital?
23  A. No.

468
1  Q. Was your husband ever engaged with anyone
2  prior to you?
3  A. He was married before me.
4  Q. I remember that in your earlier testimony,
5  but was he ever engaged and did not get married?
6  A. I don't think so.
7  Q. During the time when you -- well, let me
8  take that back because you're still working there.
9       During 2004 through 2006, did you ever
10  have a crush on someone that someone else at
11  Decatur General was seeing at the same time?
12  A. No.
13  Q. Did you ever have a crush on someone that
14  an employee or someone who was working at the
15  hospital was seeing that you were not seeing?
16  A. No.
17  Q. Do you ever recall between the years 2004,
18  2006 having any face-to-face harsh words or
19  arguments with another nurse at Decatur General?
20  A. No.
21  Q. Do you ever recall having harsh words or
22  an argument between 2004 and 2006 with any employee
23  or anyone who worked with or for Decatur General

469
1  Hospital?
2  A. No.
3  Q. On Defendants' Exhibit 23, where is the
4  air-conditioning vent?
5  A. Oh, I don't know.
6  Q. Are they in the ceiling or the floors?
7  A. They are in the ceiling.
8  Q. They're in the ceiling?
9  A. Yeah. But where exactly, I don't know.
10  It's always cold in there, though.
11  Q. Okay. And I believe this was asked
12  before, but I just want to get it on the record.
13       You don't have any tape recordings of you
14  and Dr. Gaillard?
15  A. No.
16  Q. And there are no Hallmark cards or any
17  type of cards between you or Dr. Gaillard?
18  A. No.
19  Q. And no e-mails between you or
20  Dr. Gaillard?
21  A. No.
22  Q. And no other written notes?
23  A. No.

470
1  Q. Okay. What type of computer do you have
2  currently in your home?
3  A. It's an Emachine.
4  Q. I don't even know what an Emachine is,
5  that tells you how computer literate I am.
6  A. I'm surprised it hasn't crashed. I've had
7  it for quite awhile.
8  Q. Okay. Is that the manufacturer?
9  A. Yes.
10  Q. Okay. How long have you had it?
11  A. Since about 2001 or 2002. The other one
12  had crashed, and I had to get a new one.
13  Q. And that one crashed prior to 2001?
14  A. Yes. Somewhere around there because I was
15  in nursing school and I had to have another
16  computer.
17  Q. What's your e-mail address?
18  A. It's nursenina01@yahoo.com.
19  Q. How long have you had that e-mail?
20  A. For probably -- I'm going to estimate
21  about four or five years. It's been awhile.
22  Q. Have you had any other e-mails other than
23  that e-mail from 2004 forward?

### 471

```
 1   A. Yes.
 2   Q. What other ones?
 3   A. Because I had one with BellSouth for a
 4  little while. I never did even use it. It's
 5  ninarn01.
 6   Q. Ninarn01?
 7   A. Yeah.
 8   Q. At bellsouth.net?
 9   A. Yes.
10   Q. Any other ones?
11   A. I think the one on AOL is still open, but
12  I don't ever go to it.
13   Q. Do you remember the address on it?
14   A. Yeah. It's Ninbenn, I let it make up the
15  name.
16   Q. N-i-n-b-e-n?
17   A. Yeah. Two Ns. Yeah. At AOL.
18   Q. Any other ones outside of those three?
19   A. No.
20   Q. Prior to the time that you married your
21  husband, who else did you date from 2001 to 2006,
22  date or physically were with?
23   A. Jonathan Green.
```

### 472

```
 1   Q. Does he live in Decatur?
 2   A. Yes.
 3   Q. Okay.
 4   A. Chuck Zanda.
 5   Q. Can you spell the last name for me?
 6   A. Z-a-n-d-a.
 7   Q. Where does he live?
 8   A. I think -- I don't know. I think he lives
 9  in Decatur. I'm not sure.
10   Q. Who else?
11   A. I had one date with Randy McDonald.
12   Q. Randy McDonald?
13   A. Uh-huh.
14   Q. Where did Randy live at that time?
15   A. Decatur.
16   Q. Do you know if he still lives in Decatur?
17   A. I don't know.
18   Q. Anyone else? Just from 2001 to present.
19   A. I know. I didn't date a lot, so I'm
20  trying --
21   Q. No. I didn't want you to go back prior --
22   A. I'm trying to make sure that I didn't
23  leave out a name or anything.
```

