## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NINA BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-06-S-4777-NE |
| | ) | |
| DECATUR GENERAL HOSPITAL, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This is an action seeking damages for a sexually-hostile work environment

("sexual harassment") under Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e *et seq.* ("Title VII")*,* with supplemental state law claims for assault

and battery, invasion of privacy, and outrage.  Plaintiff, Nina Bennett, asserts these

claims against the following defendants:  her employer, Decatur General Hospital

("Decatur General"); Appolomd Physician Services AL, LLC, d/b/a/ Emergency

Medical Management ("Appollomd"); and Dr. Henry Gaillard ("Gaillard").[1]

Defendant Gaillard asserts counterclaims for invasion of privacy, slander, and libel.[2]

The case presently is before the court on the following five motions: (1) Decatur

---

[1]Doc. no. 1 (Complaint).

[2]Doc. no. 17.

General's motion for summary judgment;[3] (2) Appollomd's motion for summary judgment;[4] (3) Gaillard's amended motion for summary judgment;[5] (4) Decatur General's motion to strike portions of plaintiff's affidavit;[6] and (5) plaintiff's motion to strike portions of Appollomd's initial summary judgment brief and reply brief, and the affidavit of Sally Mangel appended thereto.[7]

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[8]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and

---

[3]Doc. no. 64.

[4]Doc. no. 67.

[5]Doc. no. 90.  The court struck Gaillard's original brief in support of summary judgment for failure to comply with the requirements of Appendix II to the Uniform Initial Order.  *See* doc. no. 83 (order striking brief).

[6]Doc. no. 110.

[7]Doc. no. 127.

[8] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted).

## II. SUMMARY OF FACTS

Plaintiff, Nina Bennett, works as a nurse in the Emergency Department ("ED") at Decatur General Hospital.[9]  During all time periods relevant to this lawsuit, plaintiff's full-time work schedule consisted of twelve-hour shifts from 7:00 o'clock p.m. to 7:00 o'clock a.m. on Friday, Saturday, and Sunday nights.[10]

Dr. Henry Gaillard worked as a physician in the Decatur General ED during all

---

[9]Doc. no. 66 (Evidentiary Submission of Defendant Decatur General), Attachment 1 (Deposition of Nina Bennett), at 11, 56-57.

[10]*Id.* at 57; doc. no. 66, Attachment 3 (Affidavit of Karla Gray), at ¶ 2.

time periods relevant to plaintiff's claims.[11]  Gaillard was not an employee of Decatur General, however.  Instead, he was assigned to work at Decatur General by defendant Appollomd, a staffing company that had a contract with Decatur General to place doctors in positions in the ED.[12]  As a contract physician, Dr. Gaillard had no authority over plaintiff's employment with Decatur General.[13]  Another physician employed by Appollomd, Dr. Tracy Pool, supervised all of the Appollomd contract physicians working at Decatur General.[14]  The contract between Decatur General and Appollomd states, in pertinent part, that Appollomd "shall abide by any and all applicable federal and state equal employment opportunity statutes, rules and regulations including, without limitation, Title VII of the Civil Rights Act of 1964 . . . ."[15]

When plaintiff was hired by Decatur General in 2003, she received training on Decatur General's "Prohibition Against Harassment" policy.[16]  The policy states, in full, that:

---

[11]Gray Affidavit, at ¶ 4.

[12]*Id.* at ¶ 3.  The details of Dr. Gaillard's relationship with Appollomd — and, specifically, whether Dr. Gaillard was an employee or independent contractor with relation to Appollomd — are in dispute.  Resolution of that dispute is not necessary to this opinion, however.

[13]Gray Affidavit, at ¶ 4; Bennett Deposition, at 83-87.

[14]Gray Affidavit, at ¶ 4; doc. no. 66, Attachment 2 (Deposition of Karla Gray), at 25, 28.

[15]Gray Affidavit, Exhibit 1 (Professional Services Agreement), at 2, ¶ J.

[16]Bennett Deposition, at 70-73; Gray Affidavit, at ¶ 5.

Decatur General Hospital is committed to providing a workplace free of unlawful harassment, which includes harassment based on race, color, religion, sex, gender, national origin, age, or disability. Decatur General Hospital strongly disapproves of and will not tolerate harassment of employees by managers, supervisors, or co-workers. *Similarly, Decatur General will not tolerate harassment of its employees by non-employees with whom the hospital employees have a business, service, or professional relationship.* The Hospital's policy is that any form of harassment is completely unacceptable and will not be tolerated. Any employee who harasses another employee will be subject to disciplinary action up to and including termination of employment. It is the obligation of all directors, managers, supervisors, and employees of Decatur General to provide a work environment free of harassment. As part of this obligation, all employees are encouraged to report incidents of harassment, utilizing the complaint procedure below. Any employee who makes a complaint of harassment or provides information related to such a complaint or incident of harassment will be protected against retaliation.[17]

The policy also establishes the following complaint procedure for employees

who become victims of workplace harassment:

Any employee who believes that he or she is being harassed by a co-worker, supervisor, manager or other individual at the workplace (*whether employed by Decatur General Hospital or not*), or believes that his or her employment is being adversely affected by such conduct, should immediately report such concerns to his or her supervisor, manager or director. If you feel uncomfortable discussing the issue with your supervisor, manager, or director, you should promptly notify the Vice President of Human Resources.

After a complaint of harassment is received, a prompt and impartial investigation will be conducted and appropriate disciplinary

---

[17]Doc. no. 66 (Evidentiary Submission of Defendant Decatur General), Appendix 3 (Affidavit of Karla Gray), at Exhibit 2 (excerpt from Decatur General Hospital Administrative Policy Manual) (emphasis supplied).

action will be taken in the event the complaint is found to have merit. All complaints of harassment will be handled in a discreet manner and information will be limited to those personnel with a need to know. Managers who receive complaints or who observe harassing conduct should inform the Vice President of Human Resources. Decatur General emphasizes that an employee is not required to complain first to his or her supervisor. If it is determined that harassment has occurred, Decatur General will take prompt and appropriate corrective action. Decatur General also emphasizes that it will not tolerate retaliation against any employee for cooperating in an investigation or for making a complaint of harassment. If you believe you have been retaliated against for reporting harassment, or for making a complaint of harassment, or for participating in an investigation related to harassment, you should immediately report the alleged retaliatory action to the Vice President of Human Resources or a member of the Administrative Staff.[18]

A copy of the policy, along with the rest of the Decatur General Administrative Policy Manual, was kept in the ED.[19] Decatur General also required its employees to complete annual on-line compliance reviews of the hospital's policies, including the Prohibition Against Harassment.[20] Plaintiff acknowledges that she was aware of the anti-harassment policy, including the requirement that she report any harassment to the supervisors in her chain of command and/or to an appropriate Human Resources official.[21]

Sometime in 2005, plaintiff began to experience problems with Dr. Gaillard's

---

[18]*Id.*

[19]Bennett Deposition, at 72-73.