### 473

```
 1   Q. No. That's okay. I didn't want you to go
 2  back to like 1980, so . . .
 3   A. Jay Chesser.
 4   Q. Spell the last name for me.
 5   A. C-h-e-s-s-e-r.
 6   Q. Did he live in Decatur?
 7   A. No. Actually, he lives at Mallard Creek.
 8  He lives in Hillsboro.
 9   Q. Have you ever -- and I'm not going to get
10  much more personal than this. Have you ever dated
11  a married man before?
12   A. Yes.
13   Q. Who was that?
14   A. My daughter's dad. Him and his wife were
15  separated at the time.
16   Q. Anyone else?
17   A. No.
18   Q. You had mentioned in your testimony last
19  week that Dr. Gaillard would, I believe you said,
20  throw charts; is that stated correctly?
21   A. Yes.
22   Q. Can you recall some specific instances
23  where he did that?
```

### 474

```
 1   A. No. Not -- not -- to be real specific.
 2  It was after he had been talked to.
 3   Q. After the October 2005 incident?
 4   A. Yes.
 5   Q. Was anyone around to witness those charts
 6  flying or throwing?
 7   A. Yeah. I mean, it was happening on other
 8  shifts, not just our crew, because other people
 9  were talking about it.
10   Q. Who were the other people talking about
11  it? Give me some names.
12   A. Like Heather Garrison. I think even Penny
13  Davis had made a statement about his attitude with
14  them.
15   Q. Anyone else that you can recall about
16  throwing charts?
17   A. Candace Thomas. That's all that I can
18  think of right now.
19   Q. Okay. Did you ever personally observe
20  Dr. Gaillard ever throwing chairs or other objects
21  outside of charts?
22   A. He would just shove them. That's what he
23  would do, he would shove them.
```

Page 475

1  Q. Kind of push them?
2  A. Yeah. Really hard. He would just rare
3  back and just push them, whether it was a
4  wheelchair or chair or EKG machine or ...
5  Q. I've never worked in a medical field;
6  okay?
7  A. Okay.
8  Q. But I know in the legal field, it's always
9  very stressful. Okay. On a 1 to 10, how would you
10 rate stress for a RN at Decatur General?
11 A. At any given time or ...
12 Q. Yeah. That's true. Okay. Well, let's do
13 this --
14 A. It really depends on what's going on at
15 that time.
16 Q. Yeah. Well, based on shifts that you
17 have --
18 A. Yes.
19 Q. -- and based on the departments that you
20 work, how would you rate stress from a 1 to 10 at
21 Decatur General?
22 A. Between a 5 and a 6.
23 Q. Okay. What makes your job so stressful?

Page 476

1  A. Just the patients, you know. You can't
2  cure everybody, you can't save everybody.
3  Q. How frequently are you involved in an
4  emergency situation which would literally be a
5  spontaneous situation saving a patient's life: 10
6  percent of the time? 20 percent of the time? 5
7  percent of the time? Just roughly. I'm just
8  trying to get an idea, just gauge it.
9  A. At least one -- anywhere from one to three
10 times a shift.
11 Q. Okay.
12 A. Where that death was imminent?
13 Q. Yes.
14 A. Yes.
15 Q. Okay. So about one to three times a
16 shift?
17 A. Yeah. Every now and then, you get lucky
18 and you don't have any.
19 Q. We all understand those days. We pray for
20 those days.
21      Are you aware if Martha Potts ever dated
22 an employee or someone who worked with Decatur
23 General Hospital?