[20]Gray Affidavit, at ¶ 5.

[21]Bennett Deposition, at 73-74.

behavior toward her when they worked together.  At first, she informed Debra Phillips, her charge nurse, about the problems, but she specifically asked Ms. Phillips not to do anything about the situation.  On October 2, 2005, however, plaintiff decided she "couldn't take it anymore."  She left work in tears at the end of her shift, reported to Phillips that she was offended by Dr. Gaillard's conduct, and asked Phillips to take action.[22]  Phillips arranged for plaintiff to pass her complaint on to Pat Hudson, the Director of the ED.  After hearing plaintiff's complaint, Ms. Hudson arranged an appointment for plaintiff to speak with Karla Gray, the hospital's Director of Human Resources, on October 6, 2005.[23]

Before plaintiff met with Gray, she encountered Dr. Pool in the hospital hallway.  Dr. Pool pulled her aside and told her "to just unload on [Dr. Gaillard], just let him have it."[24]  Plaintiff understood that to mean that she should yell at Dr. Gaillard "or whatever."[25]  She responded that she couldn't do that because she would lose her job, but Dr. Pool assured her she would not.  Dr. Pool told plaintiff he would "check into" the situation, but he never got back to her about it.[26]

During plaintiff's October 6, 2005 meeting with Karla Gray, Gray informed

---

[22]Bennett Deposition, at 98-101.

[23]*Id.* at 101-04.

[24]*Id.* at 121.

[25]*Id.*

[26]*Id.* at 121-22.

plaintiff that Dr. Pool and Dr. Larry Sullivan, another supervisory physician employed by Appollomd, had already met with Dr. Gaillard and warned him that his behavior could not continue.[27]  Also during the October 6 meeting, plaintiff described to Gray several incidents that had occurred on October 2.  First, when plaintiff was caring for an uncooperative patient, Dr. Gaillard said to plaintiff, "Why don't you show him a little T & A?"  Another employee asked what Dr. Gaillard meant, and he responded, "Tits and ass."  He also told plaintiff to "lean across the patient and show a little cleavage and he'll be more inclined to cooperate."  He later indicated that plaintiff must have taken his advice when he learned that the patient had cooperated.[28]  That same evening, Dr. Gaillard made a comment about plaintiff's age.  Plaintiff told him that she was only thirty-nine, and he responded, "You must have had a hard life, rode hard and put away wet several times."  Plaintiff said, "no," and started to walk away, but Dr. Gaillard replied, "Just put up wet."[29]  Finally, when plaintiff was in the break area that evening, Dr. Gaillard told her, "Maybe someone should buy you a calendar so you can keep up with your cycle; that way you won't have to change your scrubs."[30]  Gray asked plaintiff if she would be able to work with Dr. Gaillard the

---

[27]Bennett Deposition, at 104-05.

[28]Gray Affidavit, at ¶ 7, and Exhibit 3.

[29]*Id.*

[30]*Id.*

upcoming weekend, and offered to allow plaintiff to be off on paid administrative leave, but plaintiff declined.  Plaintiff agreed to report any further unprofessional or retaliatory behavior to Gray.[31]

After her meeting with plaintiff, Gray spoke to Dr. Pool about Dr. Gaillard's conduct.  Dr. Pool acknowledged that he had already talked to Dr. Gaillard about the situation, and that Dr. Gaillard had agreed both to be more professional, and to apologize.  Gray reminded Dr. Pool to instruct Dr. Gaillard that retaliatory behavior would be unacceptable.  Gray also advised Hudson to follow up with plaintiff over the weekend and make sure no further inappropriate or retaliatory behavior occurred.[32]

From October 5 to October 14, 2005, Hudson interviewed three other nurses, Shavona Rohan, Laura Graham, and Candace Thomas, concerning Dr. Gaillard's behavior.  These nurses reported that Dr. Gaillard treated females differently and had "sexual tones to everything he said."[33]  Ms. Rohan reported that she once asked Dr. Gaillard if he was mad and told him she was just "trying to feel him out."  Dr. Gaillard responded, "Baby you can feel me up anytime but not here."[34]  Ms. Graham

---

[31]*Id.*

[32]*Id.*

[33]Doc. no. 66, Attachment 4 (Affidavit of Pat Hudson), Exhibit 1, at 1.

[34]*Id.*

stated that Dr. Gaillard tends to lean on people at the desk and pick on them, but she did not feel that any of his behavior was specifically directed at her.  Ms. Thomas said Dr. Gaillard had told her he wanted to run his fingers through her hair.  All of the women interviewed said Dr. Gaillard was difficult to work with, slow to see patients, and unwilling to listen to staff concerning patient care.[35]

Hudson also followed up with plaintiff on October 9 and October 17, 2005, in late November 2005, and on January 16, 2006, to determine whether she had experienced any further problems with Dr. Gaillard.  Plaintiff did not inform Hudson of additional problems on any of these occasions.[36]  Decatur General conducted an in-service training session on November 14, 2005, for the specific purpose of addressing workplace sexual harassment.  Decatur General also directed Appollomd to cover the issue with the contract employees it provided to the hospital.[37]

Plaintiff acknowledged in her deposition that Gaillard's behavior did improve for a period of time after her October 2005 complaint.[38]  During the weekend of January 20-January 23, 2006, however, plaintiff informed Debra Phillips that she was "still having problems with Dr. Gaillard."[39]  On January 24, 2006, Debra Phillips

---

[35]*Id.*

[36]Hudson Affidavit, at ¶ 5; Bennett Deposition, at 117-18.