Page 477

1  A. I don't know.
2      MS. BASWELL-GUTHRIE: I think
3  that's it for now. Do you want to take a
4  break, or what do you want to do?
5      MS. WAUDBY: I've got a couple of
6  questions. It shouldn't take that long,
7  but if you want to go, whatever you want
8  to do.
9      MS. BASWELL-GUTHRIE: Do you need
10 to go, Richard?
11     MR. CRUM: No, I'm fine.
12     MS. WAUDBY: Do you need a break?
13     THE WITNESS: No, I'm fine.
14
15            EXAMINATION
16 BY MS. WAUDBY:
17 Q. I'm Sally Waudby. I represent Decatur
18 General Hospital. The last time your deposition
19 was being taken, David Middlebrooks was asking the
20 questions, and I'm batting cleanup for him.
21     Just a few questions.
22 A. Okay.
23 Q. I think at one point we were talking about

Page 478

1  that you went to a psychiatrist and you discussed
2  ADHD, and you were taking some sort of medicine for
3  that?
4  A. Yes.
5  Q. What's the medicine?
6  A. Concerta.
7  Q. How long have you been taking that?
8  A. Since -- since I went to him, that would
9  have been -- I'm not really sure when I went -- I
10 don't recall exactly when I started.
11 Q. All right. Let's do it this way: Were
12 you taking Concerta during the period of time that
13 you were working with Dr. Gaillard?
14 A. I had started taking it prior to that. I
15 was -- I had started taking that prior to --
16 returning to Decatur General full time.
17 Q. Okay. So you were taking it throughout
18 the period of time you were working with him?
19 A. Yes.
20 Q. We were talking a little bit earlier about
21 this maintenance man, Troy, that you had a
22 complaint with. Was that at Decatur General?
23 A. No. That was at Valley View.

479

1  Q. You mentioned that in 2001 and 2002, you
2  were taking Lexapro. You took it for about six
3  months to a year. Was there a particular event
4  that that was tied to, or what was going on that
5  led you to start taking Lexapro?
6  A. It was an anger issue that my doctor
7  thought that maybe I had some depression going on
8  because I had an anger issue.
9  Q. Was that ever tied into any particular
10 event, or was it just a manifestation of anger?
11 A. I'm sorry?
12 Q. Was that in response to like had there
13 been an issue going on in your life that was
14 causing the anger?
15 A. Yes. She thought it was related to maybe
16 my mom and my grandmother's death and that was
17 unresolved. But actually, I think it was stress
18 from my job, because I changed jobs and I felt
19 better.
20 Q. What were your jobs at that time?
21 A. I worked at Valley View, I was assistant
22 director of nursing, and we just had to be on call
23 and work a lot of 16-hour shifts, and people call

480

1  you all night long to ask like where this syringe
2  is.
3  Q. And then you went from Valley View, is
4  that when you went to Decatur General?
5  A. No. I left Valley View and went to
6  Carlton Cove.
7  Q. And that stopped your anger issues?
8  A. Yes.
9  Q. I think David asked this: Around the time
10 that these issues were going on with Dr. Gaillard,
11 did you go back to see a psychiatrist or counselor
12 or anything like that?
13 A. No.
14 Q. Did you go back on any kind of medications
15 like Xanax or Lexapro?
16 A. No.
17 Q. I think the physical manifestations of the
18 stress or the emotional distress that you were
19 suffering, I think you mentioned losing sleep,
20 crying, and I think there was a five-pound weight
21 loss or something like that. And when he asked you
22 if you had those type of symptoms at any other
23 time, the only issue that you mentioned were around

481

1  the time of your mother's death and your
2  grandmother's death.
3  A. Right.
4  Q. Had there been any other stressful times
5  in your life where you had similar symptoms?
6  A. Not that I can recall right off the top of
7  my head.
8  Q. The emotional distress that you suffered
9  as a result of Dr. Gaillard's conduct, can you
10 separate the emotional distress from his conduct
11 versus emotional distress that's naturally caused
12 by any lawsuit?
13 A. Yes, because I also was -- I went through
14 a phase of being very afraid. I had a gun, a can
15 of mace, a stick, all of this at my house just
16 based on the fact that he was -- to me -- now, I'm
17 going to say from my point of view. If I've been
18 warned at my job and I just continue to do
19 something to lose my job, then from where I'm
20 sitting, it looks like that you're just not -- you
21 have no worries like that anything is even going to
22 happen to you. Based on that, to me, then there's
23 no limit of what you will do.