[37]Bennett Deposition, at 75-76; Gray Deposition, at 29-33; Gray Affidavit, at ¶ 10.

[38]Bennett Deposition, at 117-19.

[39]Doc. no. 99 (plaintiff's evidentiary submission), Attachment 3 (Affidavit of Nina Bennett),

stated in a management meeting that plaintiff was "still having problems" with Dr. Gaillard.[40]  On February 13, 2006, Dr. Pool informed Hudson that he had heard reports of additional problems between plaintiff and Dr. Gaillard, and that the problems had escalated to the point that plaintiff might resign.  Hudson attempted to contact plaintiff over the next couple of days, but she was unsuccessful.[41]  On February 16, 2006, Hudson spoke with plaintiff, who informed her that Dr. Gaillard was sexually harassing her again.  Specifically, plaintiff reported that Dr. Gaillard had touched her on the back of the neck, told a patient's family member that he had a crush on plaintiff, told plaintiff he started to call her at home one day, told plaintiff his marriage was temporary, told plaintiff he blew up bridges rather than burning them, and waited for her one day after work.[42]  Plaintiff testified that she did not come forward about these incidents earlier because she believed nothing had been done in response to her prior complaints, as well as complaints lodged by other employees.[43]  Hudson passed plaintiff's complaints on to Gray, who met with plaintiff on February 23, 2006.

During their February 23 meeting, plaintiff informed Gray that Gaillard told

at ¶ 3.

[40]Hudson Affidavit, at ¶ 6; Gray Deposition, Exhibit 5, at 17.

[41]Hudson Affidavit, at ¶ 7; Gray Deposition, Exhibit 5, at 13.

[42]Hudson Affidavit, at ¶ 8.

[43]Bennett Deposition, at 147-49.

her that he liked a certain pair of her scrubs best because of the way they rode on her hips, and that he looked forward to getting to know plaintiff better after his divorce. She also complained that Dr. Gaillard told a patient's mother he had a crush on plaintiff, and that Dr. Gaillard gave her some chocolate bars around Valentine's Day and made a comment about getting the chocolate off her face.[44] Plaintiff also reported that she and a female co-worker walked into a unisex restroom to get away from Dr. Gaillard one day. Plaintiff had told the co-worker that she had something to show her in the restroom. When the two women exited the restroom, Dr. Gaillard was waiting on them outside the door and said, "Can I see?" Plaintiff replied, "no," and walked away.[45] Finally, plaintiff told Gray that Dr. Gaillard had touched her on two occasions. First, sometime in late January or early February, Dr. Gaillard walked up beside plaintiff and placed his hand on her hip. Plaintiff pushed Dr. Gaillard's hand away and walked away from him.[46] On another occasion, Dr. Gaillard stood behind plaintiff while she was holding a patient, moved her hair out of the way, and ran his hand up the back of her neck.[47] Plaintiff told Dr. Gaillard not to touch her and walked away.[48]

---

[44]*Id.* at 137-39, 387-90, 408-19; Gray Affidavit, at ¶ 12.

[45]*Id.* at 128-30, 395-98.

[46]*Id.* at 125-26.

[47]*Id.* at 126, 425-31.

[48]*Id.* at 126-27.

After the weekend falling nearest the Valentine's Day holiday in 2006, Dr. Gaillard did not engage in any other conduct that plaintiff found to be hostile or sexually offensive.[49] Dr. Gaillard never touched plaintiff again after she reported his conduct to Hudson and Gray in mid-February of 2006.[50]

After plaintiff's February 23 meeting with Gray, Decatur General rearranged plaintiff's work schedule so that she would never have to work in the same part of the ED as Gaillard. If Gaillard was the only doctor present during any given shift, plaintiff would be placed on administrative leave with pay.[51] Plaintiff acknowledged that she did not lose any rights, salary, or benefits as a result of this modified work schedule.[52] Despite their assignments to separate work areas, Gaillard entered plaintiff's work area on March 4, 2006 and stated, "there's the invisible Ms. Bennett." Ms. Hudson offered to have plaintiff talk to someone about the incident, but plaintiff declined.[53] On the day of the incident, Ms. Hudson informed plaintiff that Decatur General was making efforts to change Dr. Gaillard's schedule so that he and plaintiff would never work the same shifts at all.[54]

---

[49]*Id.* at 181-82.

[50]*Id.* at 157-58, 191.

[51]Bennett Deposition, at 140-46; Gray Affidavit, at ¶ 13.

[52]Bennett Deposition, at 224.

[53]*Id.* at 160-61.

[54]Hudson Affidavit, at ¶ 11; Gray Affidavit, at ¶ 14.

On March 9, 2006, Gray told plaintiff that Decatur General would no longer allow Dr. Gaillard to work at the hospital after the end of the month.  Until the end of March, plaintiff would never be required to work in the hospital at the same time as Dr. Gaillard.[55]  Plaintiff refused to accept that arrangement, and she told Gray that she would be satisfied only if Dr. Gaillard was immediately removed from the hospital.  The following day, March 10, 2006, Dr. Gaillard was removed from Decatur General's premises, and his contract to work at Decatur General was terminated.[56]  Plaintiff had no further contact with Gaillard after that date.[57]

On October 23, 2005, nurse Catherine Tipton filed a written complain with Pat Hudson, alleging that Dr. Gaillard was stalking her and making her feel uncomfortable.  On unspecified dates *after* Tipton made this complaint, Gaillard told her he wondered how she was in bed, said he wanted to have her legs wrapped around him, and grabbed her rear end.[58]  Tipton states in her affidavit that she met with both Pat Hudson and Karla Gray to "discuss[] this matter with them," but Hudson and Gray "did or said absolutely nothing to Dr. Gaillard" as a result of her complaint.[59]

---

[55]Gray Affidavit, at ¶ 15.

[56]Bennett Deposition, at 162, 166, 185; Gray Affidavit, at ¶ 15.

[57]Bennett Deposition, at 185.

[58]Doc. no. 99 (plaintiff's evidentiary submission), Attachment 4 (Affidavit of Catherine Tipton), at ¶¶ 3-4.

[59]*Id.* at ¶¶ 5-6.