482

1  So then I became just very afraid,
2  constantly looking over my shoulder. I did that at
3  work all of the time, looking over my shoulder, but
4  it made me scared even when I got home. That's why
5  I would not just drive straight home. I would
6  drive around before I ever went home, because my
7  house is just a straight shot from the hospital.
8  Q. During what period of time did those
9  feelings go on?
10 A. During -- from October and up through past
11 -- even after he was gone, for about a month after
12 he was gone.
13 Q. Okay. So after he did leave, those issues
14 with the fear, they did get better?
15 A. Yes.
16 Q. Did the losing sleep and the crying, did
17 those issues get better at some stage?
18 A. Yes.
19 Q. And you mentioned, I don't want to put
20 words in your mouth, around a month after he left
21 Decatur General, does that also apply to the crying
22 and the losing sleep?
23 A. Yes.

483

1  Q. Okay. Did he ever say or do anything to
2  indicate that he would contact you or come after
3  you after work?
4  A. No.
5      MS. WAUDBY: I think that's all I
6  have.
7
8            EXAMINATION
9  BY MR. CRUM:
10 Q. Ms. Bennett, I've been here at your
11 deposition now for almost two days and heard
12 everything that you've had to say, and I really
13 want to ask you this, I'm just going to come out
14 and ask it: Your complaints, as we've discussed,
15 resulted in Dr. Gaillard being terminated; right?
16 A. Right.
17 Q. Why isn't that enough? Why can't we
18 just --
19 A. Why did it take so long?
20 Q. So you're upset that it took awhile?
21 A. Yes.
22 Q. And you understand that Dr. Gaillard has
23 sued you?

484

1  A. Yes.
2  Q. You do understand that?
3  A. Yes.
4  Q. You understand you've got three attorneys
5  sitting here that if, in fact, you don't prevail in
6  this case, they're going to try to get their
7  attorneys' fees back and see what they can do about
8  that --
9  A. Yes.
10 Q. -- do you understand that?
11 A. Yes.
12 Q. Well, let me ask you about some of the
13 things I see in your records. You told her during
14 her questioning, I think, that you had not taken
15 any antidepressant medications except in 2000 and
16 2001.
17 A. I think that's about correct, yes.
18 Q. Okay. Well, but that's not true, is it,
19 because the psychiatric records clearly show you
20 were taking Lexapro for about a year prior to 2005?
21 A. I might have still had it, but I don't
22 recall taking it at the time. The exact dates, if
23 that's what it says, then maybe that's so, but the

485

1  exact dates on which I took it, I -- and I went and
2  saw him, I haven't seen -- I didn't see the
3  psychiatrist. Last time I saw him was way before I
4  ever went back to Decatur General, I don't . . .
5  Q. Let me just try to help you remember.
6  A. Go ahead.
7  Q. She asked you when you last took any
8  antidepressant medication, and this record says,
9  "Her primary care physician gave her Lexapro, which
10 she's been taking for one year without any
11 improvement." And that was July 21st of 2005,
12 Dr. Zieba. So the actual truth to the matter is
13 you had been taking Lexapro, which is an
14 antidepressant for about a year prior to July 21st,
15 2005; right?
16 A. If that's what it says. But I know when I
17 started taking it, but I didn't realize that I
18 was -- I don't recall taking it that long, but if
19 that's what it says, then I guess that is so.
20     I mean, I'm sitting here, I've been asked
21 questions now for hours on end for two days, and
22 it's hard to remember dates and everything off the
23 top of your head.

486

1  Q. But you understand that you need to tell
2  the truth?
3  A. Yes, sir. And I'm not trying to not tell
4  you the truth.
5  Q. And you filed a federal lawsuit against
6  the hospital and Dr. Gaillard and my client --
7  A. Yes.
8  Q. -- for these things that Dr. Gaillard said
9  to you.
10 A. Yes.
11 Q. The other thing I note throughout your
12 records, you claim that you were put on
13 administrative leave and at a lower amount of pay,
14 but that's not true, either. Clearly, you were not
15 put on administrative leave with a lower amount of
16 pay, you got paid the same; right? We've
17 established that?
18 A. Yes. Unless the -- I think the unit
19 differential was not on there, but other than
20 that.
21 Q. And when asked how you came up with a
22 million dollars as the alleged damages in this
23 case, I think that before you simply said to