It is not clear from Tipton's affidavit whether Tipton's meetings with Hudson and Gray concerned her October 23, 2005 complaint, or the conduct she alleges occurred *after* the October 23 complaint. Plaintiff testified, however, that Ms. Tipton did not lodge a second complaint until after plaintiff had lodged her own second complaint in mid-February of 2006.[60] There is no documentation regarding Tipton's complaint in the court record. Karla Gray states only that "Ms. Tipton's complaints about Dr. Gaillard did not indicate that he had engaged in any inappropriate or offensive conduct."[61]

On February 21, 2006 nurse Nina Birdsong informed Pat Hudson that Dr. Gaillard came up behind her and shoved her. Teresa Lackey (whose position at Decatur General is not specified in the record) informed Pat Hudson on the same day that, when Dr. Gaillard came in to work the night before, he shoved a chair across the hallway.[62] Sometime after plaintiff's February 23, 2006 meeting with Karla Gray, another Decatur General employee, Laura Graham, reported to Pat Hudson that Gaillard had told her that he "liked to watch pretty nurses work."[63] Two other employees, Letia Freeman and Martha Potts, complained to Dr. Pool about Dr.

---

[60]Bennett Deposition, at ¶ 133.

[61]Gray Affidavit, at ¶ 17.

[62]Gray Affidavit, Exhibit 5, at 19.

[63]Gray Affidavit, at ¶ 18; Hudson Affidavit, at ¶ 10.

Gaillard's conduct, but Dr. Pool did not share their complaints with anyone at Decatur General.[64]

### III.  DISCUSSION

**A.    Hostile Work Environment Sexual Harassment**

Plaintiff claims that Dr. Gaillard's conduct and comments created a sexually hostile work environment.  To succeed on this claim, plaintiff must show that:  (1) she belongs to a group protected by Title VII; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and (5) there is a basis for holding defendants responsible under a theory of either vicarious or direct liability.  *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000).

The first three elements of a *prima facie* case are not in dispute.  As a female, plaintiff belongs to a protected group.  *See Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman.").  Further,

---

[64]Gray Affidavit, at ¶ 19.

plaintiff was subjected to sex-based comments and behavior that she found unwelcome.  Defendants argue, however, that the fourth and fifth elements have not been satisfied.

1.      **"Severe or pervasive"**

The requirement that the alleged harassment be sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment contains both an objective and a subjective component.  To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993).  When evaluating the objective severity of offensive conduct, courts examine the totality of the circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g., Johnson,* 234 F.3d at 509 (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995).  It is not necessary to prove each of the factors individually.  Nevertheless, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's

employment, and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g., Faragher*, 524 U.S. at 788 (citations omitted).

Plaintiff and Gaillard both worked at Decatur General from August of 2005 to March 10, 2006, a period of approximately seven months. During that seven-month period, plaintiff endured the following fifteen incidents: (1) Gaillard told her she must have been rode hard and put up wet; (2) Gaillard commented that someone should buy her a calendar so she wouldn't have to change her scrubs; (3) Gaillard suggested that she show some cleavage to an uncooperative patient; (4) Gaillard said plaintiff must have taken his advice about showing cleavage when he learned the patient had cooperated; (5) Gaillard told plaintiff he liked a pair of her scrubs because of the way they rode on her hips; (6) Gaillard told a patient's mother that he had a crush on plaintiff; (7) Gaillard told plaintiff he started to call her at home one day; (8) Gaillard told plaintiff that his marriage was temporary; (9) Gaillard told plaintiff he blew up bridges rather than burning them; (10) Gaillard waited for plaintiff one day after work; (11) Gaillard said he looked forward to getting to know plaintiff better after his divorce; (12) Gaillard waited for plaintiff and a female co-worker outside a unisex bathroom and, when they came out, he said, "can I see?"; (13) Gaillard gave plaintiff some chocolate candy around Valentine's Day and made a comment about getting it off her face; (14) Gaillard put his hand on plaintiff's hip; and (15) Gaillard moved

plaintiff's hair out of the way and rubbed his hand up her neck.

The frequency of Gaillard's behavior falls somewhere near the middle of the continuum established by relevant case law. *Compare Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276 (11th Cir. 2002) (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent) *and Johnson,* 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent) *with Mendoza,* 195 F.3d at 1248-49 (holding that four incidents over an eleven-month period were insufficiently frequent)*, Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *and Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient).

Even so, the conduct plaintiff endured was not "pervasive," in that it was not constant and recurring, especially considering that the conduct ceased for approximately a three-month period of time, between late October of 2005 and late January of 2006. *See Faragher*, 524 U.S. at 787 n.1 ("[I]ncidents of environmental sexual harassment must be more than episodic; they must be sufficiently continuous

and concerted in order to be deemed pervasive.") (citation and internal quotation marks omitted); *Reeves v. C.H. Robinson Worldwide, Inc.,* 525 F.3d 1139, 1146 (11th Cir. 2008) (finding an actionable sexually hostile work environment when offensive conduct occurred *every day*).

Moreover, most of Gaillard's conduct cannot be considered severe.  Many of his comments — except for possibly the "rode hard" and "show some cleavage" comments — were not even overtly sexual, and he never propositioned plaintiff for sex.  Further, when Gaillard touched plaintiff, it was on her hip and neck, not on a more private area, and the touchings were unaccompanied by any offensive comments or sexual gestures.  These incidents fall below the standard for severity established by Eleventh Circuit precedent. *Compare Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 585 (11th Cir. 2000) (holding that two touching incidents — a hand on the plaintiff's knee and on the hem of her dress — were not severe when they were the only such incidents over a period of six or seven months, they were "only momentary," and they were not "coupled with any verbal suggestions or advances"; other non-severe conduct included the harasser:  telling the plaintiff she was beautiful, calling the plaintiff at home at night and on weekends, commenting on the promiscuity of people from the plaintiff's home nation, unzipping his pants to tuck in his shirt in plaintiff's presence, staring at the plaintiff twice, touching the plaintiff's

ring and bracelet once, and repeatedly asking the plaintiff to lunch), *and Mendoza,* 195 F.3d at 1249 (holding that the following conduct was not severe: "(1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's 'constant' following and staring at Mendoza in a 'very obvious fashion'"), *with Hulsey v. Pride Restaurants, LLC,* 367 F.3d 1238, 1248 (11th Cir. 2004) (harasser's conduct was severe when he often propositioned the plaintiff for sex; followed her into the restroom; repeatedly attempted to touch her breasts, place his hands down her pants, and pull off her pants; and enlisted the help of others to hold the plaintiff while he attempted to grope her); *Miller,* 277 F.3d at 1277 (race-based harassing comments were severe when they were made daily in an angry and intimidating manner); *Johnson,* 234 F.3d at 509 (severe conduct included the harasser giving the plaintiff unwanted massages, standing so close to her that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts).  The severity factor, therefore, weighs against plaintiff.

Plaintiff makes no argument that Gaillard's behavior was threatening.  Most of the allegedly harassing incidents could, however, be considered at least somewhat

humiliating, as they were directed specifically at plaintiff and occurred in the presence of patients or other hospital employees. *See, e.g., Reeves,* 525 F.3d at 1146-47 (exposure to "(1) the words 'cunt' and 'whore;' (2) vulgar references to sexual acts such as 'a woman's teeth on a man's dick' and 'fuck your sister;' and (3) conversations concerning ejaculation, men's erotic dreams, female sexual anatomy, sources and indications of female sexual arousal, and female pornography" was considered *humiliating*, but not physically *threatening*).  The humiliation factor, consequently, weighs in plaintiff's favor.

Finally, and importantly, plaintiff acknowledges that Gaillard's conduct did not unreasonably interfere with her job performance.[65]  She claims that Dr. Gaillard moved things around on a desk, but there is neither a reasonable explanation why those actions would possibly interfere with her job performance, nor any evidence that they actually *did* interfere.

Weighing all these factors together, and considering the totality of the circumstances, the court concludes that the most accurate way to characterize the

---

[65]*See* doc. no. 96 (plaintiff's brief in response to Decatur General's motion for summary judgment), at 25 ("[H]aving established the frequency, severity, and humiliating nature of the conduct, *Nina Bennett's failure to establish convincingly how Dr. Gaillard's conduct interfered with her duties* is not fatal to her hostile environment claim, given the totality of the circumstances.") (emphasis supplied).  Plaintiff did state that she left work crying one day, but she acknowledged that it was at the end of her shift.  *See* Bennett deposition, at 100 ("I started crying and I just left, because it was time to leave work anyway.").

harassing behavior plaintiff endured is "moderate." The allegedly harassing incidents occurred more than merely sporadically, but they cannot reasonably be said to have created an environment of *pervasive* sexual harassment, when compared to conduct addressed in other cases. Much of Gaillard's conduct was at least moderately humiliating, but it cannot be considered severe. Given that the preceding factors balance fairly evenly, the court would struggle in deciding whether to allow plaintiff's hostile work environment claim to go forward, if it were not for the complete lack of evidence with regard to the last factor. Despite the humiliating nature of much of Gaillard's behavior, and its moderate frequency, there was no unreasonable interference with plaintiff's ability to do her job. The lack of any proof of interference with plaintiff's job performance reinforces the court's conclusion that Gaillard's behavior was not severe, and diminishes the weight to be afforded the moderate frequency of the behavior. Stated differently, if Gaillard had subjected plaintiff to objectively severe, humiliating comments and behavior on a frequent basis, the court would expect to see proof of at least *some* interference with plaintiff's job performance.

In summary, considering the evidence presented as a whole, and particularly the lack of any interference with plaintiff's job performance, the court concludes that plaintiff did not suffer sexual harassment that was sufficiently severe or pervasive as

to alter the terms and conditions of her employment.  *See Faragher*, 524 U.S. at 788

("We have made it clear that conduct must be extreme to amount to a change in the

terms and conditions of employment. . . .").

### 2.    Employer Liability

Even if plaintiff could prove that she suffered harassment that was sufficiently

severe or pervasive as to alter the terms and conditions of her employment, her hostile

work environment claim still could not succeed, because there is no basis for holding

any of the defendants liable.

### a.    Dr. Henry Gaillard

Plaintiff named Dr. Gaillard as a defendant to all of her claims, including her

Title VII claim for sexual harassment.   The Eleventh Circuit has clearly held,

however, that

> [i]ndividual capacity suits under Title VII are . . . inappropriate.
> The relief granted under Title VII is against the *employer*, not individual
> employees whose actions would constitute a violation of the Act.  We
> think the proper method for a plaintiff to recover under Title VII is by
> suing the employer, **either** by naming the supervisory employees as
> agents of the employer **or** by naming the employer directly.

*Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (citations omitted)

(italicized emphasis in original, boldfaced emphasis supplied).  "The only proper

individual defendants in a Title VII action would be supervisory employees [who are

-24-

sued] in their capacity as agents of the employer." *Hinson v. Clinch County*, 231 F.3d 821, 827 (11th Cir. 2000). When *both* an employer *and* one of its employees are named as defendants, the presence of the individual defendant is unnecessary and the claims against him should be dismissed. *Leverette v. Alabama Revenue Dept.,* 453 F. Supp. 2d 1340, 1345 (M.D. Ala. 2006).

Plaintiff argues that her Title VII claim against Gaillard should not be dismissed because there is a fact dispute with regard to whether Gaillard was an employee or independent contractor of Appollomd. That dispute, if it does exist, is irrelevant to Gaillard's Title VII liability. If he was Appollomd's *employee,* then the Title VII claim against him should be dismissed, as discussed above. Plaintiff has provided no authority, and the court knows of none, to explain why the same result would not occur if Dr. Gaillard was found to be an *independent contractor*. Even if Dr. Gaillard was an independent contractor, he still would not be plaintiff's *employer* under Title VII. *See* 42 U.S.C. § 2000e(b) (defining an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . .").

Accordingly, Dr. Gaillard cannot be held individually liable on plaintiff's Title VII claims.

### b.    Decatur General

Decatur General also asserts that it cannot be held liable for Dr. Gaillard's behavior, relying upon the affirmative defense announced by the Supreme Court in *Faragher v. Boca Raton,* 524 U.S. 775, 807 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998), *i.e.,* "(a) that the employer [*i*] exercised reasonable care to prevent and [*ii*] correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

That formulation of the affirmative defense applies only to cases in which the alleged harasser is "a supervisor with immediate (or successively higher) authority over" the plaintiff.  *Ellerth,* 524 U.S. at 765.  In the present case, it is undisputed that Dr. Gaillard had no authority over plaintiff's employment.  Accordingly, plaintiff can hold Decatur General liable for Dr. Gaillard's actions if it either knew, or should have known, of the alleged harassment, but failed to take prompt and appropriate remedial action.  *See, e.g.*, *Faragher*, 524 U.S. at 799 (collecting cases); *Ellerth*, 524 U.S. at 759 ("Negligence sets a minimum standard for employer liability under Title VII."); *Watson v. Blue Circle, Inc*., 324 F.3d 1252, 1259 (11th Cir. 2003)("When . . . the alleged harassment is committed by co-workers or customers, a Title VII plaintiff

must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action.").

In this case, Decatur General clearly had knowledge of Gaillard's harassing behavior.  Plaintiff first complained about the behavior in October of 2005, and she complained again to Debra Phillips in late January of 2006, to Pat Hudson on February 16, 2006, and to Karla Gray on February 23, 2006.  Therefore, the question becomes whether Decatur General took prompt and appropriate action in response to plaintiff's complaints.

"[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint."  *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001) (citing *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir. 2000)).  Similarly, an employer's remedial measure is adequate if it is "reasonably likely to prevent the misconduct from recurring." *Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1305 (11th Cir. 2007) (internal quotation marks and citations omitted).

Plaintiff does not appear to argue that Decatur General failed to respond promptly and appropriately to her October 2005 complaint, and the court finds that Decatur General did react in a prompt and appropriate manner.  Within days of her

initial complaint, plaintiff received an audience with successively higher members of Decatur General's management, including Debra Phillips, her charge nurse, Pat Hudson, the ED Director, and Karla Gray, the Director of Human Resources. After plaintiff's meeting with Gray, Gray offered to allow plaintiff to take paid administrative leave instead of working with Dr. Gaillard during the upcoming weekend. Gray also advised plaintiff to report any further incidents to her, and plaintiff agreed. Gray subsequently spoke to Dr. Pool about Dr. Gaillard's conduct, and Dr. Pool assured her that he would advise Dr. Gaillard not to engage in any further harassing or retaliatory behavior. Hudson interviewed other nurses to determine if any of them experienced problems with Dr. Gaillard. Gray also advised Hudson to follow up with plaintiff on a regular basis to ensure no further harassing or retaliatory behavior occurred. Hudson did so on several occasions, from October of 2005 through January 16, 2006, but plaintiff reported no further problems. Finally, Decatur General conducted a special in-service training session on November 14, 2005, to address workplace harassment problems, and it directed Appollomd to cover the issue with the contract employees it provided to the hospital. *See Baldwin,* 480 F.3d at 1305-06 (holding that warning the alleged harasser, counseling both parties, and monitoring the situation constituted "a proper and adequate remedy, at least as a first step"). Importantly, plaintiff acknowledges that *Dr. Gaillard's behavior did*

*improve* after her initial complaint to her superiors in October of 2005.

Plaintiff does argue that Decatur General should have been on notice of Dr. Gaillard's harassing behavior because of complaints lodged by other nurses. Specifically, between October 5 and October 14, 2005, Pat Hudson interviewed Shavona Rohan, Laura Graham, and Candace Thomas, who reported that Gaillard treated females differently, employed sexual undertones in conversation, said Ms. Rohan could "feel [him] up anytime," leaned on people, told Ms. Thomas he wanted to run his fingers through her hair, was difficult to work with, was slow to see patients, and did not listen to staff members regarding patient care. Further, on October 23, 2005, Catherine Tipton complained that Dr. Gaillard had been stalking and harassing her. These reports cannot form the basis of Decatur General's liability. Decatur General first learned of these nurses' reports within a short period of time after plaintiff lodged her October 2005 complaint, and as the court has previously found, Decatur General took prompt and effective action in response to that complaint. Significantly, it is undisputed that Gaillard did not engage in any further harassing behavior *toward plaintiff* until late January of 2006.[66]

Additionally, on February 21, 2006, nurse Nina Birdsong complained to Pat Hudson that Dr. Gaillard shoved her, and Teresa Lackey complained that Dr. Gaillard

[66]The allegation that Decatur General did not take appropriate action in response to Tipton's complaint is, therefore, irrelevant to plaintiff's claims.

shoved a chair across the hallway.  On some unspecified date *after* February 23, 2006, Dr. Gaillard told Laura Graham that he "liked to watch pretty nurses work."  Plaintiff fails to explain, however, how these events form a basis for holding Decatur General liable for Dr. Gaillard's alleged sexual harassment of her.  It cannot reasonably be argued that Decatur General did not take prompt and appropriate action with regard to plaintiff's claim after learning of the complaints by Birdsong, Lackey, and Graham.  By February 23, 2006, Decatur General had arranged plaintiff's work schedule so that she would never have to work in the same part of the ED as Dr. Gaillard, and it allowed plaintiff to take administrative leave with full pay for any shift during which Dr. Gaillard was the only physician present.  After Dr. Gaillard did enter plaintiff's work area on March 4, 2006, Decatur General changed Dr. Gaillard's schedule so that he and plaintiff would never work at the same time at all.  Plaintiff informed Decatur General that this arrangement was not acceptable to her, and Decatur General removed Dr. Gaillard from the premises *the next day*.  It is undisputed that plaintiff had no further contact with Dr. Gaillard after he was removed from Decatur General's premises.

Finally, plaintiff argues that "Pat Hudson and Karla Gray . . . did not follow up on [her] January 2006 complaint to Debra Phillips."[67]  This allegation is belied by the

---

[67]Doc. no. 96 (plaintiff's brief in response to Decatur General's motion for summary judgment), at 28.

record.  Plaintiff complained to Debra Phillips, then she spoke to Pat Hudson, who passed her complaint on to Karla Gray.  In response, Gray took a series of actions that ultimately resulted in the termination of Dr. Gaillard's work arrangement at Decatur General.  Clearly, therefore, Hudson and Gray did more than just "follow up" on plaintiff's complaint.

A more serious question could be raised about Hudson and Gray's response is the amount of time that passed between the date on which she complained to Debra Phillips that Dr. Gaillard's behavior had reccurred, and the dates on which Hudson and Gray met with her about the complaint.  Plaintiff informed Phillips sometime during the weekend of January 20-23, 2006, that she still was having problems with Dr. Gaillard.  Debra Phillips passed that information along to Pat Hudson in a management meeting on January 24, 2006 — either the very next day, or, at least, within a matter of a few days.  Consequently, Decatur General had actual notice of plaintiff's recurring problems with Dr. Gaillard as of January 24, 2006.  Even so, plaintiff did not speak with Pat Hudson until February 16, 2006, twenty-three days later. Despite that delay, the court concludes that Decatur General's response still can be considered "prompt and effective."  The Eleventh Circuit has held that "an employer need not act instantaneously, but must act in a *reasonably* prompt manner to respond to the employee's complaint."  *Frederick*, 246 F.3d at 1314 (citing

*Madray*, 208 F.3d at 1302) (emphasis supplied).  Further, a court should not second-guess the details of an employer's investigation because "[a]ll that is required of an investigation is *reasonableness* in all of the circumstances."  *Baldwin,* 480 F.3d at 1304 (emphasis supplied).  Decatur General's response to plaintiff's January 2006 complaint might not have been *immediate*, but it was *reasonable,* especially considering that it undisputedly was effective.  *See Baldwin,* 480 F.3d at 1305 ("[E]ven if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the [*Faragher-Ellerth*] defense is still available if the remedial result is adequate.").  Plaintiff and Dr. Gaillard were immediately separated after plaintiff's February 23, 2006 meeting with Gray, and it is undisputed that no further harassing behavior occurred after the weekend of Valentine's Day 2006.  Dr. Gaillard was removed from the hospital, at plaintiff's request, on March 10, 2006, and plaintiff had no further contact with him after that date.  *See Walton v. Johnson & Johnson Services, Inc.,* 347 F.3d 1272, 1288 (11th Cir. 2003) (employer took effective remedial measures when it suspended the alleged harasser, ensured that the plaintiff never would have to work with him again, and ultimately discharged the alleged harasser); *Fleming v. Boeing Co.,* 120 F.3d 242, 247 (11th Cir. 1997) (employer took appropriate corrective action when it demoted the alleged harasser, decreased his pay, and assigned the plaintiff to a different

supervisor, and when the plaintiff experienced no further problems with the alleged harasser).

Because Decatur General took prompt and effective remedial action in response to plaintiff's reports of harassing behavior, it cannot be held liable for Dr. Gaillard's actions, even if plaintiff could state an actionable claim for sexual harassment.

### c.    Appollomd

Plaintiff argues that Appollomd waived the right to assert the *Faragher-Ellerth* defense because it "failed to raise the elements of the . . . defense in its Answer."[68] This court disagrees.  The Eleventh Circuit has held, albeit in an unpublished opinion, that a defendant does not waive the defense "by not referring to it by name in its Answer."  *Howard v. City of Robertsdale,* 168 Fed. Appx. 883, 886 n.3 (11th Cir. 2006).  Instead, because the *Faragher-Ellerth* defense involves the requirement that a plaintiff take appropriate action to avoid harm (*i.e.,* to mitigate her damages), the defendant's assertion of a general "failure to mitigate damages" defense is sufficient to raise *Faragher-Ellerth.  Id.* (citing *Pennsylvania State Police v. Suders,* 542 U.S. 129, 152 (2004)).  Appollomd alleged in its answer that "plaintiff has failed to

---

[68]Doc. no. 100 (plaintiff's brief in response to Appollomd's motion for summary judgment), at 16.

properly mitigate her alleged damages."[69]  Appollomd also alleged that "it breached

no duty or obligation of any kind to the Plaintiff."[70]  These allegations were sufficient

to give plaintiff "'notice of the affirmative defense and a chance to rebut it,' as

required by Fed. R. Civ. Pro. 8(c)."  *Howard,* 168 Fed. Appx. at 886 n.3 (quoting

*Grant v. Preferred Research, Inc.,* 885 F.2d 795, 797 (11th Cir. 1989)).

Plaintiff does not raise any *substantive* argument that Appollomd failed to take

appropriate action in response to her complaints.  Indeed, the record reflects that, each

time Dr. Pool learned of plaintiff's complaints about Dr. Gaillard, he took prompt

action that ultimately proved to be effective.  Within days of plaintiff's first complaint

in October of 2005, Dr. Pool discussed the situation with plaintiff and told her he

would check into it.  He and Dr. Sullivan also met with Dr. Gaillard and warned him

that his behavior could not continue.  It is undisputed that Dr. Gaillard's behavior *did*

improve until late January of 2006.  Dr. Pool became aware, at some point that is not

specified in the record, that Debra Phillips had heard reports of additional problems

between plaintiff and Dr. Gaillard, and he passed that information on to Pat Hudson

on February 13, 2006.  It is undisputed that no further harassing behavior occurred

after February 16, 2006.  Finally, Decatur General removed Dr. Gaillard from its

---

[69]Doc. no. 15 (Answer of Appollomd), at 6, ¶ 6.

[70]*Id.* at 6, ¶ 8.

premises the very next day after learning that plaintiff would not be satisfied with any

other solution.  There is no indication that Appollomd objected to or interfered with

this course of action.

In summary, there would be no basis for holding Appollomd liable for Dr.

Gaillard's behavior, even if plaintiff could support a claim for hostile work

environment sexual harassment.[71]

**B.    State Law Claims**

Plaintiff concedes that summary judgment should be granted on all of her state

law claims against Decatur General.[72]  She also concedes that summary judgment

should be granted on her state law claim for outrage against Appollomd.[73]  Those

claims will, therefore, be dismissed with prejudice.

The following claims remain: plaintiff's state law claims for assault and battery

and invasion of privacy against Appollomd; her state law claims for assault and

---

[71]Because Appollomd's prompt and appropriate remedial action shields it from liability on plaintiff's Title VII sexual harassment claim, the court need not consider Appollomd's other arguments, *i.e.,* that plaintiff sued the wrong defendant, and that Dr. Gaillard was an independent contractor instead of an employee.

[72]Doc. no. 96 (plaintiff's brief in response to Decatur General's motion for summary judgment), at 29 ("Plaintiff does not object to the Court granting the Summary Judgment Motion of Decatur General as to Count Two of the Complaint for Assault and Battery[,] . . . as to Count Three of the Complaint for Invasion of Privacy[,] . . . [and] as to Count Four of the Complaint for Outrage.").

[73]Doc. no. 100 (plaintiff's brief in response to Appollomd's motion for summary judgment), at 18 ("Plaintiff does not object to the Court dismissing Count IV of the Complaint - Outrageous Conduct.").

battery, invasion of privacy, and outrage against Dr. Henry Gaillard; and Dr. Gaillard's state-law counterclaims against plaintiff for false-light invasion of privacy, slander, and libel.  This court's jurisdiction over these claims is based upon the doctrine of supplemental jurisdiction, which dictates that, in cases where a federal district court's jurisdiction is based solely upon the presence of a federal question, the court also possesses the *discretion* to entertain state claims that are so related to the federal causes of action that they form a part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).[74]  The district court may, however, decline to exercise supplemental jurisdiction when:

> (1)  the claim raises a novel or complex issue of State law,
>
> (2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)  the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4)  in exceptional circumstances, there are other compelling reasons

---

[74] In full, this statutory subsection provides that:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every
> stage of the litigation, the values of judicial economy, convenience,
> fairness, and comity in order to decide whether to exercise jurisdiction
> over a case brought in that court involving pendant [now called
> "supplemental"] state-law claims.

*Id*. at 349-50 (bracketed text supplied) (citing *United Mine Workers of America v.*

*Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law

claims are eliminated before trial, the balance of factors to be considered under the

pendent [now supplemental] jurisdiction doctrine — judicial economy, convenience,

fairness, and comity — will point toward declining to exercise jurisdiction over the

remaining state-law claims."  *Carnegie-Mellon*, 484 U.S. at 350 n.7.

Here, the court has dismissed the sole federal claim over which it had original

jurisdiction.  The court declines to exercise supplemental jurisdiction over the

remaining state law claims, which will be dismissed, but without prejudice to

plaintiff's right to refile them in an appropriate state court.

## C.    Motions to Strike

### 1.    Decatur General's motion to strike plaintiff's affidavit

Decatur General moved to strike certain portions of plaintiff's affidavit that

directly contradict her prior deposition testimony.  *See Rollins v. TechSouth, Inc.*, 833

F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S.*

*Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)) ("[A] party cannot give 'clear

answers to unambiguous questions' in a deposition and thereafter raise an issue of

material fact in a contradictory affidavit that fails to explain the contradiction.").

Specifically, Decatur General challenges plaintiff's statement that, during her January

20-23, 2006 weekend shift, she voiced complaints about Dr. Gaillard's continued bad

behavior to Debra Phillips.[75]  Plaintiff repeatedly stated in her deposition that she did

not complain about the "second round" of Dr. Gaillard's harassing behavior until

*February* of 2006.[76]  This discrepancy is of little consequence, and does not convince

the court that plaintiff's affidavit is a mere sham.  Regardless of whether plaintiff first

lodged a complaint about Dr. Gaillard's recurrent harassing behavior between January

20 and 23, 2006, or whether she waited until sometime during the month of February

2006, it is clear that Decatur General had *notice* of recurrent harassment by January

---

[75]*See* Bennett Affidavit, at ¶ 3.

[76]*See* Bennett Deposition, at 117 ("I reported it in February."), 122 (acknowledging that she complained to Debra Phillips, Pat Hudson, and Karla Gray "some time in February of '06"), 131-32 (Q: "So we're into February and, again, up until this point, you had not gone back to Pat Hudson, or Debra Phillips, or Karla Gray?"; A: "Correct."), 133-34 (Q: "So, from the first week of October until February 16th, you had made no complaints to anybody in the chain of command; is that true?"; A: "True."), 150-51 (Q: "Let me repeat it and make sure I do.  You haven't changed your testimony from October to that meeting in February you didn't come forward and complain."; A: "Right."; Q: "And when asked in that interview if there were any problems you didn't report any."; A: "Right.").

24, 2006. Pat Hudson gave sworn affidavit testimony that Debra Phillips informed her on that date that plaintiff might be having continuing problems with Dr. Gaillard. It is Decatur General's *notice* of any alleged harassment that triggers its responsibility to react in a prompt and reasonable manner, regardless of whether that notice came from plaintiff herself or from another individual. Further, as discussed above, even if Decatur General did have notice of recurrent harassing behavior by January 24, 2006, it still took reasonably prompt and effective action to remedy the problem. Accordingly, Decatur General's motion to strike plaintiff's affidavit will be denied.

### 2.   Plaintiff's motion to strike portions of Appollomd's initial summary judgment brief and reply brief, and the affidavit of Sally Mangel

Plaintiff requests the court to strike portions of Appollomd's initial summary judgment brief and reply brief, and the affidavit of Sally Mangel, all of which address issues related to Dr. Gaillard's status as an independent contractor or employee of Appollomd. The resolution of the defendants' motions for summary judgment has not required the court to decide whether Dr. Gaillard was an independent contractor or employee. Consequently, plaintiff's motion to strike will be denied as moot.

### IV.  CONCLUSION

In accordance with the foregoing, Decatur General's motion for summary judgment will be granted, and all of plaintiff's claims against Decatur General will

-39-

be dismissed with prejudice. Appollomd's motion for summary judgment will be granted in part. Plaintiff's Title VII sexual harassment and state law outrage claims against Appollomd also will be dismissed with prejudice. The court will decline to exercise supplemental jurisdiction over plaintiff's remaining claims against Appollomd for assault and battery and invasion of privacy, and those claims will be dismissed without prejudice. Dr. Henry Gaillard's motion for summary judgment also will be granted in part. Plaintiff's Title VII sexual harassment claim against Gaillard will be dismissed with prejudice. The court will decline to exercise supplemental jurisdiction over all of plaintiff's state law claims against Gaillard — *i.e.,* those for assault and battery, invasion of privacy, and outrage — and those claims will be dismissed without prejudice. The court also will decline to exercise supplemental jurisdiction over all of Gaillard's state-law counterclaims against plaintiff — *i.e.,* those for false-light invasion of privacy, slander, and libel — and those counterclaims will be dismissed without prejudice. Decatur General's motion to strike portions of plaintiff's affidavit will be denied, and plaintiff's motion to strike portions of Appollomd's initial brief in support of summary judgment, reply brief, and evidentiary submission will be denied as moot. An appropriate order will be entered contemporaneously herewith.

DONE this 13th day of June, 2008.

United States District Judge